Gretchen M. Nelson (112566)
gnelson@kreindler.com
KREINDLER & KREINDLER LLP
707 Wilshire Boulevard, Suite 4100
Los Angeles, CA 90017-3613
Telephone:  213-622-6469
Facsimile:  213-622-6019

*[Additional Counsel Appear on Signature Page]*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| SHAWN ROBERTS, ET AL.,<br><br>                    Plaintiffs,<br><br>        v.<br><br>ELECTROLUX HOME PRODUCTS, INC.<br><br>                    Defendant. | Master File No. CV12-1644-CAS(VBKx)<br><br>CLASS ACTION<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>The Honorable Christina A. Snyder |
| This Document Relates to All Actions | |

Plaintiffs Shannon Carty ("Carty"), Steven Gavic ("Gavic"), Matthew Downs ("Downs"), and Michelle McGowan ("McGowan") (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Electrolux Home Products, Inc. ("Electrolux" or "Defendant").  The following allegations are based upon personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to the acts of others.

## NATURE OF THE ACTION

1.     From at least the mid-1990s, Electrolux designed, manufactured, marketed, and sold throughout the United States, including in California, Illinois, Missouri, and New York, millions of gas and electric clothes dryers for residential use having a common ball hitch design (hereinafter referred to as the "Dryers" or "ball hitch Dryers") having uniform and dangerous defects ("the Defects") that cause these Dryers to catch fire, fail, char clothes, and spread any fire outside the Dryers, thereby damaging property and creating a serious safety risk to consumers and the public.  Defendant manufactured and sold these ball hitch Dryers under various brand names including, but not limited to, Electrolux, Kenmore, and Frigidaire.

2.     The Defects render the Dryers unsafe for use in consumers' homes.

3.     At all times relevant, Electrolux knew, or should have known, of the Defects which rendered its Dryers unsafe and of the substantial safety risk its Dryers posed to consumers and the public.  For example, testing Electrolux conducted in 1998 established that its defective Dryer design permitted a fire to quickly spread outside the Dryer cabinet, but Electrolux did nothing to remedy this safety hazard.  Also, from at least 2000 onward, Electrolux processed *thousands* of claims of dryer fires, conducted an internal investigation of the Defects, hired outside engineers to investigate the Defects, and litigated hundreds of cases involving the Defects throughout the United States.

4.     Nevertheless, Electrolux chose to sell millions of these dangerous and defective Dryers to consumers, all the while doing nothing to warn consumers of the serious safety risks its products posed or changing the design of its unsafe product.

5.     Instead, Electrolux hid its knowledge of the Defects and the Dryers' substantial safety risks from the public, and did nothing to retrofit or remove its

1   defective and dangerous Dryers from households across the country, thereby

2   putting consumers throughout the country at a serious risk of household fires,

3   personal injury and property loss.

4         6.     In short, Electrolux sold Dryers to consumers that it knew, or at the

5   very least should have known, were defective and unsafe, and it concealed

6   information about the Defects from consumers and the public in order to facilitate

7   sales and reap significant financial benefits.

8         7.     As a direct and proximate result of Electrolux's concealment of the

9   Defects, its failure to warn its customers of the Defects and the safety risks posed

10  by the Dryers, and its failure to remove the defective Dryers from consumer's

11  homes or otherwise remedy the Defects, Plaintiffs purchased Electrolux's defective

12  and unsafe Dryers.

13        8.     As a result of the Defects, Plaintiffs' Electrolux Dryers caught on fire,

14  placing Plaintiffs at a serious risk of injury.

15        9.     Class members' Dryers contain the same Defects and pose the same

16  substantial risks to the safety of consumers and the public.

17       10.    Had Plaintiffs and class members known of this serious safety risk,

18  they would not have purchased the Dryers or would have paid substantially less for

19  their Dryers than they paid.

20       11.    Because of Electrolux's concealment of the Defects, Plaintiffs and

21  class members paid for a product that could not be used for its intended purpose of

22  safely drying clothes and posed a serious safety risk to consumers and the public.

23       12.    Because of Electrolux's concealment of the Defects, Plaintiffs and the

24  proposed Property Damage Subclass members incurred property damage.

25                      **PARTIES**

26       13.    Plaintiff Shannon Carty is a citizen of California and resides in Chino,

27  California.  On or about 2007, Ms. Carty purchased an Electrolux Dryer in

28

California under the brand name Frigidaire. Her Dryer caught fire on September 6, 2012.

14.     Plaintiff Steven Gavic is a citizen of Illinois and resides in Rockford, Illinois. On or about January 2009, Mr. Gavic purchased an Electrolux Dryer in Illinois under the brand name Frigidaire. His Dryer caught on fire on November 18, 2012.

15.     Plaintiff Matthew Downs is a citizen of Missouri and resides in St. Louis, Missouri. On or about December 2006, Mr. Downs purchased an Electrolux Dryer in Missouri. His Dryer caught fire on July 9, 2012.

16.     Plaintiff Michelle McGowan is a citizen of the State of New York and resides in Staten Island, New York. On or about April 14, 2009, she purchased an Electrolux Dryer in New York under the brand name Frigidaire. Her dryer caught fire the morning of March 10, 2012.

17.     Defendant Electrolux is a Delaware corporation with its principal place of business at 10200 David Taylor Dr., Charlotte, North Carolina 28262.

18.     At all times relevant hereto, Electrolux was in the business of distributing, marketing, promoting, and selling the Dryers described herein.

19.     At all times relevant hereto, Electrolux did in fact design, promote, and market the Dryers described herein.

20.     Upon information and belief, at all times relevant, Electrolux was engaged in the business of designing, manufacturing, and distributing the Dryers throughout the United States, including in this jurisdiction. Electrolux does substantial business in California, with a significant portion of the proposed National Classes located in California.

21.     Defendant Electrolux engages in a continuous course of business in California, including selling the Dryers described herein in California; distributing products, including the Dryers, in California; selling and advertising products,

1   including the Dryers, on the Internet and through other media in California; and

2   servicing its products, including the Dryers, in California.

3       22.    Defendant has substantial and continuing contacts with California,

4   expects that its products, including the Dryers, will be purchased in California, and

5   committed tortious acts in California.

6       23.    A significant portion of the members of the proposed National Classes,

7   and all of the members of the proposed California Classes, are located in California

8   or purchased their Dryer in California.

9                   **JURISDICTION AND VENUE**

10      24.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §

11   1332(d)(2), as the amount in controversy exceeds $5,000,0000, exclusive of interest

12   and costs, and at least one member of the class is a citizen of a State different from

13   Electrolux.

14      25.    This Court also has jurisdiction under 28 U.S.C. § 1332(a) as Plaintiffs

15   and Defendant Electrolux are citizens of different States and the amount in

16   controversy exceeds $75,000.

17      26.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as

18   Electrolux does substantial business in this District, including selling the products

19   at issue, and Plaintiff Carty's claims arise from damages sustained in California and

20   this District as a result of Defendant's defective design.

21                  **FACTUAL ALLEGATIONS**

22      27.    Upon information and belief, Electrolux is engaged in the business of

23   designing, manufacturing, warranting, marketing, advertising and selling the Dryers

24   labeled under a variety of brand names, including Electrolux, Kenmore, and

25   Frigidaire.

26      28.    All Dryers sold under the various brand names and model numbers

27   which feature a drum that rotates around a fixed rear axis (or a "ball hitch" design

28

-5-

1   as commonly known in the home appliance and dryer industry) have the same

2   uniform Defects.

### Plaintiff Shannon Carty

3   

4       29.    In or around 2007, Plaintiff Shannon Carty purchased one of the

5   Dryers designed, manufactured and sold into the stream of commerce by Electrolux

6   under the brand name Frigidaire.

7       30.    Like all class members, Ms. Carty purchased her Dryer believing that

8   it was properly designed, manufactured, and safe to use in the home.

9       31.    This Dryer was used for its intended purpose of safely drying laundry

10   in a manner reasonably foreseeable by Electrolux and was being used for its

11   intended purpose of safely drying laundry on September 6, 2012.

12       32.    On September 6, 2012, Ms. Carty's Dryer caught fire and the fire

13   spread to her home as a direct and proximate result of the Defects known to and

14   concealed by Electrolux that are described in this Complaint.

15       33.    The fire caused and allowed to spread outside the dryer cabinet by the

16   Defects not only rendered Ms. Carty's Dryer unusable but caused extensive

17   property damage, including but not limited to personal property.  In addition, Ms.

18   Carty's son and mother had to be transported to the hospital via ambulance as the

19   result of smoke inhalation.

20       34.    After the fire, Electrolux was contacted and the fire reported.

21       35.    Despite being placed on notice that a fire that had occurred in Ms.

22   Carty's Dryer, Electrolux has never replaced, retrofitted or repaired Ms. Carty's

23   Dryer to remedy the Defects.

### Plaintiff Steven Gavic

24   

25       36.    On or around January, 2009, Plaintiff Steven Gavic purchased one of

26   the Dryers designed, manufactured and sold into the stream of commerce by

27   Electrolux under the brand name Frigidaire.

28   

-6-

37.    Like all class members, Mr. Gavic purchased his Dryer believing that it was properly designed, manufactured, and safe to use in the home.

38.    This Dryer was used for its intended purpose of safely drying laundry in a manner reasonably foreseeable by Electrolux and was being used for its intended purpose of safely drying laundry on November 18, 2012.

39.    On November 18, 2012, Mr. Gavic's Dryer caught fire in his home. Plaintiff's Dryer caught on fire as a direct and proximate result of the Defects known to and concealed by Electrolux that are described in this Complaint.

40.    The fire caused by the Defects destroyed Plaintiff's Dryer and rendered it unusable.

41.    After the fire, Electrolux was contacted and the fire reported.

42.    Despite being placed on notice that a fire that had occurred in Mr. Gavic's Dryer, Electrolux has never replaced, retrofitted, or repaired Mr. Gavic's Dryer to remedy the Defects.

### Plaintiff Matthew Downs

43.    In or around December 2006, Plaintiff Matthew Downs purchased one of the Dryers designed, manufactured, and sold into the stream of commerce by Electrolux.

44.    Like all class members, Mr. Downs purchased his Dryer believing that it was properly designed, manufactured, and safe to use in the home.

45.    Mr. Downs owned a condominium residence which was leased to tenants for residential use. Those tenants used this Dryer for its intended purpose of safely drying laundry in a manner reasonably foreseeable by Electrolux and did so on July 9, 2012.

46.    On July 9, 2012, Mr. Downs's Dryer caught fire, causing property damage in the condominium residence owned by Mr. Downs where tenants were residing. Plaintiff's Dryer caught on fire and the fire spread outside the Dryer as a

1  direct and proximate result of the Defects known to and concealed by Electrolux

2  that are described in this Complaint.

3      47.    The fire caused by the Defects not only rendered Plaintiffs' Dryer

4  unusable but caused property damage.

5      48.    After the fire, Mr. Downs contacted Electrolux and reported the fire.

6      49.    Despite being placed on notice that a fire had occurred in Mr. Downs'

7  Dryer, Electrolux has never replaced, retrofitted or repaired Mr. Downs' Dryer to

8  remedy the Defects.

9                    **Plaintiff Michelle McGowan**

10     50.    In or around April 2009, Plaintiff Michelle McGowan purchased one

11  of the Dryers designed, manufactured, and sold into the stream of commerce by

12  Electrolux under the brand name Frigidaire.

13     51.    Like all class members, Ms. McGowan purchased her Dryer believing

14  that it was properly designed, manufactured, and safe to use in the home.

15     52.    Ms. McGowan used this Dryer for its intended purpose of safely

16  drying laundry in a manner reasonably foreseeable by Electrolux and did so on

17  March 10, 2012.

18     53.    On March 10, 2012, Ms. McGowan's Dryer caught fire in her home.

19  Plaintiff's Dryer caught on fire and spread outside the Dryer as a direct and

20  proximate result of the Defects known to and concealed by Electrolux that are

21  described in this Complaint.

22     54.    The fire caused by the Defects destroyed Plaintiff's Dryer and

23  rendered it unusable and resulted in, among other things, damage to personal

24  property, property replacement costs, and costs associated with clean-up.

25     55.    After the fire, Electrolux was contacted and the fire was reported.

26     56.    Despite being placed on notice that a fire that had occurred in Ms.

27  McGowan's Dryer, Electrolux has never replaced, retrofitted, or repaired Ms.

28  McGowan's dryer to remedy the Defects.

-8-

## Facts Common to the Class

57. All class members' Dryers possess the same dangerous Defects which necessitate replacement of the Dryers.

58. Members of the Property Damage Classes also suffered property damage as a result of the Defects.

59. By the time Plaintiffs purchased their Dryers, and at the time the Plaintiffs' Dryers caught fire in their homes, Electrolux knew or should have known for over a decade, of the Defects and the serious safety risks the Dryers posed to the public, but it opted to remain silent and conceal evidence of the Defects, and its knowledge of the Defects, from the public and consumers who had either purchased or were considering purchasing the Dryers.

60. Like Plaintiffs, class members also purchased the Dryers designed, manufactured, and sold into the stream of commerce by Electrolux, and used the Dryers for their intended purpose of safely drying laundry in a manner reasonably foreseeable by Electrolux.

61. Like Plaintiffs, class members' Dryers had the same dangerous Defects that posed a substantial safety risk during normal use.

62. Electrolux knew, or should have known, of the Defects and hid from the public the serious safety risks posed by its Dryers, all the while selling millions of Dryers for use in the homes of consumers.

63. Electrolux knew or should have known of the Defects, as Electrolux did testing that showed its Dryer design was defective, processed thousands of dryer fire claims every year, and, based upon information and belief, regularly and systematically denied liability or responsibility for those Dryer fires.

## The Defects

64. The Dryers that Plaintiffs and class members purchased have common Defects in their design and manufacture. The Defects render the Dryers unfit for the intended purpose of safely drying clothes.

65.     Specifically, the Electrolux ball hitch Dryers purchased by Plaintiffs and class members are defective, and represent a significant safety hazard, because the design and manufacture causes lint to accumulate behind the drum in direct proximity to the heat source where it is neither visible to, nor accessible or serviceable by, the user.

66.     The defective design of the ball hitch Dryers causes the accumulation of lint behind the drum in close proximity to the heat source with the first use of the Dryers, and the accumulation of lint behind the drum in close proximity to the heat source continues to occur each time the Dryers are used to dry clothes in the manner Electrolux intended it to be used.

67.     The accumulation of lint behind the drum and in direct proximity to the heat source represents a known and unreasonable fire hazard, as it is reasonably foreseeable that the Dryers' heat source will ignite the accumulated lint during normal use and when the Dryers are being used in the manner that Electrolux intended it to be used.

68.     The Dryers also contain a combustible plastic air duct directly below the drum and a combustible plastic blower housing adjacent to that air duct, both of which accumulate lint during normal use, and both of which are not visible to or serviceable by the user.

69.     Particles of lint that accumulate behind the drum and next to the heat source can ignite and travel into the drum to ignite clothing contained within the drum.  This burning lint can also  travel through the drum to the combustible plastic air duct and blower housing and ignite those combustible materials and/or the lint contained therein

70.     The Electrolux ball hitch Dryers are also defective because Electrolux's design does not contain a fire within the dryer cabinet, but instead will aid in spreading any fire outside the Dryers.

71.   Specifically, the Electrolux design uses combustible plastic components in the air duct and blower housing that provide an additional fuel source for any fire and do not properly contain fires once ignited.  These plastics not only catch fire but melt, and the hot molten plastic then spreads the fire inside the Dryer cabinet and helps the fire to spread out of the Dryer cabinet, where it can ignite surrounding items.

72.   Indeed, the Electrolux Dryers failed fire containment testing that Electrolux performed in 1995 when molten plastic and flame escaped the Dryers, thereby proving that Electrolux's Dryers' design was defective and represented a serious safety hazard.  Nonetheless, even though Electrolux was aware of how to eliminate this hazard, and even though Electrolux was aware of a fundamental engineering principle stating that all known safety hazards should be eliminated, if possible, through the selection of a design or material that removes the hazard altogether, Electrolux chose not to fix the safety hazard or to even warn the public or consumers who purchased the Dryers.

73.   In fact, this Defect was so serious that one distributor (General Electric or "GE"), insisted in 1998 that Electrolux fix the Defect so that ball hitch Dryers Electrolux manufactured for sale under the GE brand name would pass fire containment testing.  Electrolux did try to eliminate this known safety hazard in the Dryers it manufactured for resale under the GE brand name by using plastics with fire inhibitors so the Dryers would pass fire containment testing.

74.   Nonetheless, for all other Dryers Electrolux designed and manufactured, Electrolux inexplicably decided not to use plastics having fire inhibitors, thereby knowingly and unnecessarily creating an additional, serious safety risk to consumers.

75.   The Defects described herein are particularly dangerous because they cannot be detected by consumers during normal use as they exist in areas of the Dryer not visible to consumers.  As a consequence, at least some class members

1   likely have experienced one or more small fires in their Dryers that have gone

2   undetected because they did not result in a larger fire.

3        76.    Indeed, Plaintiffs and class members not only lack any ability to see

4   lint accumulating behind the drum in close proximity to the heat source, or within

5   the combustible plastic air duct and blower housing, but they are unable to remove

6   any accumulated lint in these areas of the Dryer without first dismantling the

7   Dryers.

8        77.    Likewise, consumers like Plaintiffs and class members are unaware of

9   the materials Electrolux used that can spread fire outside the Dryers once a fire has

10   occurred, putting consumers who have the Dryers in their homes at serious risk of

11   injury or property damage.

12        78.    The Defects exist because Electrolux failed to adequately design,

13   manufacture and test the Dryers to ensure they were free from the Defects at the

14   time of sale and failed to retrofit or remove the dangerously defective Dryers from

15   Plaintiffs' and class members' homes despite knowing of the Defects and the

16   significant risks they pose to consumers and the public.

17        79.    The Defects, which are undetectable to the consumer, exist in the

18   Dryers when they leave Electrolux's possession and create an immediate safety risk

19   to consumers.

20        80.    These common Defects cause serious safety risks that requires retrofit

21   or replacement to remedy.

22        81.    These common Defects also deprive consumers like Plaintiffs and

23   class members of the benefit of their bargain and cause the Dryers to function

24   improperly during the expected useful life of the Dryers, resulting in fires like the

25   ones experienced by Plaintiffs as well as failures, repairs, and a significant risk of

26   property damage, personal injury and/or death.

27        82.    Upon information and belief, by approximately 2008 Electrolux also

28   began to design and manufacture a dryer that no longer features a ball hitch design

1    but rather a drum wrap which rotates around a fixed rear panel (or a "bulkhead"

2    design as commonly known in the home appliance and dryer industry) ("the Design

3    Change"). Electrolux, however, has continued to manufacture Dryers with the ball

4    hitch design, has left Dryers containing the Defects in the homes of consumers, and

5    has issued no warnings to consumers who already owned the Dryers containing the

6    Defects.

7    **Electrolux Conceals the Defects From the Public to Facilitate Dryer Sales**

8         83.    As early as the 1990's, Electrolux was confronted with evidence of the

9    Defects and the serious safety risks that the Defects posed to consumers. For

10   example, Electrolux discovered charred lint in the heater pans in its test dryers as

11   early as 1995.

12        84.    Not only did Electrolux discover the Dryers' ability to catch fire, but in

13   1995 it also discovered through its own testing that the Dryers had a serious Defect

14   that allowed fires to spread outside the Dryer cabinet once they had occurred.

15        85.    Indeed, in 1995 and again in 1997 and/or 1998, engineers at Electrolux

16   conducted fire containment testing where they observed molten plastic leaking from

17   the Dryers as a result of the plastic materials Electrolux chose to use in its design.

18   The Electrolux engineers considered these test results constitute failures of the

19   Dryers. Electrolux knew the Dryers failed the fire containment testing because

20   their design was defective and the plastic parts Electrolux chose to use not only

21   could spread fires but could actually act as a fire accelerant when a fire occurs in

22   the Dryer.

23        86.    In fact, as alleged above, GE insisted that Electrolux eliminate this

24   safety Defect so that any Dryers Electrolux manufactured for resale under the GE

25   brand name would pass fire containment testing. Electrolux then changed the

26   design for Dryers it manufactured for GE so those Dryers would pass a fire

27   containment test, but it decided to do nothing to try and eliminate the Defect in all

28   of the other Dryers it manufactured for resale and continued to manufacture its

-13-

1    Dryers with the same plastic parts that allow fires to accelerate and spread outside

2    the Dryers, exposing consumers and the public to serious safety risks.

3        87.    After 2000, evidence of the common Defects in the design and

4    manufacture of the Electrolux Dryers, and the safety risks to the public, became

5    undeniable.  Indeed, documents hidden by Electrolux, and uncovered for the first

6    time in recent litigation, reveal that (i) from 2002-2007 Electrolux received

7    *thousands* of warranty claims for fires for its Dryers within a five year period; (ii) in

8    2005, an Electrolux product engineer acknowledged during an investigation by the

9    Japanese government that lint could travel out of the back of the drum into the

10   heater plan in the Dryers; (iii) in 2002 Electrolux commissioned an outside

11   engineering study to examine this serious safety problem; and (iv) Electrolux

12   conducted an internal investigation regarding the Defects between 2002-2005.

13       88.    Instead of taking action to redesign and replace the Dryers to remedy

14   the Defects, or to retrofit or remove the defective Dryers it had already sold from

15   consumers' homes and warn consumers and the public of the Defects and

16   considerable safety risks the Dryers pose, Electrolux hid evidence of the Defects

17   from the public, denied the existence of the Defects in court filings across the

18   country, denied any liability for claims for replacement of the Dryers or for

19   property damage that resulted from fires caused by the Defects, created ways to

20   hide evidence of the rates of fires, and manufactured strategies to blame consumers

21   for the damage caused by the Defects to avoid liability.

22       89.    The scope of Electrolux's strategy to abuse the discovery process and

23   withhold relevant documents is evidenced by various decisions and orders issued

24   from Federal courts around the country concluding that Electrolux's conduct was

25   "reprehensible," deprived litigants of a full and fair opportunity to litigate the cases,

26   and was sanctionable.  *See Charter Oak Fire Ins. Co. v. Electrolux Home Products,*

27   *Inc.*, 882 F. Supp. 2d 396, 398 (E.D.N.Y. 2012) ("plaintiff did not have a full and

28   fair opportunity to litigate the *Newcomb* action" as a result of Electrolux's improper

-14-

withholding of documents directly responsive to discovery requests showing Electrolux's knowledge of the defects in its Dryers); *Id.* at 404, n.5 ("[Electrolux's] conduct in this case is reprehensible. I don't use that word very often.... [C]learly [Electrolux] is stonewalling this case, refusing to give discovery, cancelling depositions at the last minute... if I see any violation of your discovery obligations again, any violation of discovery obligations, I'm immediately recommending Judge Bianco enters a default judgment against [Electrolux]" (citing transcript of hearing on Motion for Sanctions before Magistrate Judge William D. Wall)); *Automobile Insurance Company of Hartford a/s/o Russell Silver v. Electrolux Home Products, Inc.*, No. 1:08-cv-3237 (E.D.N.Y. 2008) (Electrolux sanctioned on two separate occasions on discovery issues and Magistrate Judge Reyes ordered that if Electrolux failed to produce additional responsive documents he would recommend monetary sanctions and judgment be entered against Electrolux stating, "three strikes and you are out" (cited in *Charter Oak*, 882 F. Supp. 2d at 404, n.5)).

90.     In fact, the United States District Court for the Eastern District of New York concluded that a consumer who sued Electrolux over the defective Dryers "was deprived of a full and fair opportunity to litigate its claim because (1) crucial evidence supporting plaintiff's claim was not produced by defendant [Electrolux] in the [case captioned *Standard Fire Insurance Company a/s/o Julie Newcomb v. Electrolux Home Products, Inc.*, No. 3:08-cv-00540-SLC (W.D. Wis.) (the "*Newcomb* case")] even though it was responsive to plaintiff's discovery requests; (2) plaintiff did not learn of the failure to produce the information until after the *Newcomb* trial; and (3) the evidence, if it had been produced by the defendant [Electrolux] in the *Newcomb* case, could have altered the outcome of that trial." *Charter Oak*, 882 F. Supp. 2d at 398.   The Court further concluded that "Electrolux's victory in the *Newcomb* case may have been the product of its failure to produce crucial information that was directly responsive to plaintiff's discovery demands in that case." *Id.*

91.     Amazingly, even after Electrolux was forced to produce documents evidencing the existence of the Defects and Electrolux's knowledge of the Defects, (*see e.g., id.* at 405), Electrolux has continued to deny knowledge of the Defects in court proceedings and has never warned consumers of the Defects or attempted to retrofit, replace or remove the Dryers from consumers' homes.

92.     Electrolux argued as recently as December 2011 to the United States District Court for the Eastern District of New York that one of the plaintiffs in that case should be *collaterally estopped* from even bringing an action for these known Defects in the Electrolux Dryers, and it argued in a similar case pending in the United States District Court for the Eastern District of Arkansas, *Humphrey v. Electrolux Home Products, Inc.,* 4:12-cv-00157-DPM , that the Court should dismiss Plaintiff's claims for failure to state a claim on which relief could be granted. *See, e.g., Charter Oak,* 882 F. Supp. 2d at 397 (another case where Electrolux employed the same strategy: "Electrolux argues that plaintiff is collaterally estopped from bringing this action because of the February 2010 jury verdict obtained in a Wisconsin case, *Standard Fire Insurance Company a/s/o Julie Newcomb v. Electrolux Home Products, Inc.*, No. 3:08-cv-00540-SLC (W.D. Wis.) (the '*Newcomb* case').").

93.     All the while it was concealing evidence of the defective nature of its Dryers, Electrolux continued to falsely warrant in writing that "Every Electrolux Major Appliances gas or electric dryer is guaranteed to be free of materials defects or component malfunctions" and told consumers that "Electrolux Major Appliances will repair, without charge, any problem that occurs during the first year after original date of purchase."

94.     Even though it has known of the Defects *for years*, Electrolux has failed to honor these express warranties by replacing, repairing or retrofitting the Dryers to eliminate or remedy the Defects and the serious safety issues they cause.

95.     Despite its knowledge of the Defects and the serious safety risks they pose, Electrolux also continues to make express written warranties to consumers through its marketing and advertising materials that the Electrolux Dryers are free from defect and, at minimum, will dry consumers' clothes without damage or risk of fire.  For example, Electrolux's website warrants that "our dryer is gentlest on your clothes thanks to our technology that gently tumbles clothes with exceptional temperature control to help protect fabric."

96.     Not only has Electrolux concealed evidence and its knowledge of the Defects from the public and denied the Defects exist or pose any safety risks, but it also conceived and executed a strategy to purportedly place "warnings" in its user guides that have no engineering basis and exist solely to provide a means to blame consumers in any litigation for fires or other malfunctions in its Dryers resulting from the Defects.

97.     For example, Electrolux inserted a statement in its user guides that "Every 18 months an authorized servicer should clean the dryer cabinet interior and exhaust duct."  Electrolux has been unable in prior depositions to provide any engineering basis for this statement or any explanation for why it inserted this statement in its user guide.  Moreover, warranty data for Electrolux dryers showing that 80% of the fire warranty claims related to lint occurred within the first 18 months of use, demonstrate how having the Dryer serviced every 18 months does not eliminate or materially reduce the safety risks or remedy the Defects.

98.     Nonetheless, as recently as May 11, 2012, Electrolux expressly relied on this baseless instruction to argue that it had no liability for the Defects, and asked a court to dismiss a plaintiff's complaint, because "[p]laintiff's allegation shows, at most, that she failed to heed the warnings and instructions in her Use & Care Guide" to have the Dryer serviced every 18 months.  *Humphrey v. Electrolux,* 4:12-cv-00157 (E.D. Ark.) (Dkt. No. 17 at 8 n.3).  Electrolux made this argument even though it knew, or at the very least should have known, that the 18 month

-17-

period has no engineering basis and is nothing more than part of the company's strategy to conceal the Defects from consumers, shift the blame, and avoid liability for damages caused by its defective Dryers.

99. Electrolux had a duty to protect consumers by, at the very least, warning them that the Dryers have serious Defects that pose substantial risks to personal safety.

100. Nonetheless, even though Electrolux knew, or should have known, of the Defects in its Dryers and of the substantial safety risks posed by its Dryers, Electrolux opted to conceal evidence of the Defects from the public so it could realize the substantial financial benefits of selling the Dryers to the public, who had no knowledge of the Defects or the risks the Defects pose to their personal safety.

101. Electrolux knew, or should have known, that reasonable consumers like Plaintiffs and class members were unaware of the Defects and could not discover the Defects.

102. Electrolux knew, or should have known, that reasonable consumers like Plaintiffs and class members expected the Dryers to safely dry clothes without putting consumers' lives and property at risk and expected that the Dryers were safe to use in the home.

103. Electrolux knew, or should have known, that reasonable consumers expected Electrolux to disclose any defects that would prevent the Dryers from performing their function before the end of their useful lives or that would seriously threaten the class members' safety, and that such decision would impact any reasonable customer's decision as to whether to purchase the Dryers.

104. To this day, as result of Electrolux's conduct, many members of the putative classes defined herein remain unaware of the Defects in their Dryers and the serious safety risks as well as the risk of failure, injury, loss and fire due to the Defects.

105.   To this day, as a result of Electrolux's conduct, at least some members of the putative classes defined herein have likely had small fires in their Dryers as a result of the Defects, but they continue to use the Dryers because the fires went undetected as they occurred in areas not visible to the users and did not result in larger fires.

106.   Indeed, Plaintiffs were unaware of the Defects at the time their Dryers caught on fire causing serious risk to personal safety and/or severe property damage.

107.   Had Plaintiffs and class members been made aware of the serious safety problems with the Dryers, they would not have purchased their Dryers.

108.   Electrolux's reprehensible conduct has harmed Plaintiffs and class members and has left millions of consumers with a serious safety risk in their homes.

**The Defects Present an Immediate and Continuing Safety Risk**

109.   The Electrolux Dryers purchased by Plaintiffs and class members should have been usable for their intended purpose of safely drying clothes during their expected useful lives and should not have been sold containing known safety risks to consumers.

110.   The National Association of Home Builders ("NAHB") found in a 2007 study that it conducted with Bank of America Home Equity that the useful expected life of a clothes dryer is 13 years.

111.   The Electrolux Dryers pose a substantial and immediate safety risk to consumers and the public upon purchase and continue to pose a substantial safety risk to consumers and the public during their useful lives.

112.   The Defects in the design and manufacture of Electrolux Dryers have also caused and will cause Plaintiffs' and class members' Dryers to fail and/or catch fire during their expected useful lives.

113.   Thus, the Defects render the Electrolux Dryers unfit for the ordinary and intended purpose (safely drying clothes) for which they were marketed and sold to Plaintiffs and class members at the time of sale.

114.   Had the Dryers been free from the Defects, Plaintiffs and class members would not have suffered the damages complained of herein.

115.   Had Electrolux complied with its duty not to place an unsafe product onto the market, to disclose the Defects it knew or should have known of, to consumers and the public, or to remedy Defects it knew or should have known posed a substantial safety risk to consumers, Plaintiffs and class members would not have suffered the damages complained of herein.

## CLASS ACTION ALLEGATIONS

116.   Plaintiffs bring this action both individually and as a class action pursuant to Fed. R. Civ. P. 23 (a), 23(b)(2), and 23(b)(3) against Electrolux on their own behalf and on behalf of the National classes and state-wide classes (collectively "the classes") defined below.

### The National Classes

117.   The National Consumer Class consists of:  During the fullest period allowed by law, all persons in the United States who purchased or otherwise acquired an Electrolux-designed and/or -manufactured ball hitch clothes dryer, primarily for personal, family, or household purposes, and not for resale.

118.   The National Property Damage Subclass consists of:  During the fullest period allowed by law, all persons in the United States who purchased or otherwise acquired an Electrolux-designed and/or -manufactured ball hitch clothes dryer, primarily for personal, family, or household purposes, and not for resale and who have incurred property damage as a result of the Defects.

### The State-Wide Classes

119.   The California Consumer Class consists of:  During the fullest period allowed by law, all persons who purchased or otherwise acquired in the State of

-20-

California an Electrolux-designed and/or -manufactured ball hitch clothes dryer, primarily for personal, family, or household purposes, and not for resale.

120.   The California Property Damage Subclass consists of:  During the fullest period allowed by law, all persons in the United States who purchased or otherwise acquired in the State of California an Electrolux-designed and/or -manufactured ball hitch clothes dryer, primarily for personal, family, or household purposes, and not for resale, and who have incurred property damage as a result of the Defects.

121.   The Illinois Consumer Class consists of:  During the fullest period allowed by law, all persons who purchased or otherwise acquired in the State of Illinois an Electrolux-designed and/or -manufactured ball hitch clothes dryer, primarily for personal, family, or household purposes, and not for resale.

122.   The Missouri Consumer Class consists of:  During the fullest period allowed by law, all persons who purchased or otherwise acquired in the State of Missouri an Electrolux-designed and/or -manufactured ball hitch clothes dryer, primarily for personal, family, or household purposes, and not for resale.

123.   The Missouri Property Damage Subclass consists of:  During the fullest period allowed by law, all persons in the United States who purchased or otherwise acquired in the State of Missouri an Electrolux-designed and/or -manufactured ball hitch clothes dryer, primarily for personal, family, or household purposes, and not for resale, and who have incurred property damage as a result of the Defects.

124.   The New York Consumer Class consists of: During the fullest period allowed by law, all persons who purchased or otherwise acquired in the State of New York an Electrolux-designed and/or -manufactured ball hitch clothes dryer, primarily for personal, family, or household purposes, and not for resale.

125.   The New York Property Damage Subclass consists of: During the fullest period allowed by law, all persons in the United States who purchased or

otherwise acquired in the State of New York an Electrolux-designed and/or manufactured ball hitch clothes dryer, primarily for personal, family, or household purposes, and not for resale, and who have incurred property damage as a result of the Defects.

126.   The classes are limited to the time period beginning on the date established by the Court's determination of any applicable statute of limitation, after consideration of any tolling and accrual issues, and ending on the date of entry of judgment.

127.   Excluded from the classes are (a) any Judge or Magistrate presiding over this action and members of his or her family; (b) Electrolux and any entity in which Electrolux has a controlling interest or which has a controlling interest in Electrolux; (c) the officer, directors or employees of Electrolux; and (d) Electrolux's legal representatives, assigns and successors and (e) all persons who properly execute and file a timely request for exclusion from the class or subclasses.

128.   Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the classes.

129.   Numerosity: While the exact number of members cannot be determined yet, each class consists at a minimum of thousands of people dispersed throughout the United States and, in the case of the California, Illinois, Missouri, and New York classes, consists at a minimum of thousands of people dispersed throughout each of those states.  The exact number of class members can readily be determined by review of information maintained by or available to Electrolux.

130.   The members of the classes are therefore so numerous that joinder of all members is impracticable.

131.   Commonality:  Common questions of law and fact exist as to all class members.  Among the questions of law and fact common to the classes are:

a.    Whether the Dryers designed, manufactured, and sold by Electrolux pose safety risks to consumers;

b.    Whether Electrolux knew, or should have known, that the products it sold into the stream of commerce pose unreasonable safety risks to consumers;

c.    Whether Electrolux concealed the safety risks its Dryers pose to consumers;

d.    Whether the safety risks the Dryers pose to consumers constitute material facts that reasonable purchasers would have considered in deciding whether to purchase a clothes dryer;

e.    Whether the Dryers designed, manufactured, and sold by Electrolux possess  material defects;

f.    Whether the Defects in the Dryers represent an unreasonable risk that a fire will occur or that, once it has occurred, it will spread outside the Dryer cabinet;

g.    Whether Electrolux knew, or should have known, that the Dryers possessed the Defects when it placed them into the stream of commerce;

h.    Whether Electrolux concealed the Defects from consumers;

i.    Whether the existence of the Defects are material facts reasonable purchasers would have considered in deciding whether to purchase a clothes dryer;

j.    Whether the Dryers are of merchantable quality;

k.    Whether the Dryers are likely to pose serious safety risks to consumers before the end of the Dryers' reasonable expected lifetimes;

l.    Whether the Dryers are likely to start on fire or fail before the end of their reasonable expected lifetime;

-23-

m.     Whether the Dryers are defectively designed to allowed fires to spread outside the Dryer itself creating a serious risk of injury, death and/or property damage;

n.     Whether the Dryers' Defects resulted from Electrolux's negligence;

o.     Whether Electrolux breached express warranties relating to the Dryers by failing to recall, replace, repair and/or correct the Defects in the Dryers;

p.     Whether Electrolux breached the implied warranty of merchantability implied in every sale of goods;

q.     Whether Electrolux misrepresented the characteristics, qualities and capabilities of the Dryers;

r.     Whether Electrolux either knew, or should have known, of the Defects prior to marketing and selling the Dryers to Plaintiffs and class members;

s.     Whether Electrolux omitted, concealed from and/or failed to disclose in its communications and disclosures to Plaintiffs and class members material information regarding the Dryers' Defects;

t.     Whether Electrolux omitted, concealed from and/or failed to disclose in its communications and disclosures to Plaintiffs and class members material information regarding the Dryers' safety issues;

u.     Whether Electrolux failed to warn consumers of the Defects;

v.     Whether Electrolux failed to warn consumers that its Dryers pose serious safety issues;

w.     Whether Electrolux made fraudulent, false, deceptive and/or misleading statements in connection with the sale of the Dryers;

-24-

x.      Whether Electrolux was unjustly enriched by selling the Dryers;

y.      Whether Electrolux should be ordered to disgorge all or part of the profits it received from the sale of the defective Dryers;

z.      Whether Plaintiffs and class members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

aa.      Whether Plaintiffs and class members are entitled to replacement of their defective Dryers;

bb.      Whether Plaintiffs and class members are entitled to equitable relief, including an injunction requiring that Electrolux engage in a corrective notice campaign, retrofit program, and/or a recall; and

cc.      Whether Plaintiffs and class members are entitled to an award of reasonable attorneys' fees, pre-judgment interest, post-judgment interest, and costs.

132.    <u>Typicality</u>: Plaintiffs have substantially the same interest in this matter as all other members of the National Classes, the named Plaintiffs have the same interests as all members of the state-wide classes they seek to represent, and all Plaintiffs' claims arise out of the same set of facts and conduct as all other members of the classes. Plaintiffs and all class members own or owned a clothes Dryer designed and/or manufactured by Electrolux with uniform Defects that make the Dryers immediately dangerous upon first use and that cause the Dryers to fail within their expected useful lives and catch on fire. All of the claims of Plaintiffs and class members arise out of Electrolux's placement into the marketplace of a product it knew was defective and posed safety risks to consumers, and from Electrolux's failure to disclose the known safety risks and Defects. Also common to Plaintiffs' and class members' claims are Electrolux's conduct in designing,

-25-

1   manufacturing, marketing, advertising, warranting and/or selling the defective

2   Dryers, Electrolux's conduct in concealing the defects in the clothes Dryers, and

3   Plaintiffs and class members' purchase of the defective Dryers.

4       133.   Adequacy of Representation:  Plaintiffs are committed to pursuing this

5   action and have retained competent counsel experienced in products liability,

6   deceptive trade practices, and class action litigation.  Accordingly, Plaintiffs and

7   their counsel will fairly and adequately protect the interests of the members of the

8   classes.  Plaintiffs' claims are coincident with, and not antagonistic to, those of the

9   other class members they seek to represent.  Plaintiffs have no disabling conflicts

10  with the members of the classes and will fairly and adequately represent the

11  interests of the class members.

12      134.   The elements for class certification under Rule 23(b)(2) are met.

13  Electrolux will continue to commit the violations alleged, and the members of the

14  classes and the general public will continue to remain at an unreasonable and

15  serious safety risk of fire from the defective Dryers.  Electrolux has acted and

16  refused to act on grounds that apply generally to the class members so that final

17  injunctive relief and corresponding declaratory relief is appropriate respecting the

18  classes as a whole.

19      135.   The elements of Rule 23(b)(3) are met.  Here, the common questions

20  of law and fact enumerated above predominate over the questions affecting only

21  individual members of the classes, and a class action is the superior method for the

22  fair and efficient adjudication of the controversy.  The likelihood that individual

23  class members will prosecute separate actions is remote due to the time and expense

24  necessary to conduct such litigation.  There will be many other pending cases

25  against Electrolux.  Serial adjudications in numerous venues are not efficient,

26  timely or proper.  Judicial resources throughout California, Illinois, Missouri, New

27  York, and the United States will be unnecessarily depleted by resolution of

28  individual claims.  Joinder on an individual basis of thousands of claimants in one

-26-

suit would be impractical or impossible.  Individualized rulings and judgments have and will result in inconsistent relief for similarly-situated Plaintiffs.  Plaintiffs' counsel, highly experienced in class action litigation, foresee little difficulty in the management of this case as a class action.  Indeed, the only way to ensure that the serious conduct and safety risks alleged herein are remedied is through a collective action on behalf of consumers.

136.   To the extent a National Class is sought on Plaintiffs' claims, *see, e.g.,* implied warranty, express warranty, and negligence claims, Plaintiffs claims are materially the same under the law of California as in all states in the United States. In the event that California law does not apply on a nationwide basis to any of Plaintiffs' claims, Plaintiffs will seek to apply the laws of the various States and the District Columbia as will be addressed in Plaintiffs' brief in support of class certification.

**Tolling and Estoppel of Statutes of Limitation and Fraudulent Concealment**

137.   The claims alleged herein accrued upon discovery of the defective nature of the Dryers and the dryer drums contained therein.  Because the Defects alleged herein are hidden, and because Electrolux took steps to actively misrepresent and conceal the true character, nature and quality of the Dryers, among other reasons, Plaintiffs and class members did not discover and could not have discovered the Defects alleged herein through reasonable and diligent investigation.

138.   Any applicable statutes of limitations have been tolled by Electrolux's knowledge and actual misrepresentation, concealment and denial of the facts as alleged herein, concealment which is ongoing and continues to this day.  Plaintiffs and class members could not have reasonably discovered the true, defective nature of the Dryers.  As a result of Electrolux's active concealment of the Defects and/or failure to inform Plaintiffs and class members of the Defects, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

139.   Alternatively, the facts alleged above give rise to an estoppel. Electrolux knew of the Defects and the serious safety risk it posed to consumers and has actively concealed it.  Electrolux was and is under a continuous duty to disclose to Plaintiffs and the classes the true character, quality and nature of the Dryers, particularly that they pose serious risks to public safety, are fire hazards and are at risk of failure.  At all relevant times, and continuing to this day, Electrolux knowingly, affirmatively and actively misrepresented and concealed the true character, quality and nature of the Dryers and sold the Dryers into the stream of commerce as if they were safe for use.  Given Electrolux's failure to disclose this non-public information about the defective nature of the Dryers and safety risks to the public —information over which Electrolux had exclusive control— and because Plaintiffs and class members could not reasonably have known that the Dryers were thereby defective, Plaintiffs and the class members reasonably relied on Electrolux's knowing affirmative and ongoing concealment.  Had Plaintiffs and class members known that the Dryers posed a safety risk to the public, they would not have purchased the Electrolux Dryers.  Based on the foregoing, Electrolux is estopped from prevailing on any statute of limitations defense in this action.

140.   Additionally, Electrolux is estopped from raising any defense of laches due to its own conduct as alleged herein.

## CLAIMS FOR RELIEF

## COUNT I

### Declaratory Relief

(Plaintiffs, Individually, and on Behalf of All Classes and Subclasses)

141.   Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

142.   There is an actual controversy between Electrolux and class members concerning the existence of defects in the Dryers.

143.    Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

144.    Accordingly, Plaintiffs and class members seek a declaration that the Dryers have the common Defects alleged herein in their design and/or manufacture.

145.    Additionally, Plaintiffs and class members seek a declaration that these common Defects found in the Dryers pose serious safety risks to consumers and the public.

## COUNT II

### Negligence

(Plaintiffs, Individually, and on Behalf of all Classes and Subclasses)

146.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

147.    Electrolux owed a duty to Plaintiffs and class members to design, manufacture, produce, test, inspect, market, distribute, and sell dryers with reasonable care and in a workmanlike fashion, and had a duty to protect Plaintiffs and class members from foreseeable and unreasonable risks of harm.

148.    Electrolux breached that duty by, among other things, defectively designing, manufacturing, testing, inspecting and distributing the Dryers.

149.    As set forth more fully above, Electrolux knew or should have known that the Dryers it designed, manufactured, produced, tested, inspected, marketed, distributed, and sold, when used in an ordinary and foreseeable manner, create an unreasonable safety risk and fail to perform as intended.

150.    Electrolux knew or should have known that the Dryers create unreasonable safety risks as the Dryers have Defects causing them to start on fire and spread any fire outside the Dryer cabinet.

151.    Electrolux knew or should have known that the Dryers have Defects that can cause catastrophic property damage, personal injury, and/or death.

-29-

152.   Based on this knowledge, Electrolux had a duty to disclose to the Plaintiffs and class members the serious safety risks posed by the Dryers and a duty to disclose the defective nature of the Dryers.

153.   Electrolux had a further duty not to put the defective Dryers on the market, and has a continuing duty to retrofit or replace its unsafe Dryers, remove its unsafe Dryers from the market and recall the Dryers from consumers' homes.

154.   Electrolux failed to exercise reasonable care with respect to the design, manufacture, production, testing, inspection, marketing, distribution, and sale of the Dryers by, among other things, failing to design and manufacture the Dryers in a manner to ensure that, under normal intended usage, serious safety risks such as the ones posed by the Dryers did not occur.

155.   Electrolux failed to exercise reasonable care because it failed to adequately and sufficiently users, either directly or indirectly, of the uniform Defects in the Dryers.

156.   Electrolux failed to exercise reasonable care when it knew of the safety risks the Dryers pose and actively concealed those risks from Plaintiffs and class members.

157.   Electrolux failed to exercise reasonable care when it failed to replace, repair, retrofit or recall Dryers it knew or should have known were unsafe and defective.

158.   Electrolux failed to exercise reasonable care when it did not conduct adequate testing, including pre- and post-marketing surveillance of the safety of the Dryers.

159.   As a direct and proximate result of Electrolux's negligence, Plaintiffs and class members bought the Dryers without knowledge of the Defects or of their serious safety risks.

160.   As a direct and proximate result of Electrolux's negligence, Plaintiffs and class members purchased unsafe products that could not and cannot be used for their intended use.

161.   As a direct and proximate result of Electrolux's negligence, Plaintiffs and class members have suffered damages.

162.   Electrolux was unjustly enriched by keeping the profits from the sales of the unsafe Dryers while never having to incur the cost of repair, replacement, or a recall.

163.   Electrolux's negligence was a substantial factor in causing harm to Plaintiffs and class members and unjust enrichment to Electrolux.

## COUNT III

### Breach of Implied Warranty of Merchantability

(Plaintiffs, Individually, and on Behalf of All Classes and Subclasses)

164.   Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

165.   The Dryers owned by Plaintiffs and class members were defectively designed and manufactured and pose serious and immediate safety risks to consumers and the public.

166.   The Dryers that left Electrolux's facilities and Electrolux's control were manufactured according to defective designs.

167.   The Defects place consumers and the public at serious risk for their own safety when the Dryers are used in consumers' homes.

168.   At all times relevant hereto, Electrolux was under a duty imposed by law requiring that a manufacturer or seller's product be reasonably fit for the ordinary purposes for which the product is used, and that the product be acceptable in trade for the product description.  This implied warranty of merchantability is part of the basis for the bargain between Electrolux, on the one hand, and Plaintiffs and class members, on the other.

-31-

169.   Notwithstanding the aforementioned duty, at the time of delivery, Electrolux breached the implied warranty of merchantability in that the Dryers were defective and posed a serious safety risk at the time of sale, would not pass without objection, are not fit for the ordinary purposes for which such goods are used (safely drying clothes in residential setting), and failed to conform to the standard performance of like products used in the trade.

170.   Electrolux knew or should have known that the Dryers pose a safety risk and are defective and knew or should have known that selling the Dryers to Plaintiffs and class members constituted a breach of the implied warranty of merchantability.

171.   As a direct and proximate result of Electrolux's breach of the implied warranty of merchantability, Plaintiffs and class members bought the Dryers without knowledge of the Defects or their serious safety risks.

172.   As a direct and proximate result of Electrolux's breach of the implied warranty of merchantability, Plaintiffs and class members purchased unsafe products which could not be used for their intended purpose of safely drying clothes in a residential setting.

173.   As a direct and proximate result of Electrolux's breach of the implied warranty of merchantability, Plaintiffs and class members have suffered damages.

174.   Electrolux was unjustly enriched by keeping the profits for its unsafe products while never having to incur the cost of repair, replacement, retrofit, or a recall.

## COUNT IV

### Breach of Express Warranty

(Plaintiffs, Individually, and on Behalf of all Classes and Subclasses)

175.   Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

176.   Electrolux is and was at all times relevant a merchant with respect to clothes dryers.

177.   As fully pled above, Electrolux had knowledge of the Defects alleged herein and that they pose serious safety risks to consumers like Plaintiffs and class members.

178.   Despite that knowledge, at all times relevant, Electrolux expressly warranted in writing that "Every Electrolux Major Appliances gas or electric dryer is guaranteed to be free of materials defects or component malfunctions."

179.   In its warranty to customers, Electrolux also warrants in writing that it will "repair without charge any problem that occurs during the first year after purchase."

180.   During the second year of purchase, Electrolux warrants in writing that it will provide a replacement for any defective part(s) that breaks due to defects in material or workmanship (not customer abuse) for two years from the original date of purchase.

181.   By selling Dryers containing the Defects to consumers like Plaintiffs and class members after it gained knowledge of the Defects, Electrolux breached its express warranty to provide Dryers that were free from defects.

182.   Electrolux also breached its express warranty to repair and correct material defects or component malfunctions in its Dryers when it failed to do so despite knowledge of the Defects and/or despite knowledge of alternative designs, alternative materials, and/or options for retrofits.

183.   Electrolux has not made repairs correcting such material Defects or component malfunctions in its Dryers.

184.   Further, any "repairs" Electrolux offers do not fix the safety issues with its Dryers and are not adequate to fix the serious safety issues caused by the Defects.

185.   The limited warranty of repair for the Dryers fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and class members whole and/or because Electrolux has refused to provide the promised remedies within a reasonable time.

186.   Also, as alleged in more detail herein, at the time Electrolux warranted and sold the Dryers, it knew that the Dryers did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding its Dryers.

187.   Accordingly, Plaintiffs and class members are not limited to the limited warranty of "repair" and Plaintiffs and class members seek all remedies allowed by law.

188.   As more fully detailed above, Electrolux was notified of Plaintiffs' Dryer fires but failed to provide defect-free dryers to Plaintiffs or class members free of charge or to provide an adequate retrofit to remedy the Defects.

189.   As more fully detailed above, Electrolux was provided with notice and has been on notice of the Defects and of its breach of express written warranties through its own internal and external testing as well as thousands of consumer warranty claims reporting fires in the Electrolux Dryers, customer complaints, and CPSC complaints, yet it failed to repair, replace or retrofit the Dryers to ensure they were free of materials defects or component malfunctions as Electrolux promised.

190.   As a direct and proximate result of Electrolux's breach of its express warranty, Plaintiffs and class members have suffered damages.

191.   Electrolux has been unjustly enriched by keeping the profits from the sale of its unsafe Dryers while never having to incur the cost of repair, replacement, retrofit or a recall.

## COUNT V

### Violation of the Magnuson Moss Warranty Act

### (15U.S.C. § 2301, et seq.)

(Plaintiffs, Individually, and on Behalf of all Classes and Subclasses)

192.    Plaintiffs re-allege and incorporate by reference all paragraphs alleged herein.

193.    The Electrolux Dryers are consumer products as defined in 15 U.S.C. § 2301(1).

194.    Plaintiffs and class members are consumers as defined in 15 U.S.C. § 2301(3).

195.    Electrolux is a supplier and a warrantor as defined in 15 U.S.C. § 2301(4) and (5).

196.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

197.    Electrolux's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The defective Dryers' implied warranties are covered under 15 U.S.C. § 2301(7).

198.    Electrolux breached these warranties, as described in more detail above, but generally by (a) designing, manufacturing and selling to Plaintiff and class members Dryers that are defective and unsafe, (b) providing Dryers that are not merchantable and not fit for their ordinary purpose of safely drying clothes in a residential setting because they present an unreasonable risk of catching fire in the homes of consumers and an unreasonable risk of any fire spreading outside the Dryers, and (c) not repairing, retrofitting or replacing the Dryers to eliminate the Defects, .

199.    At the time Electrolux sold the Dryers to Plaintiffs and the other members of the classes, it knew that the Dryers were defective and had the

-35-

1  propensity to start on fire in the homes of consumers, knew that once the Dryers

2  started on fire that the Defects created a serious risk that the fire would spread

3  outside the Dryer, knew that the Dryers pose serious safety risks to consumers, and

4  knew that Plaintiffs and class members would incur significant costs in removing

5  and re-installing the Electrolux Dryers.

6      200.  Electrolux is liable to Plaintiffs and class members pursuant to 15

7  U.S.C. § 2310(d)(1), because it breached the implied warranty of merchantability.

8  Specifically, the Electrolux Dryers have Defects that render the Dryers incapable of

9  performing the functions that they were intended: to safely dry clothes in a

10 residential setting.

11     201.  Electrolux is liable to Plaintiffs and class members pursuant to 15

12 U.S.C. § 2310(d)(1), because it breached its written warranties to Plaintiffs and

13 class members.   Specifically, Electrolux breached its written warranties to

14 Plaintiffs and class members in that Electrolux failed to provide non-defective

15 dryers or repairs/retrofits sufficient to render the Dryers non-defective during the

16 warranty period despite knowledge of the Defects and the serious safety risks they

17 pose to Plaintiffs and class members.

18     202.  Plaintiffs and the class members gave Electrolux an opportunity to

19 cure pursuant to 15 U.S.C. § 2310(e) by inter alia, their repeated contacts with

20 Electrolux over the Defects as described herein which notified Electrolux of the

21 Defects present in all dryers purchased by class members, but Electrolux failed to

22 provide Plaintiffs and the class members with defect-free dryers.

23     203.  Electrolux was on notice of putative nation-wide class action

24 Magnuson Moss Act allegations concerning the Defects as described herein since at

25 least early 2012, when another case, *Humphrey v. Electrolux Home Products, Inc.*,

26 was filed in the Eastern District of Arkansas on behalf of a nation-wide class.  That

27 case is now proceeding on behalf of an Arkansas-only class.  Electrolux was again

28 given notice of putative nation-wide class action Magnuson Moss Act allegations

-36-

concerning the Defects as described herein with the filing of this action on September 27, 2012. Despite being on notice of these claims, Electrolux failed to provide the class members with defect-free dryers.

204.   Further, when notified of the Defects, it is Electrolux's practice to routinely deny liability for any damage caused by the Defects.

205.   Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and class members are entitled to recover the damages caused to them by Electrolux's breaches of implied and express warranties, which damages constitute the cost of replacing the Electrolux Dryers with non-defective dryers, a refund of the full purchase price of the Electrolux Dryers, retrofit of the defective Electrolux Dryers, plus all costs they reasonably incurred or will incur in removing and re-installing, replacing or retrofitting the Electrolux Dryers.

206.   Plaintiffs and proposed class members have sustained damages in excess of $50,000 as a direct and proximate result of Electrolux's breach of its express and implied warranties.

207.   In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiffs and the class members in connection with the commencement and prosecution of this action.

## COUNT VI

### Injunctive Relief

(Plaintiffs, Individually, and on Behalf of All Classes and Subclasses)

208.   Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

209.   Electrolux designed, manufactured, produced, tested, inspected, marketed, distributed, and sold Dryers that contain material and dangerous Defects as described above.

210.   Based upon information and belief, Electrolux continues to market, distribute, and sell Dryers that contain the material and dangerous Defects and has done nothing to remove the Dryers containing the Defects described herein from the market and from the households of consumers.

211.   The Defects described herein pose an imminent threat to the safety of consumers and the public.

212.   Upon information and belief, Electrolux has taken no corrective action concerning the Defects described herein and has not issued any warnings or notices concerning the dangerous Defects, replaced or retrofitted the dangerous Dryers, or implemented a product recall.

213.   Plaintiffs and class members have suffered actual damage or injury or are in immediate risk of suffering actual damage or injury due to the Dryers' Defects.

214.   Electrolux should be required to take corrective action to avoid the serious and immediate safety risks its Dryers pose, including: issuing a nationwide recall and replacement and/or retrofit of the Dryers; issuing warnings and/or notices to consumers and the class members concerning the Dryers' Defects and the safety risks the Dryers pose; and, if Electrolux has not already done so, immediately discontinuing the manufacture, production, marketing, distribution, and sale of the defective Dryers.

## STATE LAW COUNTS

215.   Each of the state law counts is asserted on behalf of each state law class.

CALIFORNIA

## COUNT VII

### Negligent Failure to Recall/Retrofit

(Plaintiff Carty, Individually, and on Behalf of the California Consumer Class and California Property Damage Subclass)

216.   Plaintiff Carty re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

217.   At all times relevant, Electrolux designed, manufactured, distributed, advertised, marketed, promoted and sold the Dryers at issue herein.

218.   At all times herein, Electrolux had a continuing duty to remove or retrofit the unsafe and defective Dryers from households across the United States and to recall or retrofit the Dryers from consumers.

219.   As set forth more fully above, at all times relevant, Electrolux knew, or reasonably should have known, of the Defects and that the Dryers were dangerous or were likely to be dangerous when used in a reasonably foreseeable manner. Indeed, Electrolux was aware of Defects in its Dryers causing a serious safety risk to all consumers who owned the Dryers, and Electrolux put those consumers at a significant risk of household fires, property damage and injury.

220.   Electrolux became aware of the defective nature of the Dryers before they were sold and yet placed these defective and unsafe Dryers into the market and continued to place these defective and unsafe Dryers into the market for years.

221.   Moreover, Electrolux was aware of the Defects in its Dryers, which posed a serious safety risk to consumers and the public, and yet continued to leave millions of the defective and unsafe Dryers in consumers' homes across the United States and in California.

222.   Electrolux knew of the defective nature of the Dryers before it sold the Dryers, but it proceeded to sell them into the stream of commerce and left these

-39-

unsafe products in millions of consumers' homes across the United States and in California, creating a serious safety risk to consumers and the public

223. Electrolux has made no effort to remove this serious safety risk from consumers' homes or retrofit the Dryers even today, and in fact, it took steps to conceal the Defects and the safety risk its Dryers pose from consumers and the public.

224. Despite its knowledge of the Defects and the serious safety risks its Dryers pose to consumers and the public, Electrolux failed to recall or retrofit the Dryers or warn of the dangers of the Dryers despite a duty to do so.

225. In failing to recall or retrofit the Dryers, or even warn of the serious safety risk its Dryers pose to consumers, Electrolux failed to act as a reasonable manufacturer, distributor or seller would under the same or similar circumstances and failed to exercise reasonable care.

226. As a result, Plaintiff and class members have suffered actual damage or injury; the Defects have rendered the Dryers unsafe and unfit for normal use and has caused injury and damage to property.

227. Electrolux's failure to recall the Dryers is a substantial factor in causing harm to Plaintiff and class members.

<u>COUNT VIII</u>

**Violations of the California Consumer Legal Remedies Act**

(Cal. Civ. Code § 1750, *et seq.*)

(Plaintiff Carty, Individually, and on Behalf of the California Consumer Class and California Property Damage Subclass)

228. Plaintiff Carty re-alleges and incorporates the preceding paragraphs as though more fully set forth herein.

229. The California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA") prohibits "unfair or deceptive acts or practices."

-40-

230.   The CLRA applies to Electrolux's actions and conduct described herein because it extends to the sale of goods or services for personal, family or household use.

231.   At all relevant times, Plaintiff Carty and members of the California Replacement Class and Property Damage Subclass were "consumers" as defined in Cal. Civ. Code § 1761(d).

232.   The transactions from which this action arise include transactions involving the sale or lease of goods or services for personal, family or household purposes within the meaning of Cal. Civ. Code § 1761.

233.   Electrolux developed, manufactured, marketed, and sold the defective Dryers containing the Defects as alleged herein.

234.   Electrolux developed, manufactured, marketed, and sold the Dryers despite knowledge of the Defects and that the Dryers pose serious safety risks to consumers like Plaintiff and class members.

235.   Electrolux sells its Dryers as safe for home use despite knowing that the Dryers pose serious safety risks to consumers, fails to disclose the Defects and safety risks known to it but hidden from the consumer, and knowingly conceals the unreasonable safety risks associated with the defective Dryers.  These are misrepresentations, omissions and concealments of material fact that constitute unfair and/or deceptive practices in violation of the CLRA.

236.   Electrolux violated the CLRA not only when it sold the Dryers representing them to be safe to be used in consumers' homes, but when, despite its knowledge of these facts, Electrolux failed to disclose to Plaintiff Carty and the California class members that the Dryers had Defects that pose serious safety risks to consumers and the public.

237.   Electrolux engaged in deceptive trade practices in violation of the CLRA, including selling its Dryers for home use and, holding out to the public that the Dryers could be used safely in the home when in fact it knew or should have

-41-

1   known that the Dryers were unsafe, and failing to warn consumers that the Dryers

2   contained Defects that pose serious safety risks to consumers and the public.

3        238.   Electrolux's deceptive trade practices were designed to induce

4   Plaintiff and the California class members to purchase the Dryers containing the

5   Defects and to permit Electrolux to avoid the cost of replacing the defective Dryers

6   already in use in thousands of homes throughout California and the United States.

7        239.   Electrolux's violations of the CLRA were designed to conceal, and

8   Electrolux failed to disclose, material facts about the Defects and unreasonable

9   safety risks in the Dryers in order to induce Plaintiff and the California class

10  members to purchase the Dryers, and in order to avoid the enormous business cost

11  of retrofitting or replacing the Dryers.

12       240.   By engaging in the unfair and deceptive conduct described herein and

13  more fully above, Electrolux actively concealed and failed to disclose material facts

14  about the defective Dryers.

15       241.   The omissions set forth above regarding the Dryers are material facts

16  that a reasonable person would have considered important in deciding whether or

17  not to purchase a clothes dryer.  Indeed, no reasonable consumer would have

18  knowingly bought a Dryer for use in the home (or anywhere for that matter) if that

19  consumer had known that the product was designed with serious Defects that can

20  cause it to start on fire and that facilitate the spread of any fire throughout the home.

21       242.   Electrolux's acts were intended to be deceptive and/or fraudulent,

22  namely to market, distribute and sell the Dryers and to avoid the expense of

23  correcting the Defects and replacing thousands of Dryers throughout California and

24  across the United States.

25       243.   Plaintiff Carty and the California class members suffered injury in-fact

26  as a direct result of Electrolux's violations of the CLRA in that they have paid for a

27  Dryer that poses an immediate safety risk and will have to be replaced.

28

244.  Had Electrolux disclosed the true quality and defective nature of the Dryers, Plaintiff and class members would not have purchased the Dryers or would have paid substantially less for those Dryers.

245.  Plaintiff Carty and class members have also been denied the use of their Dryers, expended money on replacements, repairs, and extended warranties, and suffered unreasonable diminution in value of their Electrolux Dryers as a result of Electrolux's conduct.

246.  To this day, Electrolux continues to violate the CLRA by concealing the defective nature of the Dryers in failing to notify customers, failing to issue a recall, and in collecting the profits from costly repairs and replacements.  For their violations of the CLRA, Plaintiff Carty seeks damages and injunctive relief on behalf of herself and the California Consumer Class and Property Damage Subclass.  The prior named Plaintiffs in this case seeking to represent California class members (Shawn Roberts and Nicole Horton) gave notice of the same Defects described herein to Electrolux and demanded that Electrolux: (i) rectify the Defects; (ii) notify all consumers of the Dryers that Electrolux would provide them with an appropriate remedy, including, but not limited to, full reimbursement for the Dryers, along with compensation for out-of-pocket losses; (iii) conduct a corrective advertising campaign and destroy all misleading and deceptive advertising materials and products; and (iv) recall the defective Dryers and inform all purchasers of the Dryers of the Defects and that the Defects may cause the Dryers to catch fire and cause property damage, personal injuries, or death.  Electrolux's wrongful business practices in connection with the development, manufacture, marketing, and sale of the Dryers constitute a continuing course of conduct in violation of the CLRA.  A copy of former Plaintiffs Roberts and Horton's letter to Electrolux is attached to Plaintiffs' First Amended Complaint as Exhibit 1. Pursuant to Cal. Civ. Code § 1780(a), Plaintiff Carty and the class members seek an order enjoining Electrolux from continuing to engage in unlawful, unfair, or

-43-

deceptive business practices and any other act prohibited by law, awarding Plaintiff and the California class members restitution and/or disgorgement, and/or awarding Plaintiff and the California class members damages and punitive damages.

COUNT IX

**Violations of the California Unfair Competition Law**

(Cal. Bus. & Prof. Code § 17200, *et seq*.)

(Plaintiff Carty, Individually, and on Behalf of the California Consumer Class and California Property Damage Subclass)

247.   Plaintiff Carty re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

248.   Electrolux has engaged in unfair competition within the meaning of the California Business & Professions Code § 17200, *et seq*. ("the California UCL") because Electrolux's conduct is unlawful, misleading and unfair, as herein alleged.

249.   Electrolux's business practices are unlawful because they violate the California Civ. Code, including at least § 1572, 1709-10, 1770(a)(5), 1770(a)(7) and/or 1770(a)(9), 1770(a)(15), 1770(a)(19) and other laws.

250.   Electrolux violated the California UCL, when it concealed and/or failed to disclose the serious safety risks to consumers that its Dryers pose, and concealed and/or failed to disclose the fact that the Dryers were defective as described herein when it had a duty to disclose the safety risks and the Defects, and instead sold the Dryers as if they were fit for ordinary purposes and did not pose an unreasonable safety risk.

251.   Electrolux violated the California UCL when it failed to disclose the fact that the Dryers pose serious safety risks and were defective as described herein when it had a duty to disclose the safety risks and Defects to consumers and to and instead falsely represented that the Dryers were safe for consumer use and sold the Dryers as if they were safe for consumer use.

-44-

1    252.   Electrolux developed, manufactured, marketed and sold the Dryers.

2    253.   As more fully set forth above, Electrolux had knowledge of the serious

3    safety risks the Dryers pose to consumers and had knowledge of the Defects prior

4    to their sale to Plaintiff and class members.

5    254.   Electrolux failed to disclose at the time of sale to Plaintiff and class

6    members the material fact that the Dryers pose serious safety risks, are defective,

7    will prematurely fail, and pose a serious fire hazard when Electrolux was in

8    exclusive possession of this knowledge.

9    255.   Plaintiff Carty and the California class members did not and could not

10   know of the safety risks posed by the Dryers or the Defects at the time they

11   purchased their Dryers.  Plaintiff and the members of the California classes lost

12   money or property as a result of their purchases and thus Plaintiff has standing to

13   represent the classes in this action.

14   256.   Despite its knowledge of the serious safety risks the Dryers pose to

15   consumers and the public, Electrolux failed to issue a warning or recall and failed to

16   retrofit or replace the Dryers.  Instead, the company concealed the Defects and the

17   safety issues with its Dryers for years.

18   257.   Electrolux's business acts are both unlawful and fraudulent within the

19   meaning of the California UCL.

20   258.   As an entity with exclusive knowledge regarding the safety risks and

21   Defects in the Dryers, Electrolux had a duty to disclose the Defects, particularly in

22   light of the fact that the Dryers pose serious safety risks to Plaintiff and the

23   California class members.

24   259.   Plaintiff and the California class members reasonably expected that

25   Electrolux would disclose the existence of any Defects or serious safety risks the

26   Dryers pose to consumers and the public and reasonably expected that Electrolux

27   would not sell a product for home use that was unsafe to use in the home and would

28   start on fire, information which is and was material to Plaintiff and class members.

-45-

260.   Electrolux, at all times relevant, knew or should have known that Plaintiff and the California class members did not know of, or could not have reasonably discovered, the safety risks or the Defects.

261.   By concealing the serious safety risks posed by its Dryers and the existence of the Defects, Electrolux engaged in actionable, fraudulent conduct within the meaning of the California UCL.

262.   Had Plaintiff and class members known of the serious safety risks and/or the Defects in the Dryers, they would not have purchased the Dryers.

263.   Electrolux's business acts and practices alleged herein are unfair within the meaning of the California UCL.   Specifically, by failing to disclose and by concealing the existence of the Defects in the Dryers, Electrolux has engaged in unfair conduct within the meaning of the California UCL.

264.   Electrolux's misconduct is unfair within the meaning of the California UCL as it offends established policy and/or is immoral, unethical, unscrupulous, and substantially injurious to consumers.

265.   Plaintiff and California class members have lost money and/or property as a result of Defendant's misconduct.

266.   Electrolux's unlawful, unfair and fraudulent business acts and practices continue through the date of this Complaint's filing.

267.   Under the California UCL, Plaintiff and class members request that this court enjoin Electrolux from engaging in business practices that constitute a violation of the California UCL.   Plaintiff and California class members further request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair practices, as provided for in Cal. Bus. & Prof. Code § 17203 and for such other relief as set forth herein.

## COUNT X

### Breach of Implied Warranty of Merchantability

(Cal. Com. Code § 2314)

(Plaintiff Carty, Individually, and on Behalf of the California Consumer Class and California Property Damage Class)

268.    Plaintiff Carty re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

269.    Electrolux is and was at all relevant times a merchant with respect to clothes dryers under Cal. Com. Code § 2104.

270.    A warranty that the defective Dryers were in merchantable condition was implied by law in the purchases of Electrolux Dryers made by Plaintiff Carty and members of the California classes, pursuant to Cal. Com. Code § 2314.

271.    The Dryers owned by Plaintiff and class members were defectively designed and manufactured and pose serious and immediate safety risks to consumers and the public.

272.    The Dryers left Electrolux's facilities and control with Defects caused by defective design incorporated into the manufacture of the Dryers.

273.    The Defects expose consumers to serious safety risks when they are used in their homes.

274.    At all times relevant hereto, there was a duty imposed by law which requires that a manufacturer or seller's product be reasonably fit for the ordinary purposes for which such product is used, and that the product be acceptable in trade for the product description.  This implied warranty of merchantability is part of the basis for the bargain between Electrolux, on the one hand, and Plaintiff and class members, on the other.

275.    Notwithstanding the aforementioned duty, at the time of delivery, Electrolux breached the implied warranty of merchantability in that the Dryers were defective and posed serious safety risks at the time of sale, would not pass without

-47-

1   objection, are not fit for the ordinary purposes for which such goods are used

2   (safely drying clothes in a residential setting), and failed to conform to the standard

3   performance of like products used in the trade.

4       276.   Prior to the sale of the Dryers to Plaintiff and class members,

5   Electrolux knew or should have known that the Dryers posed safety risks and were

6   defective.  It know or should have known that it was a breach of the implies

7   warranty of merchantability to sell the Dryers in this defective condition.

8       277.   As a direct and proximate result of Electrolux's breach of the implied

9   warranty of merchantability, Plaintiff and class members bought the Dryers without

10   knowledge of the Defects or their serious safety risks.

11       278.   As a direct and proximate result of Electrolux's breach of the implied

12   warranty of merchantability, Plaintiff and class members purchased unsafe products

13   which could not be used for their intended use of safely drying clothes in a

14   residential setting.

15       279.   As a direct and proximate result of Electrolux's breach of the implied

16   warranty of merchantability, Plaintiff and class members have suffered damages

17   and Electrolux.

18       280.   Electrolux was unjustly enriched by keeping the profits for its unsafe

19   products while never having to incur the cost of repair, replacement or a recall.

20   **COUNT XI**

21   **Breach of Express Warranty**

22   (Cal. Com. Code § 2313)

23   (Plaintiff Carty, Individually, and on Behalf of the California Consumer Class and

24   California Property Damage Class)

25       281.   Plaintiff Carty re-alleges and incorporates the preceding paragraphs as

26   if fully set forth herein.

27       282.   Electrolux is and was at all times relevant a merchant with respect to

28   clothes dryers under Cal. Com. Code § 2104.

-48-

283.   As fully pled above, Electrolux had knowledge of the Defects alleged herein and that they pose serious safety risks to consumers like Plaintiff and class members.

284.   Despite that knowledge, at all relevant times, Electrolux expressly warranted in writing that "Every Electrolux Major Appliances gas or electric dryer is guaranteed to be free of materials defects or component malfunctions."

285.   In its warranty to customers, Electrolux also warrants in writing that it will "repair without charge any problem that occurs during the first year after purchase."

286.   During the second year of purchase, Electrolux warrants in writing that it will provide a "replacement for any defective part(s) that breaks due to defects in material or workmanship (not customer abuse) for two years from the original date of purchase.

287.   By issuing Dryers containing the Defects to consumers like Plaintiff and class members after it gained knowledge of the Defect, Electrolux breached its express warranty to provide Dryers that were free from defects and at a minimum would not catch on fire or spread the fire to consumers' homes.

288.   Electrolux also breached its express warranty to repair to correct material defects or component malfunctions in its Dryers when it failed to do so despite knowledge of the Defects and/or despite knowledge of alternative designs, alternative materials, and/or options for retrofits.

289.   Electrolux has not repaired such material defects or component malfunctions in its Dryers.

290.   Further, any "repairs" Electrolux offers do not fix the safety issue with its Dryers, are not adequate, and cannot be adequate to fix the serious safety issues caused by the Defects.

291.   The limited warranty of repair for the Dryers fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and class

members whole and/or because Electrolux has refused to provide the promised remedies within a reasonable time.

292.   Also, as alleged in more detail herein, at the time Electrolux warranted and sold the Dryers, it knew that they did not conform to express and implied warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their Dryers.

293.   Accordingly, Plaintiff and class members are not limited to the limited warranty of "repair" and Plaintiff and class members seek all remedies allowed by law.   As more fully detailed above, Electrolux was notified of the Plaintiff's fire but failed to provide a defect-free dryer to Plaintiff and class members free of charge or to provide an adequate retrofit to remedy the Defects.

294.   As more fully detailed above, Electrolux was provided with notice and has been on notice of the Defects and of its breach of express written warranties through thousands of consumer warranty claims reporting fires in the Electrolux Dryers, customer complaints, CPSC complaints, and its own internal and external testing and failed to repair, replace or retrofit the Dryers to ensure they were free of material defects or component malfunctions as Electrolux promised.

295.   As a direct and proximate result of Electrolux's breach of its express warranties, Plaintiff and class members have suffered damages.

296.   Electrolux has been unjustly enriched by keeping the profits from the sale of its unsafe Dryers while never having to incur the cost of repair, replacement, retrofit or a recall.

<u>COUNT XII</u>

**Strict Product Liability**

(Plaintiff Carty, Individually, and on Behalf of the California Property Damage Subclass)

297.   Plaintiff Carty re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

298.   Electrolux is engaged in the business of designing, manufacturing, distributing, advertising, marketing, promoting, and/or selling appliances, including dryers, throughout the United States.

299.   Electrolux designed, manufactured, distributed, advertised, marketed, promoted, and sold the Dryers at issue herein.

300.   The Dryers were expected to, and did, reach Plaintiff and class members without substantial change in the condition in which the Dryers were manufactured, sold, and distributed.

301.   The Dryers were in a defective and unreasonably dangerous condition when they left Electrolux's possession or control in that, under normal conditions, usage and applications, the Dryers could not withstand the use for which they were intended and failed, causing damage and fire as well as threatening consumers' personal safety and in some cases causing personal injuries.

302.   Plaintiff and class members used the Dryers in a manner reasonably intended by Electrolux.

303.   The Dryers were defective for the following reasons: (1) they were not reasonably safe for the ordinary and intended use of safely drying clothes; (2) Electrolux failed to provide Plaintiff and class members with adequate and sufficient warning regarding the known or foreseeable safety risks and dangers inherent in the Dryers; (3) the design, methods of manufacture, and testing of the Dryers was inadequate and produced a defective product.

304.   As a direct and proximate result of the defective condition of the Dryers, Plaintiff and class members purchased Dryers that do not serve the purpose for which they are intended, have suffered property damages and other incidental and consequential damages, and have put their personal safety and the safety of others at serious risk.

-51-

## COUNT XIII

### Strict Product Liability for Failure to Warn

(Plaintiff Carty, Individually, and on Behalf of the California Property Damage Subclass)

305.   Plaintiff Carty re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

306.   Electrolux is engaged in the business of designing, manufacturing, distributing, advertising, marketing, promoting, and/or selling appliances, including dryers.

307.   Electrolux designed, manufactured, distributed, advertised, marketed, promoted and sold the Dryers at issue herein without substantial change in the condition in which they were manufactured, sold, and distributed.

308.   The Dryers were in a defective and unreasonably dangerous condition when they left Electrolux's possession or control in that under normal conditions, usage and applications, the Dryers could not withstand the use for which they were intended and resulted in failure, damage, and fire causing damage to the dryer as well as threatening consumers' personal safety and, upon information and belief, in some instances, causing personal injury.

309.   Electrolux knew or should have known of the Defects in the Dryers described herein prior to their releasing them into the stream of commerce.

310.   Electrolux had no reason to believe that consumers who purchased the Dryers would be aware of the harm associated with the use of the Dryers.

311.   Prior to and before distributing the Dryers sold to Plaintiff and class members, Electrolux had a legal duty to warn Plaintiff and class members about the Defects in the Dryers and the dangers the Defects posed.

312.   As a direct and proximate result of the defective condition of the Dryers, Plaintiff and class members purchased Dryers that do not serve the purpose for which they are intended, have suffered property damages and other incidental

-52-

1   and consequential damages, and have put their personal safety, and the safety of

2   others, at serious risk.

3                              COUNT XIV

4                           Unjust Enrichment

5   (Plaintiff Carty, Individually, and on Behalf of the California Consumer Class and

6                  the California Property Damage Subclass)

7        313.   Plaintiff Carty re-alleges and incorporates by reference all paragraphs

8   as though fully set forth herein, and asserts these allegations in the alternative to

9   any warranty claims.

10       314.   Electrolux had knowledge of the Defects and the serious safety risks

11  they pose, which it failed to disclose to Plaintiff and the class members.

12       315.   As a result of its wrongful and fraudulent acts and omissions, as set

13  forth above, pertaining to the design Defects of the Dryers and the concealment of

14  the Defects, Electrolux obtained monies which rightfully belong to Plaintiffs.

15       316.   Electrolux appreciated, accepted and retained the non-gratuitous

16  benefits conferred by Plaintiff and the class members, who without knowledge of

17  the safety Defects either purchased Dryers they would not otherwise have

18  purchased or paid a higher price for their Dryers than they otherwise would have.

19       317.   It would be inequitable and unjust for Electrolux to retain these

20  wrongfully obtained profits.

21       318.   Plaintiff, therefore, is entitled to restitution of the profits unjustly

22  obtained, plus interest.

23

24

25

26

27

28

-53-

# ILLINOIS

## COUNT XV

### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act

(815 ILCS 505/1, *et seq.*)

(Plaintiff Gavic, Individually, and on Behalf of the Illinois Consumer Class)

319.   Plaintiff Gavic re-alleges and incorporates the preceding paragraphs as through fully set forth herein.

320.   At all times relevant hereto, there was in full force and effect the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* ("the CFA").

321.   Plaintiff and other class members may sue as consumers within the meaning of the CFA because Electrolux's business activities involve trade or commerce, are addressed to the market generally, and otherwise implicate consumer protection concerns.

322.   Section 2 of the CFA renders unlawful the "use or employment of any deception [including the] concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce."

323.   When Electrolux developed, manufactured, marketed and sold the Dryers, it was involved in the conduct of trade and commerce under the CFA.

324.   At the time Electrolux developed, manufactured, marketed, and sold the Dryers, it knew that they contained Defects that pose serious safety risks to consumers like Plaintiff and class members.

325.   Nonetheless, Electrolux concealed its knowledge of the Defects from consumers like Plaintiff and Illinois class members and instead sold its Dryers as safe for home use.

326.   The Defects pose serious safety risks to consumers and were hidden from the consumer.

327.   Electrolux intentionally concealed the unreasonable safety risks associated with the defective Dryers which were material facts to consumers like Plaintiff and class members. Indeed, no reasonable consumer would have knowingly bought a Dryer for use in the home (or anywhere for that matter) if that consumer had known that the product was designed with serious Defects that can cause it to start on fire and that facilitate the spread of any fire throughout the home.

328.   Electrolux's intentional misrepresentations, omissions and concealments of material fact constitute unfair and/or deceptive practices in violation of the CFA.

329.   Electrolux violated the CFA not only when it sold the Dryers representing them to be safe to be used in consumers' homes, but when it failed to disclose to Plaintiff and the Illinois class members that the Dryers had  Defects that pose serious safety risks to consumers and the public despite its knowledge of those Defects and their safety risk.

330.   Electrolux violated the CFA when it sold a product for home use that it knew was unsafe to use in the home and indeed had the propensity to start on fire during normal household use, when it held out to the public that its Dryers could be used safely in the home, and when it failed to warn consumers that the Dryers contained Defects that pose serious safety risks to consumers and the public.

331.   Electrolux's deceptive practices were designed to induce Plaintiff and the Illinois class members to purchase the Dryers containing the Defect and to avoid the cost of replacing, retrofitting, and/or repairing the defective Dryers already in use in thousands of homes throughout Illinois.

332.   Electrolux's violations of the CFA were designed to conceal, and Electrolux failed to disclose, material facts about the Defects and unreasonable safety risks of the Dryers in order to induce Plaintiff and the Illinois class members to purchase the Dryers and in order to avoid the cost of replacing, repairing or retrofitting the Dryers.

333.   Plaintiff and the Illinois class members suffered injury in-fact as a direct result of Electrolux's violations of the CFA in that they have paid for Dryers that pose an immediate safety risk and will have to be replaced.

334.   Had Electrolux disclosed the true quality, and defective nature of the Dryers, Plaintiff and class members would not have purchased the Dryers or would have paid substantially less for them.

335.   Plaintiff and class members have also been denied the use of their Dryers, expended money on replacements, repairs, and extended warranties, and suffered unreasonable diminution in value of their Electrolux Dryers as a result of Electrolux's conduct.

336.   To this day, Electrolux continues to violate the CFA by concealing the defective nature of the Dryers in failing to notify customers of the serious safety issues posed by the Defects, in failing to issue a recall or retrofit, and in collecting the profits from costly repairs and replacements.

337.   As a direct and proximate result of Electrolux's unfair acts or practices alleged herein, Plaintiff Gavic and Illinois class members were damaged.

## COUNT XVI

### Violation of Illinois Uniform Deceptive Trade Practices Act

### (815 ILCS 510/1, *et seq.*)

(Plaintiff Gavic, Individually, and on Behalf of the Illinois Consumer Class)

338.   Plaintiff Gavic re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

339.   At all times relevant hereto, there was in full force and effect the Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/1, *et seq.*

340.   815 ILCS 510/2 provides that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods

-56-

or services; … (5) represents that goods or services have sponsorship, approval, characteristics ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; … (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; … (9) advertises goods or services with intent not to sell them as advertised; … [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

341.   Electrolux is a "person" within the meaning of 815 ILCS 510/1 (5).

342.   Electrolux's actions, as alleged herein, constitute deceptive, unfair, fraudulent, and unlawful practices committed in violation of 815 ILCS 510, *et seq.*

343.   All of the conduct and misrepresentations alleged herein occurred in the course of Defendant's business and was part of a pattern or generalized course of conduct.

344.   As pled more fully above, Electrolux knew of the Defects and that the Dryers posed a serious safety risk to consumers but concealed that knowledge and misrepresented to consumers and the public that its Dryers were safe for in home use.

345.   Despite its knowledge of the serious safety risk the Dryers posed to consumers and the public, Electrolux failed to issue a warning or repair, retrofit, recall and/or replace the Dryers and instead concealed the Defects and the safety issues with the Dryers for years and is still concealing it today.

346.   As an entity with exclusive knowledge regarding the safety risk and Defects in the Dryers, Electrolux had a duty to disclose the Defects, particularly in light of the fact that the Dryers posed a serious safety risk to Plaintiff and the Illinois class members.

347.   Plaintiff and the Illinois class members reasonably expected that Electrolux would disclose the existence of the Defects and the serious safety risk

-57-

the Dryers posed to consumers and the public and reasonably expected that Electrolux would not sell a product for home use that was unsafe to use in the home and would start on fire, information which is and was material to Plaintiff and class members.

348.   Electrolux, at all times relevant, knew or should have known that Plaintiff and the Illinois class members did not know of, or could not have reasonably discovered, the safety risk or the Defects and that Electrolux was in exclusive possession of the knowledge of the Defects.

349.   By concealing the serious safety risk posed by its Dryers and the existence of the Defects and representing that the Dryers were safe to use in the home, Electrolux engaged in actionable conduct within the meaning of the UDTPA.

350.   Had Plaintiff and class members known of the serious safety risk and/or the Defects in the Dryers, they would not have purchased the Dryers or would have paid substantially less for their Dryers.

351.   Defendant's deceptive, unfair, fraudulent, and unlawful conduct alleged herein was specifically designed to and did induce Plaintiff Gavic and Illinois class members to purchase the Electrolux Dryers for use and installation in their homes and in residential structures.

352.   Electrolux violated the UDTPA when it concealed and/or failed to disclose the serious safety risk to consumers that its Dryers posed, and concealed and/or failed to disclose fact that the Dryers were defective as described herein when it had a duty to disclose the safety risks and the Defects, and instead sold the Dryers as if they were fit for ordinary purposes, could be used safely in the home, and did not pose an unreasonable safety risk.

353.   Electrolux violated the UDTPA when it failed to disclose the fact that the Dryers posed a serious safety risk and were defective as described herein when it had a duty to disclose the safety risk to consumers and to disclose the Defects and

1    instead falsely represented that the Dryers were safe for consumer use and sold the

2    Dryers as if they were safe for consumer use.

3         354.   Plaintiff and the Illinois class members lost money or property as a

4    result of their purchases and thus Plaintiff has standing to represent the classes in

5    this action.

6         355.   As a direct and proximate result of Electrolux's violation of the Illinois

7    UDTPA alleged herein, Plaintiff Gavic and Illinois class members were damaged.

8                               <u>COUNT XVII</u>

9              **Breach of Implied Warranty of Merchantability**

10        (Plaintiff Gavic, Individually, and on Behalf of the Illinois Consumer Class)

11        356.   Plaintiff Gavic re-alleges and incorporates the preceding paragraphs as

12   if fully set forth herein.

13        357.   Electrolux is and was at all relevant times a merchant with respect to

14   clothes dryers under 810 ILCS 5/2-314.

15        358.   A warranty that the defective Dryers were in merchantable condition

16   was implied by law when the Dryers were sold to Gavic and Illinois class members,

17   pursuant to 810 ILCS 5/2-314.

18        359.   At all times relevant hereto, 810 ILCS 5/2-314 imposed a duty that

19   requires a manufacturer or seller's product be reasonably fit for the ordinary

20   purposes for which such products are used, and that the products be acceptable in

21   trade for the product description.

22        360.   This implied warranty of merchantability is part of the basis for the

23   bargain between Electrolux, on the one hand, and Plaintiff and class members, on

24   the other.

25        361.   The Dryers owned by Plaintiff and class members were defectively

26   designed and manufactured and pose serious and immediate safety risks to

27   consumers and the public.

28

-59-

362.   The Dryers left Electrolux's facilities and control with Defects caused by defective design incorporated into the manufacture of the Dryer.

363.   The Defects place the consumers at a serious safety risk upon using the Dryer in his/her home.

364.   Notwithstanding the aforementioned duty, at the time of delivery, Electrolux breached the implied warranty of merchantability in that the Dryers were defective and posed a serious safety risk at the time of sale, would not pass without objection, were not fit for the ordinary purposes for which such goods are used of safely drying clothes in residential setting, and failed to conform to the standard performance of like products used in the trade.

365.   Electrolux knew, or should have known, that the Dryers posed a safety risk and were defective and knew or should have known of these breaches of the implied warranty of merchantability prior to the sale of the Dryers to Plaintiff and class members.

366.   As a direct and proximate result of Electrolux's breach of the implied warranty of merchantability, Plaintiff and class members bought the Dryers without knowledge of the Defects or their serious safety risks.

367.   As a direct and proximate result of Electrolux's breach of the implied warranty of merchantability, Plaintiff and class members purchased unsafe products which could not be used for their intended use of safely drying clothes in a residential setting.

368.   As a direct and proximate result of Electrolux's breach of the implied warranty of merchantability, Plaintiff and class members have suffered damages.

369.   Electrolux was unjustly enriched by keeping the profits for its unsafe products while never having to incur the cost of repair, replacement or a recall.

## COUNT XVIII

### Breach of Express Warranty

(Plaintiff Gavic, Individually, and on Behalf of the Illinois Consumer Class)

370.   Plaintiff Gavic re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

371.   As fully pled above, Electrolux had knowledge of the Defects alleged herein and that they pose serious safety risks to consumers like Plaintiff and class members.

372.   Despite that knowledge, at all times relevant, Electrolux expressly warranted in writing that "Every Electrolux Major Appliances gas or electric dryer is guaranteed to be free of materials defects or component malfunctions."

373.   In its warranty to customers, Electrolux also warrants in writing that it will "repair without charge any problem that occurs during the first year after purchase."

374.   During the second year of purchase, Electrolux warrants in writing that it will provide a "replacement for any defective part(s) that breaks due to defects in material or workmanship (not customer abuse) for two years from the original date of purchase.

375.   By issuing Dryers containing the Defects to consumers like Plaintiff and class members after it gained knowledge of the Defects, Electrolux breached its express warranty to provide Dryers that were free from defects.

376.   Electrolux also breached its express warranty to repair to correct material defects or component malfunctions in its Dryers when it failed to do so despite knowledge of the Defects and/or despite knowledge of alternative designs, alternative materials and/or options for retrofits.

377.   Electrolux has not repaired such material defects or component malfunctions in its Dryers.

378.   Further, any "repairs" Electrolux offers do not fix the safety issues with its Dryers, are not adequate, and cannot be adequate to fix the serious safety issues caused by the Defects.

379.   The limited warranty of repair to the Dryers fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and class members whole and/or because Electrolux has refused to provide the promised remedies within a reasonable time.

380.   Also, as alleged in more detail herein, at the time Electrolux warranted and sold the Dryers, it knew that the Dryers did not conform to its warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding its Dryers.

381.   Accordingly, Plaintiff and class members are not limited to the limited warranty of "repair" and Plaintiff and class members seek all remedies allowed by law.

382.   As more fully detailed above, Electrolux was notified of Plaintiff's Dryer fire but failed to provide a defect-free dryer to Plaintiff and class members free of charge or to provide an adequate retrofit to remedy the Defects.

383.   As more fully detailed above, Electrolux was provided with notice by the Plaintiff, and has been on notice of the Defects and of its breach of express written warranties through thousands of consumer warranty claims reporting fires in the Electrolux Dryers, customer complaints, CPSC complaints and its own internal and external testing, but failed to repair, replace, or retrofit the Dryers to ensure they were free of materials defects or component malfunctions as Electrolux promised.

384.   As a direct and proximate result of Electrolux's breach of the implied warranty of merchantability, Plaintiff and class members have suffered damages.

385.   Electrolux has been unjustly enriched by keeping the profits from the sale of its unsafe Dryers while never having to incur the cost of repair, replacement, retrofit, or a recall.

## COUNT XIX

### Unjust Enrichment

(Plaintiff Gavic, Individually, and on Behalf of the Illinois Consumer Class)

386.   Plaintiff Gavic re-alleges and incorporates by reference all paragraphs as though fully set forth herein and asserts these allegations in the alternative to any warranty claims.

387.   Electrolux had knowledge of the Defects and the serious safety risks they pose, which it failed to disclose to Plaintiff and the class members.

388.   As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design Defects of the Dryers and the concealment of the Defects, Electrolux obtained monies which rightfully belong to Plaintiff to the detriment of the Plaintiff.

389.   Electrolux appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiff and the class members, who without knowledge of the safety Defect either purchased dryers they would otherwise not have purchased or paid a higher price for their Dryers than they otherwise would have.

390.   It would be inequitable and unjust for Electrolux to retain these wrongfully-obtained profits.

391.   Electrolux's retention of these wrongfully-obtained profits would violate the fundamental principles of justice, equity, and good conscience.

392.   Plaintiff and class members, therefore, are entitled to restitution of the profits unjustly obtained, plus interest.

## MISSOURI

## COUNT XX

### Violation of the Missouri Merchandising Practices Act

(Mo. Rev. Stat. § 407.010, *et seq.*)

(Plaintiff Downs, Individually, and on Behalf of the Missouri Consumer Class and Property Damage Subclasses)

393.   Plaintiff Downs re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

394.   This cause of action is brought pursuant to Mo. Rev. Stat. § 407.025 for violations of Mo. Rev. Stat. § 407.020, the Missouri Merchandising Practices Act ("MMPA").

395.   When Electrolux developed, manufactured, marketed and sold the Dryers it was involved in the conduct of trade and commerce under the MMPA.

396.   At the time Electrolux developed, manufactured, marketed and sold the Dryers Electrolux knew, or upon reasonable inquiry should have known, that the Dryers contained a Defect that posed a serious safety risk to consumers like Plaintiff and class members.

397.   Nonetheless, Electrolux concealed its knowledge of the Defects from consumers like Plaintiff Downs and Missouri class members and instead sold its Dryers as safe for home use.

398.   The Defects posed a serious safety risk to consumers and was hidden from the consumer.

399.   Electrolux intentionally concealed the unreasonable safety risks associated with the defective Dryers which were material facts to consumers like Plaintiff and class members. Indeed, no reasonable consumer would have knowingly bought a Dryer for use in the home (or anywhere for that matter) if that consumer had known that the product has serious Defects and safety risk and that

1   had the propensity to start on fire in the home and spread the fire outside the Dryer
2   once a fire in the Dryer has occurred.

3       400.   Electrolux's intentional misrepresentations, omissions and
4   concealments of material fact constitute unfair and/or deceptive practices in
5   violation of the MMPA.

6       401.   Electrolux violated the MMPA not only when it sold the Dryers
7   representing the Dryers to be safe to be used in consumers' homes, but when it
8   failed to disclose to Plaintiff and the Missouri classes members that the Dryers had
9   Defects that posed a serious safety risk to consumers and the public despite the
10  knowledge of those Defects and its safety risk.

11      402.   Electrolux violated the MMPA when it a product for home use that
12  Electrolux knew was unsafe to use in the home and indeed had the propensity to
13  start on fire during normal household use, when it held out to the public that its
14  Dryers could be used safely in the home, and when it failed to warn consumers that
15  the Dryers contained Defects that posed a serious safety risk to consumers and the
16  public.

17      403.   Electrolux's deceptive practices were designed to induce Plaintiff and
18  the Missouri class members to purchase the Dryers containing the Defects and to
19  avoid the cost of replacing retrofitting and/or repairing the defective Dryers already
20  in use in thousands of homes throughout Missouri.

21      404.   Electrolux's violations of the MMPA were designed to conceal, and
22  Electrolux failed to disclose, material facts about the Defects and unreasonable
23  safety risks of the Dryers in order to induce Plaintiff and the Missouri class
24  members to purchase the Dryers and in order to avoid the cost of replacing,
25  repairing or retrofitting the Dryers.

26      405.   Plaintiff and Missouri class members suffered injury in-fact as a direct
27  result of Electrolux's violations of the MMPA in that they have paid for a Dryer
28  that poses an immediate safety risk and will have to be replaced.

406.   Had Electrolux disclosed the true quality, nature and defects of the Dryers, Plaintiff and class members would not have purchased the Dryers or would have paid substantially less for their Dryers.

407.   Plaintiff and class members have also been denied the use of their Dryers, expended money on replacements, repairs, and extended warranties, and suffered unreasonable diminution in value of their Electrolux Dryers as a result of Electrolux's conduct.

408.   To this day, Electrolux continues to violate the MMPA by concealing the defective nature of the Dryers in failing to notify customers of the serious safety issue posed by the Defects, in failing to issue a recall or retrofit, and in collecting the profits from costly repairs and replacements.

409.   As a direct and proximate result of Electrolux' violations of the MMPA alleged herein, Plaintiff Downs and Missouri class members were damaged.

410.   As a direct and proximate result of Electrolux's violation of the MMPA alleged herein, Plaintiff Downs and Missouri class members suffered an ascertainable loss of money and/or property.

411.   Electrolux is liable to Plaintiff and the class members for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs and such equitable relief as this Court sees fit.

412.   Pursuant to Mo. Rev. Stat. § 407.025, Plaintiff will serve the Clerk of Court with the appropriate notice that this action is filed pursuant so that the Clerk may give the Missouri Attorney General Notice of the action.

<u>COUNT XXI</u>

**Breach of the Implied Warranty of Merchantability**

(Mo. Rev. Stat. § 400.2-314)

(Plaintiff Downs, Individually, and on Behalf of the Missouri Replacement Class and Missouri Property Damage Class)

413.   Plaintiff Downs re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

414.   Electrolux is and was at all relevant times a merchant with respect to clothes dryers.

415.   A warranty that the defective Dryers were in merchantable condition was implied by law when the Dryers were sold to Plaintiff Downs and class members, pursuant to Mo. Rev. Stat. § 400.2-314.

416.   At all times relevant hereto, Mo. Rev. Stat. § 400.2-314 imposed a duty that requires a manufacturer or seller's product be reasonably fit for the ordinary purposes for which such products are used, and that the product be acceptable in trade for the product description.  This implied warranty of merchantability is part of the basis for the bargain between Electrolux, on the one hand, and Plaintiff and class members, on the other.

417.   The Dryers owned by Plaintiff and class members were defectively designed and manufactured and posed a serious and immediate safety risk to consumers and the public.

418.   The Dryers left Electrolux's facilities and control with Defects caused by defective design incorporated into the manufacture of the Dryer.

419.   The Defects places the consumers at a serious safety risk upon using the Dryer in his/her home.

420.   Notwithstanding the aforementioned duty, at the time of delivery, Electrolux breached the implied warranty of merchantability in that the Dryers were defective and posed a serious safety risk at the time of sale, would not pass without

-67-

objection, are not fit for the ordinary purposes for which such goods are used of safely drying clothes in residential setting, and failed to conform to the standard performance of like products used in the trade.

421.   Electrolux knew, or should have known, that the Dryers posed a safety risk and were defective and knew, or should have known, of these breaches of the implied warranty of merchantability prior to sale of the Dryers to Plaintiff and class members.

422.   As a direct and proximate result of Electrolux's breaches of the implied warranty of merchantability, Plaintiff and class members bought the Dryers without knowledge of the Defects or their serious safety risks.

423.   As a direct and proximate result of Electrolux's breach of the implied warranty of merchantability Plaintiff and class members purchased unsafe products which could not be used for their intended use of safely drying clothes in a residential setting.

424.   As a direct and proximate result of Electrolux's breach of the implied warrant of merchantability, Plaintiff and class members have suffered damages and Electrolux.

425.   Electrolux was unjustly enriched by keeping the profits for its unsafe products while never having to incur the cost of repair, replacement or a recall.

<u>COUNT XXII</u>

**Breach of Express Warranty**

(Mo. Rev. Stat. § 400.2-313)

(Plaintiff Downs, Individually, and on Behalf of the Missouri Consumer Class and Missouri Property Damage Class)

426.   Plaintiff Downs re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

427.   As fully pled above, Electrolux had knowledge of the Defects alleged herein and that it posed a serious safety risk to consumers like Plaintiff and class members.

428.   Despite that knowledge, at all times relevant, Electrolux expressly warranted in writing that "Every Electrolux Major Appliances gas or electric dryer is guaranteed to be free of materials defects or component malfunctions."

429.   In its warranty to customers, Electrolux also warrants in writing that it will "repair without charge any problem that occurs during the first year after purchase."

430.   During the second year of purchase, Electrolux warrants in writing that it will provide a "replacement for any defective part(s) that breaks due to defects in material or workmanship (not customer abuse) for two years from the original date of purchase.

431.   By issuing Dryers containing the Defects to consumers like Plaintiff and class members after it gained knowledge of the Defect, Electrolux breached its express warranty to provide Dryers that were free from defects.

432.   Electrolux also breached its express warranty to repair to correct material defects or component malfunctions in its Dryers when it failed to do so despite knowledge of the Defects and/or despite knowledge of alternative designs, alternative materials and/or options for retrofits.

433.   Electrolux has not repaired such material defects or component malfunctions in its Dryers.

434.   Further, any "repairs" Electrolux offers do not fix the safety issue with its Dryers and are not adequate and cannot be adequate to fix the serious safety issues caused by the Defects.

435.   The limited warranty of repair to the Dryers fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and class

1  members whole and/or because Electrolux has refused to provide the promised
2  remedies within a reasonable time.

3      436.   Also, as alleged in more detail herein, at the time Electrolux warranted
4  and sold the Dryers, it knew that the Dryers did not conform to the warranties and
5  were inherently defective, and Defendants wrongfully and fraudulently
6  misrepresented and/or concealed material facts regarding their Dryers.

7      437.   Accordingly, Plaintiff and class members are not limited to the limited
8  warranty of "repair" and Plaintiff and class members seek all remedies allowed by
9  law.

10     438.   As more fully detailed above, Electrolux was notified of Plaintiff's
11 Dryer fire but failed to provide a defect-free dryer to Plaintiff and class members
12 free of charge or to provide an adequate retrofit to remedy the Defects.

13     439.   As more fully detailed above, Electrolux was provided with notice and
14 has been on notice of the Defects and of its breach of express written warranties
15 through thousands of consumer warranty claims reporting fires in the Electrolux
16 Dryers, customer complaints, CPSC complaints and its own internal and external
17 testing and failed to repair, replace or retrofit the Dryers to ensure they were free of
18 materials defects or component malfunctions as Electrolux promised.

19     440.   As a direct and proximate result of Electrolux's breach of its express
20 warranties, Plaintiff and class members have suffered damages.

21     441.   Electrolux has been unjustly enriched by keeping the profits from the
22 sale of its unsafe Dryers while never having to incur the cost of repair, replacement,
23 retrofit or a recall.

## COUNT XXIII

### Strict Product Liability

(Mo. Rev. Stat. § 537.760)

(Plaintiff Downs, Individually, and on Behalf of the Missouri Property Damage Subclass)

442.   Plaintiff Downs re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

443.   At all times herein mentioned, Electrolux designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed the dryers as hereinabove described and the Plaintiff and class members used said product.

444.   Electrolux expected that the dryers would reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by Electrolux.

445.   At those times, the dryers were in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, to Plaintiff and the class members.

446.   Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective in design in that, when they left the hands of the manufacturer or suppliers, the foreseeable risks exceeded the benefits associated with their design.

447.   Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective in design in that, when they left the hands of Electrolux or suppliers, they were unreasonably dangerous and they were more dangerous than an ordinary consumer would expect.

448.   At all times herein mentioned, the dryers were in a defective and unsafe condition, and Electrolux knew or had reason to know that said products

-71-

were defective and unsafe, especially when used in the form and manner as provided by Electrolux.

449.   Electrolux knew or should have known that at all times herein mentioned, its dryers were in a defective, inherently dangerous and unsafe condition.

450.   At the time of the Plaintiff's and class members' use of dryers, the dryers were being used for the purposes and in a manner normally intended.

451.   Electrolux had a duty to create products that were not unreasonably dangerous for their normal, intended use.

452.   Electrolux created products unreasonably dangerous for their normal, intended use.

453.   Plaintiff and the class members could not, by the exercise of reasonable care, have discovered the defects and perceived their danger.

454.   Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective because Electrolux knew but concealed the unreasonable, dangerous safety hazards associated with its dryers, including possible injury and death, expense and economic loss, and Electrolux failed to adequately warn of said risks.

455.   Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective due to inadequate post-marketing surveillance and warnings because, after Electrolux knew or should have known of the risks of unreasonable, dangerous safety hazards, including possible injury and death, expense and economic loss, Electrolux concealed those risks and dangers from consumers and failed to warn consumers of those risks and dangers.

456.   The Defects in Electrolux's dryers were a substantial factor in causing injuries to the Plaintiff and class members.

457.   As a result of the foregoing acts and omissions, Plaintiff and the class members were and/or still are caused to suffer unreasonable, dangerous effects, including possible injury and death, expense, and damages.

## COUNT XXIV

### Unjust Enrichment

(Plaintiff Downs, Individually, and on Behalf of the Missouri Consumer Class and the Missouri Property Damage Subclass)

458.   Plaintiff Downs re-alleges and incorporate by reference all paragraphs as though fully set forth herein, and in the alternative to warranty claims.

459.   Electrolux had knowledge of the Defects and the serious safety risks it poses, which it failed to disclose to Plaintiff and the classes.

460.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design Defects of the Dryers and the concealment of the Defects, Electrolux obtained monies which rightfully belong to Plaintiffs.

461.   Electrolux appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiff and the classes, who without knowledge of the safety Defects either paid a higher price for their Dryers which actually had lower values or received monies for Dryers Plaintiff and class members would not have purchased.

462.    It would be inequitable and unjust for Electrolux to retain these wrongfully obtained profits.

463.   Plaintiffs, therefore, are entitled to restitution of the profits unjustly obtained, plus interest.

-73-

1

NEW YORK

2

COUNT XXV

3

**Violation of the New York Deceptive Acts and Practices Statute**

4

(N.Y. GBL § 349, *et seq.*)

5

(Plaintiff McGowan, Individually, and on Behalf of the New York Consumer Class

6

and Property Damage Subclass)

7

464. Plaintiff McGowan re-alleges and incorporate by reference all

8

paragraphs as though fully set forth herein.

9

465. Plaintiff and other members of the New York Consumer Class and

10

Property Damage Subclass are "consumers" in accordance with N.Y. GBL § 349.

11

466. At all relevant times material hereto, Electrolux conducted trade and

12

commerce in New York and elsewhere within the meaning of N.Y. GBL § 349.

13

467. Electrolux concealed that its ball hitch Dryers are designed and sold

14

with a defect that poses a substantial safety risk to the consumer.

15

468. Electrolux concealed that its ball hitch Dryers are defective because

16

they are designed in such a way that allows lint to accumulate behind the Dryer's

17

drum and next to the heat source. This defective design results in lint accumulating

18

in areas that are not visible to, nor serviceable by, the user. The defective design

19

also incorporates combustible plastic blower housings  which do not adequately

20

contain the fire, and allow any internal dryer fire to spread outside of the cabinet,

21

causing significant property damage.

22

469. Electrolux consciously omitted to disclose material facts from Plaintiff

23

McGowan and other class members with respect to the use and dangers associated

24

with the dryers.

25

470. Electrolux intended that Plaintiff McGowan and other members of the

26

New York Class and Subclass rely on Electrolux's acts of concealment and

27

omissions, so that Plaintiff McGowan and class members would obtain an

28

Electrolux Dryer for personal use.

-74-

471.   The foregoing acts, omissions, and practices proximately caused Plaintiff McGowan and the class members to suffer actual injury.

## COUNT XXVI

### Breach of Implied Warranty of Merchantability

(N.Y. UCC § 2-314)

(Plaintiff McGowan, Individually, and on Behalf of the New York Consumer Class and Property Damage Subclass)

472.   Plaintiff McGowan re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

473.   Electrolux is a "merchant" within the meaning of N.Y. UCC § 2-314.

474.   The dryers are "goods" within the meaning of N.Y. UCC § 2-314.

475.   Electrolux's implied warranty of merchantability accompanied the sale of the dryers to Plaintiff McGowan and class members.

476.   Electrolux, by implication, warranted that the dryers were fit for ordinary use.

477.   The design and frequent failure of the dryers made them defective and, thus, unfit for the ordinary purposes for which the goods are used. The dryers are not fit for ordinary use because they can catch fire.

478.   As set forth herein, any effort by Electrolux to disclaim or otherwise limit its responsibility for the defective dryers is unconscionable under all of the circumstances, including because Electrolux knew that the dryers were unfit for normal use. Through the conduct described herein, Electrolux has breached the implied warranty of merchantability and is liable to Plaintiff and class members.

479.   Plaintiff and class members have sustained damages as a result of Electrolux's breaches.

480.   Plaintiff and other class members have provided notice to Electrolux regarding the problems they experienced with the dryers and, notwithstanding such

notice, Electrolux has failed and refused to remedy the problems.  Further, Electrolux had actual knowledge of the Defects.

481.   As a result of Electrolux's breach of the implied warranty of merchantability, Plaintiff McGowan and class members suffered damages.

**COUNT XXVII**

**Breach of Express Warranty**

(N.Y. UCC § 2-313)

(Plaintiff McGowan, Individually, and on Behalf of the New York Consumer Class and Property Damage Subclass)

482.   Plaintiff McGowan re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

483.   Electrolux is a "merchant" within the meaning of N.Y. UCC § 2-313.

484.   The dryers are "goods" within the meaning of N.Y. UCC § 2-313.

485.   As fully pled above, Electrolux had knowledge of the Defect alleged herein and that it posed a serious safety risk to consumers like Plaintiff and class members.

486.   Despite that knowledge, at all times relevant, Electrolux expressly warranted in writing that "Every Electrolux Major Appliances gas or electric dryer is guaranteed to be free of materials defects or component malfunctions."

487.   In its warranty to customers, Electrolux also warrants in writing that it will "repair without charge any problem that occurs during the first year after purchase."

488.   During the second year of purchase, Electrolux warrants in writing that it will provide a "replacement for any defective part(s) that breaks due to defects in material or workmanship (not customer abuse) for two years from the original date of purchase.

489.   By issuing Dryers containing the Defects to consumers like Plaintiff and class members after it gained knowledge of the Defects, Electrolux breached its express warranty to provide Dryers that were free from defects.

490.   Electrolux also breached its express warranty to repair to correct material defects or component malfunctions in its Dryers when it failed to do so despite knowledge of the Defects and/or despite knowledge of alternative designs, alternative materials and/or options for retrofits.

491.   Electrolux has not repaired such material defects or component malfunctions in its Dryers.

492.   Further, any "repairs" Electrolux offers do not fix the safety issue with its Dryers and are not adequate and cannot be adequate to fix the serious safety issues caused by the Defects.

493.   The limited warranty of repair to the Dryers fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and class members whole and/or because Electrolux has refused to provide the promised remedies within a reasonable time.

494.   Also, as alleged in more detail herein, at the time Electrolux warranted and sold the Dryers, it knew that the Dryers did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their Dryers.

495.   Accordingly, Plaintiff and class members are not limited to the limited warranty of "repair" and Plaintiff and class members seek all remedies allowed by law.

496.   As more fully detailed above, Electrolux was notified of Plaintiff's Dryer fire but failed to provide a defect-free dryer to Plaintiff and class members free of charge or to provide an adequate retrofit to remedy the Defects.

497.   As more fully detailed above, Electrolux was provided with notice and has been on notice of the Defects and of its breach of express written warranties

-77-

through thousands of consumer warranty claims reporting fires in the Electrolux Dryers, customer complaints, CPSC complaints and its own internal and external testing and failed to repair, replace or retrofit the Dryers to ensure they were free of materials defects or component malfunctions as Electrolux promised.

498.   As a direct and proximate result of Electrolux's breach of its express warranties, Plaintiff and class members have suffered damages.

**COUNT XXVIII**

**Strict Product Liability**

(Plaintiff McGowan, Individually, and on Behalf of the New York Property Damage Subclass)

499.   Plaintiff McGowan re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

500.   At all times herein mentioned, Electrolux designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed the dryers as hereinabove described and the Plaintiff and class members used said product.

501.   Electrolux expected that the dryers would reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by Electrolux.

502.   At those times, the dryers were in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, to Plaintiff and the class members.

503.   Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective in design in that, when they left the hands of the manufacturer or suppliers, the foreseeable risks exceeded the benefits associated with their design.

504.   Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective in design in that, when they left the hands of Electrolux or suppliers, they were unreasonably dangerous and they were more dangerous than an ordinary consumer would expect.

505.   At all times herein mentioned, the dryers were in a defective and unsafe condition, and Electrolux knew or had reason to know that said products were defective and unsafe, especially when used in the form and manner as provided by Electrolux.

506.   Electrolux knew or should have known that at all times herein mentioned, its dryers were in a defective, inherently dangerous and unsafe condition.

507.   At the time of the Plaintiff's and class members' use of dryers, the dryers were being used for the purposes and in a manner normally intended.

508.   Electrolux, with this knowledge, voluntarily designed its dryers in a dangerous condition for use by the public, and in particular by Plaintiff and the class members.

509.   Electrolux had a duty to create products that were not unreasonably dangerous for their normal, intended use.

510.   Electrolux created products unreasonably dangerous for their normal, intended use.

511.   Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were manufactured defectively in that said dryers left the hands of Electrolux in a defective condition and were unreasonably dangerous to their intended users.

512.   Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux reached their intended users in the same defective and unreasonably dangerous condition in which Electrolux manufactured them.

513.   Electrolux designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed defective products that created an unreasonable risk to the health of consumers and to the Plaintiff and class members in particular, and Electrolux is therefore strictly liable for the injuries sustained by Plaintiff and class members.

514.   Plaintiff and the class members could not, by the exercise of reasonable care, have discovered the defects and perceived their danger.

515.   Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective because Electrolux knew but concealed the unreasonable, dangerous safety hazards associated with its dryers, including possible injury and death, expense and economic loss, and Electrolux failed to adequately warn of said risks.

516.   Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective due to inadequate warnings and inadequate testing.

517.   Dryers designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Electrolux were defective due to inadequate post-marketing surveillance and warnings because, after Electrolux knew or should have known of the risks of unreasonable, dangerous safety hazards, including possible injury and death, expense and economic loss, Electrolux concealed those risks and dangers from consumers and failed to warn consumers of those risks and dangers.

518.   By reason of the foregoing, Electrolux is strictly liable to Plaintiff and the class members for manufacturing, marketing, promoting, distributing, and selling defective dryers.

519.   Electrolux's defective design, manufacturing defect, and inadequate warnings of dryers were acts that amount to willful, wanton, and reckless conduct by Electrolux.

1  520.   The Defects in Electrolux's dryers were a substantial factor in causing
2  injuries to the Plaintiff and class members.

3  521.   As a result of the foregoing acts and omissions, Plaintiff and the class
4  members were and/or still are caused to suffer unreasonable, dangerous effects,
5  including possible injury and death, expense and economic loss.

6  ## COUNT XXIV

7  ### Unjust Enrichment

8  (Plaintiff McGowan, Individually, and on Behalf of the New York Consumer Class
9  and the New York Property Damage Subclass)

10  522.   Plaintiff McGowan re-alleges and incorporates by reference all
11  paragraphs as though fully set forth herein and asserts these allegations in the
12  alternative to any warranty claims.

13  523.   Electrolux had knowledge of the Defects and the serious safety risks it
14  poses, which it failed to disclose to Plaintiff and the class members.

15  524.   As a result of their wrongful and fraudulent acts and omissions, as set
16  forth above, pertaining to the design Defects of the Dryers and the concealment of
17  the Defects, Electrolux obtained monies which rightfully belong to Plaintiff to the
18  detriment of the Plaintiff.

19  525.   Electrolux appreciated, accepted and retained the non-gratuitous
20  benefits conferred by Plaintiff and the class members, who without knowledge of
21  the safety Defect either paid a higher price for their Dryers which actually had
22  lower values or received monies for Dryers Plaintiff and class members would not
23  have purchased.

24  526.   It would be inequitable and unjust for Electrolux to retain these
25  wrongfully-obtained profits.

26  527.   Electrolux's retention of these wrongfully-obtained profits would
27  violate the fundamental principles of justice, equity, and good conscience.

28

-81-

528.   Plaintiff, therefore, are entitled to restitution of the profits unjustly obtained, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following judgment:

A.     An Order certifying this action as a class action;

B.     An Order appointing Plaintiffs as class representatives and appointing counsel undersigned to represent the classes;

C.     A Declaration that the Dryers are defective;

D.     A Declaration that the Defects poses a serious safety risk to consumers and the public;

E.     An Order awarding injunctive relief by requiring Electrolux to issue corrective actions including notification, recall, and replacement of the Dryers;

F.     Payment to the classes of all damages associated with the replacement of the defective products and parts, in an amount to be proven at trial;

G.     Payment to the classes of all damages associated with property damage as a result of the defective products, in an amount to be proven at trial;

H.     Restitution as authorized by law;

I.     An award of attorneys' fees and costs, as provided by law and/or as would be reasonable from any recovery of monies recovered for or benefits bestowed on the class;

J.     Interest as provided by law, including but not limited to pre-judgment and post-judgment interest as provided by rule or statute; and

K.     Such other and further relief as this Court may deem just, equitable, or proper.

1

## JURY TRIAL DEMANDED

2        Plaintiffs hereby demand a trial by jury on all claims for which a jury trial is

3   authorized.

4   Dated:  May 20, 2013

5                                    By:

6                                        Gretchen Nelson

7

8   **KREINDLER & KREINDLER LLP**
    GRETCHEN NELSON
9   gnelsen@kreindler.com
    707 Wilshire Boulevard
10  Los Angeles, California 90017
    Telephone: (213) 622-6469
11  Facsimile: (213) 622-6019

12

13  **WEXLER  WALLACE LLP**
    EDWARD A. WALLACE
14  AMY E. KELLER
    DAWN M. GOULET
15  eaw@wexlerwallace.com
    aek@wexlerwallace.com
16  dmg@wexlerwallace.com
    55 West Monroe Street, Suite 3300
17  Chicago, Illinois 60603
    Telephone: (312) 346-2222
18  Facsimile: (312) 346-0022

19

20

21  **HANSEN REYNOLDS DICKINSON**
    **CRUEGER LLC**
22  ERIN DICKINSON
    CHARLES CRUEGER
23  edickinson@hrdclaw.com
    ccrueger@hrdclaw.com
24  316 North Milwaukee Street, Suite 200
    Milwaukee, Wisconsin 53202
25  Telephone: (414) 455-7676
    Facsimile: (414) 273-8476
26

27

28

-83-

**GREG COLEMAN LAW PC**
GREGORY F. COLEMAN
MARK E. SILVEY
greg@gregcolemanlaw.com
mark@gregcolemanlaw.com
Bank of America Center
550 Main Avenue, Suite 600
Knoxville, Tennessee 37902
Telephone: (865) 247-0080
Facsimile: (865) 522-0049

**SQUITIERI AND FEARON LLP**
STEPHEN J. FEARON, JR.
CAITLIN DUFFY
stephen@sfclasslaw.com
caitlin@sfclasslaw.com
32 East 57th Street, 12th Floor
New York, New York 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553

*Attorneys for the Plaintiffs and the Putative Classes*