# Exhibit 1
## Part I

*Roberts, et al. v. Electrolux Home Products, Inc.*

No. SACV12-1644-CAS(VBKx)

Declaration of Edward A. Wallace in Support of Class Counsel's Application for Attorneys' Fees and Expenses and for Service Awards

EDWARD A. WALLACE (*pro hac vice*)
AMY E. KELLER (*pro hac vice*)
DAWN M. GOULET (*pro hac vice*)
**WEXLER  WALLACE LLP**
eaw@wexlerwallace.com
aek@wexlerwallace.com
dmg@wexlerwallace.com
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

(*Additional Counsel Appear
on Signature Page*)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| SHAWN ROBERTS, et al.;<br><br>                    Plaintiffs,<br><br>         vs.<br><br>ELECTROLUX HOME PRODUCTS, INC.,<br><br>                    Defendants. | Master File No. SACV12-1644-CAS(VBKx)<br><br>CLASS ACTION<br><br>**DECLARATION OF EDWARD A. WALLACE IN SUPPORT OF CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES AND FOR SERVICE AWARDS**<br><br>Action Filed: September 27, 2012<br><br>The Honorable Christina A. Snyder<br>Date: August 18, 2014<br>Time: 10:00 a.m.<br>Courtroom: 5—2nd Floor |
| This Document Relates To: All Actions. | |

Pursuant to 28 U.S.C. § 1746, I, Edward A. Wallace, declare as follows:

1. I am a member in good standing of the State Bar of Illinois and a partner at Wexler Wallace LLP. I am admitted to practice *pro hac vice* in this matter. I make this declaration based on personal knowledge. If called upon to do so, I could and would testify competently to the truth of the matters stated herein.

2. I am the partner at Wexler Wallace with primary responsibility for the instant litigation. I submit this declaration in support of Class Counsel's concurrently submitted application for attorneys' fees and expenses and for service awards to the Class Representatives.

3. The attorneys appointed by this Court as Class Counsel (ECF No. 150)—Wexler Wallace LLP, Hansen Reynolds Dickinson Crueger, LLC, and Greg Coleman Law, P.C.—are highly regarded members of the bar who have significant experience with consumer class actions and complex litigation, including specialized knowledge vital to the success of this case.

4. Class Counsel are particularly experienced in the litigation, certification, trial, and settlement of nationwide class action cases involving allegedly defective products like those at issue here. The skill of Class Counsel in investigating the claims, litigating the various motions, and negotiating a favorable resolution was essential to achieving the benefits provided for by the Settlement now before the Court.

5. Class Counsel prosecuted this case on a pure contingent-fee basis, agreeing to advance all necessary expenses on the understanding that a fee would be forthcoming only if the case generated class-wide benefits.

6. Class Counsel had to forego other work in order to devote necessary time and resources to handle this case.

7. As detailed below, Class Counsel dedicated considerable time and resources to investigating, litigating, and negotiating a resolution of this case.

1

8.     As detailed in their Application, Class Counsel does not seek compensation based on the value of any cash rebates or discounts made available to the Class through the Settlement, but rather seeks fees using a lodestar analysis based on the considerable equitable relief the Settlement affords.  *See Owen v. Fresh, Inc., et al.*, No. 12-cv-7971-SVW-JEM (C.D. Cal. Nov. 7, 2013 Order), attached as Exhibit A.

9.     **Pre-Filing Investigations.**  Class Counsel devoted substantial resources to researching the facts and claims alleged in these consolidated cases. Before filing the initial complaint in the *Humphrey* Action, and continuing throughout the litigation, Class Counsel consulted with fire cause and origin and engineering experts who specialize in identifying product defects to investigate potential problems with the Dryers.

10.     Plaintiffs reviewed documents relating to insurance subrogation cases pending against Electrolux and interviewed numerous consumers who experienced fires in their Dryers.

11.     Plaintiffs also travelled to Benton Harbor, Michigan for an all-day meeting with Jack Sanderson of Fire Findings, LLC, where they toured a warehouse full of Dryers that had been involved in fires and dismantled an exemplar Dryer to better understand the mechanisms by which fires are caused and can spread outside the Dryer cabinet, as well as the ways in which affected Dryer models can be identified by consumers in the field.

12.     Plaintiffs viewed videos of testing performed by Mr. Sanderson and Fire Findings, as well as data compiled from Dryer fire investigations.  Mr. Sanderson was eventually retained as a consulting expert witness and to conduct a non-destructive examination of Ms. Humphrey's dryer.

13.     In consultation with each other and with their experts and the Class Representatives, Class Counsel thoroughly researched and meticulously crafted

the factual allegations, causes of action, and other sections of the complaints filed first in Arkansas on March 9, 2012 (the *Humphrey* Action), in this Court on September 27, 2012 (the *Roberts* Action), and in New York on October 5, 2012 (the *McGowan* Action).

14. **Motions to Dismiss.** Plaintiffs responded to lengthy motions to dismiss in both Arkansas and California (Electrolux did not file a motion to dismiss in New York only because the judge instructed it not to) asking for dismissal of nearly every claim. These motions were nearly uniformly denied.

15. **Case Management**. When Plaintiffs agreed to consolidate the actions in California, Electrolux wanted to continue litigating the *Humphrey* Action in Arkansas, requiring the cases to proceed on parallel tracks.

16. Plaintiffs were also forced to respond to Electrolux's attempts to force Plaintiffs to litigate all of their cases in Arkansas, including motions to stay the California and New York proceedings, both of which involved extensive briefing and oral argument. Both motions were squarely rejected by the courts.

17. Electrolux even argued that two early class representatives should not be allowed to withdraw from the case as a result of serious medical issues affecting their family, forcing Plaintiffs to fully brief a motion that the Court also granted.

18. **Discovery.** The parties began discovery in August 2012. Over nearly two years, they engaged in extensive written and document discovery, including the production of over 900,000 pages of documents, and copies of numerous electronic databases, comprising terabytes of data.

19. Plaintiffs also took numerous Rule 30(b)(6) depositions of Electrolux's corporate representatives on topics ranging from design modifications and materials, Electrolux's corporate structure, and records retention.

20.     In turn, Electrolux served written discovery on Plaintiffs and took each of their depositions in California, New York, Illinois, Arkansas, and Missouri. Plaintiffs produced relevant documents within their possession, in addition to hundreds of thousands of pages of documents and other data—including testing and video—in the possession of their experts.

21.     Despite the extensive discovery produced, Plaintiffs noted deficiencies with Electrolux's responses—namely, that Electrolux had identified only one individual in its initial disclosures—Carl King, Electrolux's "Safety Engineer"—with relevant knowledge of the case, did not initially provide Plaintiffs with basic discovery such as sales numbers, and did not produce documents which were ultimately produced from another source after Plaintiffs had to subpoena one of Electrolux's customers, General Electric.

22.     Class Counsel diligently met and conferred with Electrolux (including an in-person meet-and-confer in Chicago, Illinois), only bringing one discovery motion over the course of approximately two years of contentious litigation. Although that motion was ultimately unsuccessful, it resulted in Electrolux producing documents for the first time that had never been produced in over a decade of litigation involving other Dryer fires.

23.     Electrolux's discovery conduct created additional work for Plaintiffs' counsel.  Because issues could not be narrowed through written discovery, for example, Plaintiffs were required to take numerous 30(b)(6) depositions to obtain even basic information regarding sales numbers, class size, database management and storage of documents, and litigation holds.

24.     The large volume of documents Electrolux and third-parties eventually produced in this litigation was obtained through great effort.  Class Counsel spent significant time reviewing the documents and data and discussing them with their experts.

4

25.     **Experts and Class Certification.**  Class Counsel were preparing to file their motion for class certification when the Settlement was reached.  They worked-up five merits cases (one for each of the class representatives in California, New York, Arkansas, Illinois and Missouri) through both discovery and expert reports to develop factual evidence demonstrating not only that class members' claims involve common, uniform theories of liability, but that class members all have standing to assert those claims, that the damages being sought were tied to those claims and that the underlying case had merit.

26.     Class Counsel retained several, highly-qualified testifying experts— after extensive research—in order to prepare this case for class certification and, ultimately, for trial, including:

   i   An engineering expert to perform extensive air flow testing on the Dryers (Marthinus van Schoor, Ph.D., who is well-known and well-respected in his field);

   i   Experts regarding the thermal properties of plastics (Sam Miller, Ph.D. and W. Joseph Fallows, B.S.E., whose unique experiences with the plastic component parts used in Electrolux's competitors' dryers proved helpful to Plaintiffs' continuing investigation of the Dryers' defects);

   i   An experienced fire origin and cause expert (Michael Stoddard of the Wright Group, Inc., a company which has investigated many dryer fires, including Electrolux Dryer fires);

   i   An expert on warnings and a human factors psychologist (Carol Pollack-Nelson, Ph.D., formerly of the U.S. Consumer Product Safety Commission); and

i   An expert witness on damages (Frank Bernatowicz, C.P.A., P.E., whose background in engineering and extensive accounting experience benefitted the case).

27.   Plaintiffs served their initial expert disclosures and reports in October 2013 on topics such as dryer design, materials, human factors and warnings, and damages in consumer class actions. Electrolux submitted its expert disclosures and reports in early January 2014, and the parties started preparing for expert depositions on the eve of class certification briefing when they began engaging in settlement negotiations.

28.   Each expert prepared an extensive report after reviewing thousands of documents, and performing numerous tests.  During settlement negotiations, Class Counsel were also preparing for the upcoming depositions of their expert witnesses.

29.   The experts Class Counsel retained performed cutting edge testing (never done by Electrolux) showing that the Dryers were defective as designed and as sold, as well as extensive damages modeling tying each theory of the case to a comprehensive damages model.

30.   **Settlement Discussions and Mediation.**  The Settlement before the Court is the product of hard-fought negotiations spanning a number of months. Class Counsel expended extensive resources to prepare for, participate in, and follow up on the mediation sessions that eventually led to the Settlement.

31.   In late 2013, Class Counsel and counsel for Electrolux (including Wheeler Trigg O'Donnell LLP and Electrolux's in-house counsel) met in Chicago, Illinois, to preliminary discuss a potential resolution to the pending actions.  In December 2013, the parties engaged the services of Jonathan Marks of MarksADR, LLC, a nationally-renowned private mediator, to assist in exploring the possibility of resolving Plaintiffs' class claims.

32.     The parties provided Mr. Marks with voluminous materials, including all pertinent pleadings, expert reports, orders, and briefing in this case to date and extensive mediation statements (Class Counsel provided Mr. Marks with over 100 pages of briefing specifically drafted for the mediation, itself).  Mr. Marks also spoke with Plaintiffs' counsel and Electrolux's counsel in *ex parte* telephone conversations regarding their respective claims, defenses, and arguments.

33.     The parties thereafter engaged in a formal mediation with Mr. Marks on January 7 and 8, 2014, in Chicago, Illinois.  With the assistance of Mr. Marks, the parties engaged in arm's-length negotiations.  Following numerous proposals and counter-proposals, the parties' agreed on many, but not all, of the essential terms of the settlement.

34.     Among other key terms, Class Counsel specifically negotiated for a customer instruct safety notice after a survey studied by Class Counsel's expert Carol Pollack-Nelson revealed that many of Electrolux's customers did not review their dryer's Use and Care Guides (where similar "cleaning" instructions were located), and because the Use and Care Guide for the Dryers did not contain *specific* instructions to clean behind the drums of the Dryers—where Plaintiffs alleged that lint could accumulate next to the heat source and catch fire.

35.     Based on the testimony of Electrolux Engineer Brian Ripley and Safety Engineer Carl King that customers could not see whether lint was building up behind the drums of their Dryers, that Electrolux did not train its service technicians on how to take apart the Dryers to properly clean them, and that if the Dryers were properly cleaned, there would be fewer fires (*see* Exhibit B, March 14, 2014 Deposition of Brian Ripley, at 126:1-12 and Exhibit C, March 26, 2014 Deposition of Carl King, at 218:24-219:20),Class Counsel also negotiated heavily for a cleaning program that would provide class members experiencing preliminary warning signs with free Dryer cleanings.

36.     The parties negotiated the issue of attorneys' fees to Class Counsel only after the substantive terms of the settlement were agreed upon.  When they could not reach an agreement on the fees, Class Counsel suggested bringing the issue directly to the Court, an idea that was rejected by Electrolux.  The parties then engaged in subsequent sessions, with and without Mr. Marks's involvement, in the following months.

37.     On April 30, 2014, the parties formally entered into a comprehensive written Settlement Agreement.

38.     Class Counsel engaged the services of several of their previously-retained experts for the specific purpose of evaluating the Settlement benefits and the value of each of the benefits.  Specifically, Class Counsel obtained opinions from their engineering and damages experts regarding the value of the various components of the Settlement to class members.  *See* Exhibit D, Declaration of Frank A. Bernatowicz (incorporating data from Dr. Marthinus van Schoor).

39.     **Post-Settlement Efforts.**  Even after the Settlement Agreement itself was finalized, Class Counsel continued to negotiate a wide variety of details with counsel for Electrolux regarding the content of the settlement notice, website, customer instruct safety notice, and instructional service bulletin to Electrolux's authorized servicepersons.

40.     Class Counsel worked at length with counsel for Electrolux and Settlement Administrator and notice provider KCC to develop a customized plan designed to notify the Class of the Settlement effectively and efficiently.

41.     Class Counsel then worked diligently on the preliminary approval papers filed on April 30, 2014 (ECF Nos. 145-46) and presented oral argument on May 5, 2014.

42.     After the Court preliminarily approved the Settlement and ordered that notice be issued to the Class (ECF No. 150), Class Counsel worked with the

8

Settlement Administrator to effectuate the Court-approved notice plan, which has now been fully implemented.

43. **Continuing Obligations to the Class.** Class Counsel continues to review weekly status reports and has fielded well over 100 telephone calls and other communications from Class members seeking additional information about the Settlement.

44. Class Counsel specifically negotiated on behalf of the Class for a lengthy redemption period for many of the benefits available under the Settlement. For example, eligible class members who choose to receive a free dryer cleaning have until December 15, 2016 to schedule their cleanings, class members may also submit their cash rebates or use their online discount codes until December 15, 2016, and those who experience dryer fires may submit claims until December 31, 2022.

45. As fiduciaries of the Class, Class Counsel will necessarily expend additional time and effort not accounted for here as they continue to monitor the claims process and ensure that the terms of the Settlement are complied with.

46. **Lodestar and Expenses.** Each of the above-described tasks was performed for the benefit of the Class, and the time spent on these tasks was reasonable. Class Counsel endeavored to prevent duplication of work and to avoid inefficiencies that might otherwise have resulted from multiple firms working on the case.

47. Class Counsel and their local counsel have spent approximately 12,020.5 hours working on this case, for a total unadjusted lodestar of $5,975,029.50 to date, exclusive of costs. Class Counsel's historical and customary rates, used to calculate the lodestar here, are squarely in line with prevailing rates in this District and have been approved by courts in this District and elsewhere.

48.     Class Counsel and their local counsel have additionally incurred $627,987.80 in necessary out-of-pocket litigation expenses in furtherance of prosecuting this action.  Class Counsel incurred costs in connection with investigating the claims, expert work, engaging a mediator, obtaining deposition and hearing transcripts, travel, legal research, photocopying, telephone service, postage, and other customary litigation expenses.  These costs were advanced by Class Counsel for the benefit of the Class, and were both reasonable and essential for the investigation, prosecution, and settlement of this action

49.     The total hours, lodestar and expenses for each firm are as follows and as stated in the summaries attached as Exhibit E, which were prepared from computerized records that were contemporaneously generated and kept by the firms in the ordinary course of business.

| Firm | Total Hours | Total Lodestar | Total Expenses |
|---|---|---|---|
| Wexler Wallace LLP | 4,975.4 | $ 1,971,985.00 | $242,098.93 |
| Hansen Reynolds Dickinson Crueger LLP | 3,681.8 | $2,213,774.50 | $182,860.76 |
| Greg Coleman Law, P.C. | 3,063.5 | $1,615,700.00 | $195,292.51 |
| Kreindler & Kreindler LLP | 135.6 | $ 90,432.50 | $ 5,694.61 |
| Squitieri & Fearon, LLP | 105.1 | $46,727.50 | $745.84 |
| Carney Williams Bates Pulliam & Bowman, PLLC | 59.10 | $ 36,410.00 | $ 1,295.15 |
| Total | 12,020.5 | $5,975,029.50 | $627,987.80 |

50.     **Class Representatives' Efforts.**  Each of the five Class Representatives has reviewed and approved the terms of the Settlement.  *See* Exhibit F, Settlement Agreement with signature pages.

10

51.     In addition to lending their names to this case, and thereby subjecting themselves to public attention, the Class Representatives all actively participated in the litigation, consulting with Class Counsel on a regular basis concerning their purchases and experiences with the subject Dryers.  Class representatives provided documents and affidavits, allowed their Dryers to be destructively tested, prepared for and sat for lengthy depositions, and were prepared to testify at trial if needed. None of the Class Representatives was ever promised a service or incentive award, nor were such awards ever conditioned on support for the Settlement.

52.     Class Counsel believes that the Settlement provides substantial and certain relief for the Class and avoids protracted and costly litigation.  The relief is fair, adequate, and reasonable.

53.     On behalf of Plaintiffs, Wexler Wallace and Class Counsel, I respectfully request that the Court award the requested attorneys' fees, costs, and plaintiff service awards.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed this 22nd day of July, 2014.

/s/ Edward A. Wallace
Edward A. Wallace

# Exhibit A

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:12-cv-7971-SVW-JEM | Date | November 7, 2013 |
|----------|----------------------|------|------------------|
| Title | Tessa Owen v. Fresh, Inc., et al. | | |

| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE |
|------------------------|----------------------------------------|

| Paul M. Cruz | N/A |
|--------------|-----|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|-----------------------------------|-----------------------------------|
| N/A | N/A |

**Proceedings:**     IN CHAMBERS ORDER GRANTING Plaintiff's Amended Motion for Attorneys' Fees and Costs and Incentive Award [Dkt 41]

Having read and considered plaintiff's amended and unopposed motion for attorneys' fees [Dkt 41] and reviewed the additional authority submitted by plaintiff [Dkt 45], the Court concludes that plaintiff's request for attorneys' fees and reimbursement of costs in the amount of $145,000 is just and reasonable. Plaintiff's counsel does not seek compensation based on the value of coupon relief in this case, but rather seeks fees using a lodestar analysis based on the provision of equitable relief in the class settlement. *See* 28 U.S.C. §§ 1712(b)(1) & (c)(2) (Portion of attorney's fee based on obtaining equitable relief "shall be based upon the amount of time class counsel reasonably expended working on the action.")

Plaintiff has submitted adequate documentation of the hours expended and costs incurred by counsel. The billing records evidence a base lodestar figure of $174,322.50 in fees (316.95 hours at $550 per hour) plus $2,520.61 in costs for a total base figure of $176,843.11. No multiplier is required to reach the lesser amount of $145,000 requested by plaintiff. The Court finds plaintiff's hours figure to be reasonable and justified by adequately detailed descriptions of the work performed, and the $550 hourly rate to be reasonable and commensurate with hourly rates approved in other class action cases under the Song-Beverly Credit Card Act, California Civil Code § 1747.08. The Court further finds the costs incurred by plaintiff (filing fees, court reporter fees, messenger fees, and copying charges) to be reasonable and necessary to the prosecution of the action. The Court therefore approves the $145,000 amount in fees and costs without reduction. Defendant shall pay this amount to plaintiff's counsel, Wucetich & Korovilas LLP, in accordance with the Settlement Agreement.

The Court also finds the request for an incentive award to plaintiff Tessa Owen in the amount of

|  | : |
|--|---|
| Initials of Preparer | PMC |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-7971-SVW-JEM | Date | November 7, 2013 |
|---|---|---|---|
| Title | Tessa Owen v. Fresh, Inc., et al. | | |

$2,500 to be just and reasonable. This amount is commensurate with incentive awards previously approved for named plaintiffs in other Song-Beverly class action settlements. Defendants shall therefore pay this amount to plaintiff in accordance with the Settlement Agreement.

For the foregoing reasons, plaintiff's amended motion for fees and costs is hereby GRANTED.

:

Initials of Preparer    PMC

# Exhibit B

1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

----------------------------X
SHAWN ROBERTS, et al.,          :
                                :
            Plaintiff,          :
                                : Civil Action No.
       -vs-                     : 8:12-CV-01644-CAS-VBK
                                :
ELECTROLUX HOME                 :
PRODUCTS, INC.,                 :
                                : DEPOSITION OF:
            Defendant.          : BRIAN D. RIPLEY
----------------------------X
MICHELLE MCGOWAN,               :
                                : * * * CONFIDENTIAL * * *
            Plaintiff,          : SUBJECT TO PROTECTIVE ORDER
                                :
       -vs-                     :
                                : Civil Action No.
ELECTROLUX HOME                 : 12-CV-05019(BMC)
PRODUCTS, INC.,                 :
                                :
            Defendants.         :
----------------------------X
TAMMIE HUMPHREY,                :
                                :
            Plaintiff,          :
                                : Civil Action No.
       -vs-                     : 4:12-CV-157-DPM
                                :
ELECTROLUX HOME                 :
PRODUCTS, INC.,                 :
                                :
            Defendants.         :
----------------------------X

          DEPOSITION OF BRIAN D. RIPLEY, a witness herein,

taken on behalf of the Plaintiffs herein, before JILL M.

KRUSE, a Certified Shorthand Reporter in and for the State

of Iowa, on March 14, 2013, commencing at 8:55 a.m., at

Nyemaster Goode, PC, 700 Walnut Street, Suite 1600, Des

Moines, Iowa.

126

1   Q.   So it's foreseeable that a clothes dryer will
2   start on fire in a consumer's home; correct?
3       MR. WILLIAMS:  Objection to the form of the
4   question.
5       A.   If not installed and maintained properly, yes,
6   that is a risk.
7   BY MR. CRUEGER:
8       Q.   Do you believe if installed and maintained
9   properly, there's no risk of fire in the consumer's home?
10      A.   There are other avenues that fire can initiate,
11  but if they install and maintain the dryer properly, fire
12  should not be a significant risk.
13      Q.   That wasn't my question.  Do you believe that if
14  the dryer was installed and maintained properly in the
15  consumer's home, the risk of fire is zero on the probability
16  scale?
17      A.   There are other things that can affect whether
18  there is a fire or not, and just installation cannot always
19  foresee that.  There could be a product defect.  There could
20  be some other defect that's in the wiring of the unit
21  installed.  But the probability of a properly installed
22  dryer is at a very reduced risk.
23      Q.   What data are you relying on to make that
24  statement?
25      A.   I'm relying on all of the testing that we've done

127

1   in our feasibility lab, in our reliability lab, in our CUFT
2   units.  There's been thousands of units that have been run
3   through our lab.  We have not had a dryer that did not have
4   an assignable cause.  We did not have any unit that caught
5   on fire that did not have an assignable cause.
6       Q.   I'm not talking about your history of experience.
7   I'm wondering do you have a spreadsheet, a data set, that
8   you would compile data on fires that occur in dryers that
9   are properly installed and maintained versus dryers that
10  believe are not properly installed and maintained?  Do you
11  have such a data set that you rely on to make that
12  statement?
13      A.   I do not.
14      Q.   So we've established that a dryer, whether or not
15  properly installed and maintained, may start on fire;
16  correct?
17      A.   It is always a possibility.
18      Q.   And so knowing that a dryer may start on fire,
19  you know and have identified the risk that if an Electrolux
20  ball hitch dryer starts on fire that the plastic parts can
21  melt and the molten from the plastic can seep out of the
22  cabinet; correct?
23      MR. WILLIAMS:  Objection.  You can answer.
24      A.   If the unit catches on fire, that can occur.
25  BY MR. CRUEGER:

128

1   Q.   And that poses a danger to --  That's a safety
2   risk for consumers, is it not?
3       MR. WILLIAMS:  Objection.
4       A.   It is a risk of the unit, yes.
5   BY MR. CRUEGER:
6       Q.   And it also poses a risk of property damage;
7   correct?
8       MR. WILLIAMS:  Same objection.
9       A.   If the fire escaped the cabinet, that's correct.
10  BY MR. CRUEGER:
11      Q.   And is there a method to eliminate that risk of
12  molten plastic seeping out of the cabinet?
13      A.   There was, yes.
14      Q.   What were those?
15      A.   When we were receiving the General Electric
16  business that did require this as a standard, we did find a
17  method to do this.
18      Q.   Was that method using plastics with fire
19  inhibitors?
20      A.   Yes.
21      Q.   How about the use of metal?
22      MR. WILLIAMS:  Objection to the form of the
23  question.
24  BY MR. CRUEGER:
25      Q.   Would a metal air duct melt in a dryer fire?

129

1       MR. WILLIAMS:  Objection to the form of the
2   question.
3       A.   A metal air duct most likely would not melt, but
4   that doesn't mean that there would not be a fire in the
5   dryer that could escape.
6   BY MR. CRUEGER:
7       Q.   But it would eliminate the problem of molten
8   plastic leaking out of the dryer cabinet; correct?
9       MR. WILLIAMS:  Objection.  Incomplete
10  hypothetical.
11      A.   If there was a fire, there still is that
12  possibility.
13  BY MR. CRUEGER:
14      Q.   So after this burn test in 1990 -- let's say it's
15  '96 that you conducted, what steps did Electrolux take to
16  eliminate the risk of molten material coming out of the
17  bottom of the dryer?  I'm not talking about the GE dryers.
18      A.   The testing was reviewed and compared to the
19  standard, and we proceeded with the plastic air duct and
20  blower housing.
21      Q.   Who reviewed it?
22      A.   It would have been a project review at staff
23  level.
24      Q.   Do you recall who that was?
25      A.   I would have to go back and look at the

# Exhibit C

1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

```
----------------------------X
SHAWN ROBERTS, et al.,       :
                             :
            Plaintiff,       :
                             : Civil Action No.
       -vs-                  : 8:12-CV-01644-CAS-VBK
                             :
ELECTROLUX HOME              :
PRODUCTS, INC.,              :
                             : DEPOSITION OF:
            Defendant.       : CARL D. KING
----------------------------X
MICHELLE MCGOWAN,            :
                             : * * * CONFIDENTIAL * * *
            Plaintiff,       : SUBJECT TO PROTECTIVE ORDER
                             :
       -vs-                  :
                             : Civil Action No.
ELECTROLUX HOME              : 12-CV-05019(BMC)
PRODUCTS, INC.,              :
                             :
            Defendants.      :
----------------------------X
TAMMIE HUMPHREY,             :
                             :
            Plaintiff,       :
                             : Civil Action No.
       -vs-                  : 4:12-CV-157-DPM
                             :
ELECTROLUX HOME              :
PRODUCTS, INC.,              :
                             :
            Defendants.      :
----------------------------X
```

DEPOSITION OF CARL D. KING, a witness herein,

taken on behalf of the Plaintiffs herein, before JILL M.

KRUSE, a Certified Shorthand Reporter in and for the State

of Iowa, on March 26, 2013, commencing at 8:55 a.m., at

Nyemaster Goode, PC, 700 Walnut Street, Suite 1600, Des

Moines, Iowa.

42

1  adding documents like that as exhibits on the deposition.
2      MR. COLEMAN: I understand.
3      MR. WILLIAMS: But we'll deal with that at a
4  later time.
5  BY MR. COLEMAN:
6      **Q.** Now, I want to talk specifically about Exhibit 4
7  that was made an exhibit to Mr. Brian Ripley's deposition.
8  Have you ever seen this document before or not?
9      **A.** No.
10      **Q.** And you can take a minute to peruse it. But if
11  you tell me you've not seen it, of course, I take you at
12  your word. Let me ask you if you agree or disagree with
13  certain statements since you're the product safety engineer
14  for Electrolux. Can you look at that -- It's that
15  Paragraph No. 1 on the very first page. Do you see that?
16  It says, "Engineers shall hold paramount the safety, health,
17  and welfare of the public in the performance of their
18  professional duties"? Did I read that accurately?
19      **A.** Yes.
20      **Q.** Do you agree or disagree with that statement?
21      MR. WILLIAMS: Objection to the lack of
22  foundation. Form of the question. Vague and ambiguous.
23  You can answer.
24      **A.** Yeah, I think you want to strive to make sure you
25  **have a safe product when you design it, yes.**

43

1  BY MR. COLEMAN:
2      **Q.** It needs to be safe at the design process, then
3  into the manufacturing process. Is that fair?
4      MR. WILLIAMS: Objection to the form of the
5  question.
6      **A.** Yes.
7  BY MR. COLEMAN:
8      **Q.** And then once it enters, as we say in the law,
9  the stream of commerce and the consumer buys it, does
10  Electrolux as a company, in your opinion as a product safety
11  engineer, is there a continuing duty to make sure that the
12  product performs safely?
13      MR. WILLIAMS: Objection. Incomplete
14  hypothetical. Foundation. Vague and ambiguous. You can
15  answer. Also this witness is not a legal expert, to the
16  extent that calls for a legal conclusion.
17      MR. COLEMAN: I don't want a legal conclusion.
18  Just your opinion as the product safety engineer.
19  BY MR. COLEMAN:
20      **Q.** Subject to Mr. Williams' objection -- and I'll
21  stipulate it on the record -- once the product reaches the
22  consumer, does the company have a continuing responsibility
23  to make sure that the product is performing safely?
24      MR. WILLIAMS: Same objection.
25      **A.** Our responsibility is, yeah, we provide a safe**

44

1  **product to the customer and the appropriate warnings and**
2  **instruction how to use it and operate it properly. And if**
3  **all those things are followed, then, yes, the product should**
4  **operate safely.**
5  BY MR. COLEMAN:
6      **Q.** Okay. All right. So let's look at 1A. And I
7  understand you've not seen this before, but I'm just asking
8  you if you agree generally with these statements. You can
9  read it. Let's look at 1A of Exhibit 4. It says,
10  "Engineers shall recognize that the lives, safety, health,
11  and welfare of the general public are dependent upon
12  engineering judgments, decisions, and practices incorporated
13  into structures, machines, products, processes, and
14  devices." Did I read that correctly?
15      **A.** Yes.
16      **Q.** Do you agree with that statement as the product
17  safety engineer for Electrolux?
18      MR. WILLIAMS: Objection to the form of the
19  question. Vague and ambiguous. Lack of foundation. You
20  can answer.
21      **A.** Yeah, the statement is correct as read.
22  BY MR. COLEMAN:
23      **Q.** Okay.
24      MR. COLEMAN: Off the record.
25      (Discussion off the record.)

45

1  BY MR. COLEMAN:
2      **Q.** You said earlier that there is an Electrolux code
3  of ethics that you reviewed -- it may have been 18 months to
4  two years ago; right?
5      **A.** Yeah, that's approximate, based on my**
6  **recollection.**
7      **Q.** Okay. Is there anything in that code of ethics
8  that deals with product safety that you know of?
9      **A.** I guess I don't recall all the content of it.**
10      **Q.** Well, as a product safety engineer, you would be
11  looking for things in that code of ethics that deal with
12  your area; right?
13      **A.** No, I don't look at it with any specific intent.**
14  **I look at it for overall content and whether I agree or**
15  **disagree and whether I lead my daily life in practice at**
16  **work following it.**
17      **Q.** Well, in the code of ethics -- First I'm going
18  to ask that, and then I'm going to ask a follow-up question.
19  To your memory -- And again, tell me if you don't remember.
20  That's a perfectly fine answer. I'm not going to be going,
21  "Aha, you said you don't remember, but here it is in this
22  document." If you don't remember it, that's fine. Is there
23  anything in the Electrolux code of ethics that you recall
24  deals with product safety?
25      **A.** At this point I cannot recall any specific**

46

1   passages in that document.

2   **Q.**   All right.  Number two, the next one is, the

3   follow-up, are there any documents that Electrolux has as a

4   company and in your role as a product safety engineer that

5   give you guidance on the safety of the products?

6   MR. WILLIAMS:  Same objections as last.

7   **A.**   I'm not really sure I understand the question.

8   I'm sorry.

9   BY MR. COLEMAN:

10   **Q.**   Yeah.  I mean is there any sort of -- either in

11   your job description, in that code of ethics -- You've

12   already told me you don't recall any -- Is there any

13   document that you're aware of that Electrolux as a company

14   has that talks about or discusses the safety of the products

15   that they make and how it should be done?

16   **A.**   I think that there is -- we have a design -- You

17   know, there's design criteria, and there is processes during

18   the design, you know, and safety reviews that could happen

19   during the design process.  So there's safety interwoven in

20   everything we do during design, production, and

21   manufacturing.

22   **Q.**   But there's nothing that you could say, "Well,

23   Greg, here's where we emphasize safety in the manufacture

24   and design of a product.  Here's a document that shows what

25   we do."  Is there anything that comes to your mind?

47

1   MR. WILLIAMS:  Objection.  Misstates his

2   testimony.  Compound.  You can answer.

3   **A.**   I don't recall ever seeing any document entitled

4   "Safety" and this is the --  But like I say, safety is

5   interwoven in everything we do.

6   BY MR. COLEMAN:

7   **Q.**   Okay.  Since you've been Electrolux product

8   safety engineer, have you taken -- I asked you about

9   seminars, but have you taken any courses whatsoever to

10   further educate you in your position as a product safety

11   engineer?

12   **A.**   Since I've been the product safety engineer?

13   **Q.**   Correct.

14   **A.**   Not that I recall.

15   **Q.**   Do you as the product safety engineer or the

16   company conduct any safety reviews to ensure compliance with

17   those voluntary standards we talked about?

18   MR. WILLIAMS:  Objection.  Ambiguity.  You can

19   answer.

20   **A.**   Yes.

21   BY MR. COLEMAN:

22   **Q.**   Tell me what those are and how that works.

23   MR. WILLIAMS:  Same objection.  Compound.  You

24   can answer.

25   **A.**   It depends what you're talking about.  We

48

1   evaluate the products during the development or the

2   introduction of modifications, and we undergo what the

3   agencies call follow-up services on a regular basis.

4   BY MR. COLEMAN:

5   **Q.**   As an example, UL 2158 -- that's the voluntary

6   standard for electric dryers -- what safety reviews are you

7   aware of -- that's the word you used -- that you as the

8   product safety engineer or Electrolux does for those

9   electric dryers?

10   **A.**   It's the same answer I just gave you.  It depends

11   on what you're doing.  If you're in development, you're

12   contemplating alternate components, or if you're worried

13   about -- Not worried.  I'm sorry.  I don't mean that term.

14   Or if you're undergoing what they refer to as a follow-up

15   service.  There's different things.

16   BY MR. COLEMAN:

17   **Q.**   You used the word "safety reviews."  What do you

18   mean by safety reviews?  How do you mean that?

19   **A.**   At the highest level, like we talked a little

20   earlier, whether we decide whether a safety engineer would

21   be in a meeting or not, it depends on what the change is.

22   If we're contemplating changing the supplier of a screw,

23   we're probably not going to involve the safety engineer for

24   a supplier change on a minor component.  So there would be a

25   decision made whether they would attend or not.  Then we

49

1   would attend meetings and discuss the contemplated change.

2   **Q.**   Okay.  Do the safety reviews occur only with

3   respect to the voluntary standards, or are they done in

4   other areas?

5   MR. WILLIAMS:  Objection.  Vague and ambiguous.

6   You can answer.

7   **A.**   To my recollection, a decision is made whether a

8   review would happen on every change.

9   BY MR. COLEMAN:

10   **Q.**   A safety review would happen on every change?

11   **A.**   The decision would be made whether it was

12   necessary on every change.

13   **Q.**   But you as the product safety engineer, I think

14   you said, you're not in some of those where the change is a

15   screw, for example?

16   **A.**   That is correct.  You know, there's no -- It's

17   not necessary.

18   **Q.**   And I just want to stay with this a minute, but,

19   again, I'm trying to understand your role as a product

20   safety engineer.  You talked about meetings when we were

21   discussing safety reviews.  As the product safety engineer,

22   are you involved in meetings with respect to dryer fires

23   that are the subject of this case?

24   **A.**   I do not recall any meetings concerning dryer

25   fires at the factory or the design area.

74

1    Q.   Yes.  And that was the one component of plastic
2  where?
3    A.   **The blower housing.**
4    Q.   Yes.  And why was it important to change the
5  plastic in the blower housing?
6    A.   **Through our development process, they found that**
7  **it could become, you know, a secondary fuel once the fire**
8  **would start.**
9    Q.   Right.  In other words, it would increase the
10  risk that the fire would start and continue; true?
11    A.   **No.  That plastic is going to do nothing -- and**
12  **the choice of that plastic is going to do nothing to keep a**
13  **fire from starting.  The fire has to start.  That plastic**
14  **will do nothing until it is exposed to a direct flame.**
15    Q.   Right.  But then it does not retard the fire or
16  constrain the fire, and that's why it was changed in the
17  blower housing area?
18         MR. WILLIAMS:  Objection.  Assumes facts not in
19  evidence.
20    A.   **It does retard the fire to a degree but not as**
21  **well as the plastic that we changed to.**
22  BY MR. COLEMAN:
23    Q.   The plastic that you changed to, what's the name
24  of that plastic?
25    A.   **I can't give you the exact compound, but it's**

75

1  a -- Matrix is the supplier.
2    Q.   How long has that plastic been available on the
3  market?
4    A.   **I do not know.**
5         MR. WILLIAMS:  I'm sorry.  Objection.
6  Foundation.  Go ahead.
7    A.   **I'm sorry.  I do not know.**
8  BY MR. COLEMAN:
9    Q.   And when I say "that plastic," I mean the new
10  plastic that you went to that is supposed to help contain
11  the fire.
12         MR. WILLIAMS:  Same objection.
13    A.   **And I do not know anything about the history of**
14  **its availability.**
15  BY MR. COLEMAN:
16    Q.   Okay.  The other change to the ball hitch dryer
17  to comport with the UL 2158 new requirement was, you said,
18  the gaskets around the door.
19    A.   **Yes.**
20    Q.   And one of the reasons you said that may have
21  been was because either it was getting outside the door
22  because it caused the door to open or some other way; right?
23         MR. WILLIAMS:  Objection.  Misstates his
24  testimony.
25    A.   **It's just speculation on my part to say basically**

76

1    I saw some of the tests and I talked to them sometimes, but
2    I do not know all the criteria what they do and why they do
3    it.
4    Q.   You're the product safety engineer and you want
5  to make sure that the fire is contained because that would
6  clearly help safety, wouldn't it?
7         MR. WILLIAMS:  Objection.
8    A.   **The dryer is as safe as it ever was.  If there is**
9  **no fire in the dryer, nobody would ever know that these**
10  **changes occurred if you don't have a fire start for some**
11  **other reason.  But, yes, I am concerned to the degree that I**
12  **need to report to the agencies what parts were changed and**
13  **what descriptions need changed.**
14  BY MR. COLEMAN:
15    Q.   Okay.  And then you said there was a shield that
16  was added to the ball hitch dryer to make it comport with
17  this requirement?
18    A.   **Yes.**
19    Q.   And tell me about that shield.
20    A.   **It's below the drum over the top of the console.**
21    Q.   Okay.  I'm trying to visualize that, Mr. King, so
22  bear with me a minute.  Okay.  The shield is below the drum
23  but over the top of the console?
24    A.   **Yes.**
25    Q.   And how does that help fire containment?

77

1    A.   **It helps --  To the degree when you start a drum**
2  **fire, it deflects the heat coming down out of the drum away**
3  **from the console.**
4    Q.   And that decreases the chance that the fire will
5  go outside the unit; right?
6         MR. WILLIAMS:  Objection.  Assumes facts not in
7  evidence.  Go ahead.
8    A.   **It decreases the likelihood of damage occurring**
9  **or the plastic of the console moving away from the body of**
10  **the dryer.**
11  BY MR. COLEMAN:
12    Q.   Okay.  The shield that you just described, who
13  makes the shield or that product, do you know?
14    A.   **It's a unique part to our dryer.  I don't know**
15  **who we're going to choose to manufacture it for us.**
16    Q.   If you don't know, you don't know.  Was the
17  shield a type of device that was available to Electrolux at
18  any time in the last five years?
19         MR. WILLIAMS:  Objection.  Vague and ambiguous.
20  You can answer.
21    A.   **We specifically designed it through our**
22  **development of this product at this time.  So, no, it was**
23  **not available prior to this.**
24  BY MR. COLEMAN:
25    Q.   Were you aware of any competitors that used such

**218**

1    **A.   Right.**

2        **Q.**   It doesn't say "that includes the blower

3    housing," does it?

4        **A.   It does not say that, but the interior of the**

5    **dryer does include the blower housing.  The blower housing**

6    **is inside the dryer.**

7        **Q.**   And that part of the manual does not detail any

8    steps that the technician should take to disassemble the

9    dryer to get the drum out; correct?

10       MR. WILLIAMS:  Objection.  Ambiguous.

11       **A.   No, we do not provide step-by-step instructions.**

12   **I would expect that somebody who does dryer repair for a**

13   **living would be able to disassemble a dryer without being**

14   **told how.**

15   BY MR. COLEMAN:

16       **Q.**   Certainly you wouldn't expect a consumer who

17   doesn't do this for a living, you wouldn't expect a consumer

18   to know how to do it and do it properly, would you?

19       **A.   No.  That's not what the manual says.  It says**

20   **have it done by an authorized or qualified person.**

21       **Q.**   How many authorized Electrolux service

22   technicians are there, if you know, that Electrolux uses?

23       **A.   I do not know.**

24       **Q.**   Is there any safety training that's provided to

25   them on how to do this cleaning in the 18-month period?

**219**

1        MR. WILLIAMS:  Objection.  Foundation.

2        **A.   I know that Electrolux provides training to the**

3    **servicepeople.  I do not know the content, nor have I ever**

4    **attended one of the training sessions.**

5    BY MR. COLEMAN:

6        **Q.**   Well, the purpose of the -- or at least what

7    you've told me, one of the purposes of the 18-month cleaning

8    is for a safety reason, to help limit lint fires; right?

9        **A.   I think cleaning the lint from the dryer takes**

10   **the fuel out of the dryer.**

11       **Q.**   All right.  And that eliminate or at least

12   reduce the risk of fire?

13       **A.   Yes.**

14       **Q.**   So from a safety standpoint, have you ever been

15   involved in helping any Electrolux outside service

16   technician understand the disassembling and cleaning of a

17   ball hitch dryer?

18       MR. WILLIAMS:  Objection.  Ambiguous.  Compound.

19       **A.   No, I've never -- I've never done that action,**

20   **no.**

21   BY MR. COLEMAN:

22       **Q.**   What does Electrolux design the useful life of

23   its dryers to be, specifically the ball hitch dryer?

24       MR. WILLIAMS:  Objection.  Ambiguous.  Lacks

25   foundation.  You can answer, if you can.

**220**

1        **A.   I've never really seen any document where you say**

2    **the dryers should last X number of years.  We do reliability**

3    **testing to 5,000.**

4    BY MR. COLEMAN:

5        **Q.**   How many years is 5,000 cycles, on average?

6        MR. WILLIAMS:  Objection.  Go ahead.

7        **A.   Based on industry averages provided to us for,**

8    **like, energy usage, and estimate energy usage is 416 cycles**

9    **per year, so 5,000 equates to, like, 12-plus years.**

10   BY MR. COLEMAN:

11       **Q.**   And so in a roundabout way, that would be an

12   indicator of what Electrolux believes the useful life of

13   their ball hitch dryer should be, 12-plus years?

14       MR. WILLIAMS:  Objection.

15   BY MR. COLEMAN:

16       **Q.**   That would be fair, wouldn't it?

17       MR. WILLIAMS:  Foundation.  Assumes facts not in

18   evidence.

19       **A.   Yes.  Based on the results of our reliability**

20   **testing, properly installed, maintained dryers will survive**

21   **5,000 cycles.**

22   BY MR. COLEMAN:

23       **Q.**   How long has Electrolux --  And I should have

24   asked this at the beginning, but a lot better lawyers than

25   me in this world.  How long has Electrolux been producing

**221**

1    ball hitch dryers?

2        **A.   I really do not know the exact date.  I know at**

3    **one time somebody told me they traced part of the ball hitch**

4    **components back into the '60s.**

5        **Q.**   In any event, do you agree that they had been

6    designing and producing ball hitch dryers for many years,

7    even before you came to work there?

8        **A.   That's my understanding, yes.**

9        **Q.**   All right.  And we know that with some of the

10   testing that you maybe have heard of or seen in different

11   cases with Brian Ripley, they were certainly producing and

12   manufacturing ball hitch dryers in the '90s; right?

13       **A.   Yes, that's correct.**

14       **Q.**   And most likely before the '90s?

15       **A.   Yeah, my understanding is into the '60s.**

16       **Q.**   So far as design changes, are you aware of any --

17   I'm not talking about these recent changes with respect to

18   the plastic to comply with the UL 2158 requirement.  I'm

19   talking about to the design of the ball hitch design.  Have

20   there been any design changes that you're aware of, other

21   than the one that's in effect in 2013 --

22       MR. WILLIAMS:  Objection.  Vague and ambiguous.

23   BY MR. COLEMAN:

24       **Q.**   -- since you've been working at Electrolux?

25       **A.   Yeah.  They're continually making improvements to**

# Exhibit D

1  EDWARD A. WALLACE (*pro hac vice*)
   AMY E. KELLER (*pro hac vice*)
2  DAWN M. GOULET (*pro hac vice*)
   **WEXLER  WALLACE LLP**
3  eaw@wexlerwallace.com
4  aek@wexlerwallace.com
   dmg@wexlerwallace.com
5  55 West Monroe Street, Suite 3300
6  Chicago, Illinois 60603
   Telephone: (312) 346-2222
7  Facsimile: (312) 346-0022

8
   (*Additional Counsel Appear
9  on Signature Page*)

10
                    **UNITED STATES DISTRICT COURT**
11
          **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**
12

| 13  SHAWN ROBERTS, et al.; | Master File No. SACV12-1644-CAS(VBKx) |
|---|---|
| 14                          Plaintiffs, | **CLASS ACTION** |
| 15      vs. | **DECLARATION OF FRANK BERNATOWICZ IN SUPPORT OF CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES AND FOR SERVICE AWARDS** |
| 16  ELECTROLUX HOME PRODUCTS, INC., | |
| 17                          Defendants. | |
| 18 | Action Filed: September 27, 2012 |
| 19 | The Honorable Christina A. Snyder |
| 20 | Date: August 18, 2014 |
| 21 | Time: 10:00 a.m. |
|    | Courtroom: 5—2nd Floor |
| 22 | |
| 23  This Document Relates To: All Actions. | |

24
25
26
27
28

I, Frank A. Bernatowicz, CPA, MBA, PE of the City of Burr Ridge, in the State of Illinois, declare as follows pursuant to 28 U.S.C. § 1746:

## I.  QUALIFICATIONS

1.      I provide this declaration in support of the valuation of settlement benefits related to class claims asserted in *Roberts v. Electrolux Home Products, Inc.*, Master File No. SACV12-1644-CAS (VBKx) (C.D. Cal.).

2.      I am the Founder and Managing Principal of the FAB Group.  The FAB Group is a consulting firm providing economic, valuation, accounting, and financial advisory services primarily to companies and their stakeholders and representatives in a variety of matters including litigation, bankruptcy and insolvency, crisis management, and general advisory services.

3.      I obtained my Bachelor of Science in Electrical Engineering from the University of Illinois in 1976.  I became a Professional Engineer, registered in Illinois, in 1983.

4.      I obtained my Master of Business Administration degree from Loyola University in 1981 with a concentration in Finance.

5.      I majored in Accounting at Loyola University and concluded coursework in 1984.  I became a Certified Public Accountant in 1984.

6.      I have held leadership positions in various International accounting and consulting firms since 1984.  From 1985 to 1996, I served as the Partner-in-Charge of Ernst & Young's Midwest Region Dispute Resolution and Litigation Services practice as well as National Director of Intellectual Property Services. From 1996 to 1999, I served as Chicago office Managing Partner of Jay Alix and Associates and was a member of its operating and management committees.  From 1999 to 2001, I served as Midwest Region Managing Partner of PricewaterhouseCooper's Intellectual Property Dispute Analysis & Investigations practice.  From 2001 to 2003, I served as BDO Seidman's Midwest Region

1

Business line leader for Litigation and Financial Recovery Services.  In 2003, I formed FAB Advisory Services, LLC.  In 2006, I sold my firm to Huron Consulting group.  In 2007, I formed the FAB Group.

7.    Since 1984, I have regularly served as an expert witness on economic, valuation, financial and accounting issues in a variety of litigation matters including a significant concentration of intellectual property suits.  In all, I have acted as a consultant and/or expert witness in well over 500 matters including substantial testimony in various federal and state courts, as well as in arbitration and mediation proceedings.

8.    I have testified regarding the quantification of damages in numerous lawsuits relating to class action, intellectual property, breach of contract, and other litigation matters that has been accepted in various federal and state courts.  Some of these matters involved preliminary injunctions and temporary restraining orders.

9.    I have worked as a consultant and expert witness for numerous companies associated with the manufacturing sector across a variety of industries. In these endeavors, I have provided economic, valuation, financial and accounting advice on a number of issues pertaining to their products, competitors, and the market.

10.    I have analyzed the products, relevant markets, and manufacturing operations of such entities as: Abbott Laboratories, Altana, Apotex, Astra-Zeneca, Aventis, Avery-Dennison, BASF, Baxter, Biomet, Biovail, Black & Decker, Boston-Scientific, Bristol Meyers Squibb, Chrysler, DuPont, Ford, General Electric, GM,  Johnson & Johnson, Medtronic, Novartis, O'Brien Corp., Pfizer, St. Jude Medical, Merck, Mercedes-Benz, Rockwell International, Sanofi, Sears, Sun Pharmaceutical Industries, Teva, Trinity Industries, Upsher-Smith, Westinghouse, Whirlpool Corp, W.R. Grace, Wyeth, Zimmer and others.

11.    My qualifications and credentials are set forth in greater detail in my curriculum vitae, attached as Exhibit B.

2

12.     A summary of my testimony in selected litigation matters is set forth in the attached Exhibit C.

## II.     BACKGROUND

13.     It is my understanding that Shannon Carty ("Carty"), Stephen Gavic ("Gavic"), Matthew Downs ("Downs"), Michelle McGowan ("McGowan"), and Tammie Humphrey ("Humphrey"), brought three class action complaints against Electrolux Home Products, Inc. ("Electrolux" or "Defendant"), individually and on behalf of all others similarly situated.  Those three class actions—*Humphrey v. Electrolux Home Products, Inc.*, No. 12-cv-00157-DPM ("*Humphrey*"), *McGowan v. Electrolux Home Products, Inc.*, No. 12-cv-05019 ("*McGowan*") Case No. 12-cv-05019 (BMC), *Roberts, et al. v. Electrolux Home Products, Inc.*, No. CV12-1644-CAS(VBKx) *("Roberts")*—were consolidated with this Court on May 22, 2013.

14.     Defendant is alleged to have designed, manufactured, marketed, and sold throughout the United States, including in California, Illinois, Missouri, New York, and Arkansas, gas and electric clothes dryers for residential use having a common ball hitch design (hereinafter referred to as the "Dryers" or "ball hitch Dryers") and having uniform and dangerous defects ("the Defects") that cause these Dryers to catch fire, fail, char clothes, and spread any fire outside the Dryers, thereby damaging property and creating a serious safety risk to consumers and the public.

15.     In 2013, I was retained by Hansen Reynolds Dickinson Crueger LLC ("HRDC"), Greg Coleman Law PC ("GC Law"), and Wexler Wallace LLP ("Wexler Wallace"), on behalf of the Plaintiffs and Putative Classes ("Plaintiffs" or "Classes") to review and analyze damages in connection with claims for class certification asserted in the *Roberts* and *Humphrey* Actions.

3

16.     On October 22, 2013 I had submitted my expert report on damages in connection with claims for class certification asserted in the aforementioned class action suits.

17.     It is my understanding that the parties have reached a tentative nationwide settlement in this matter.

18.     Plaintiffs' Counsel has asked me to independently value the Settlement Class Member benefits associated with the proposed Settlement.  I have done so, and my valuation methodology, valuation opinion, and primary significant assumptions for my opinion, are indicated below.

19.     In conducting my work and forming my opinion, I have considered, in addition to my substantial experience in this area, the materials identified in Exhibit A.

20.     In determining the estimated valuation described in this Declaration, I have employed methods and analyses of a type reasonably relied upon by experts in my field in forming opinions or inferences on the subject.

21.     In connection with this Declaration, I have reviewed the following key documents:

      a. Proposed Settlement;

      b. Expert Report of Dr. van Schoor, dated October 22, 2013;

      c. Survey results performed by Qualtrics, dated October 18, 2013;

      d. FEMA report, TFRS Volume 13, Issue 7/Clothes Dryer Fires in Residential Buildings (2008-2010);

      e. Expert Report of CAROL POLLACK-NELSON, Ph.D., dated October 22, 2013; and

      f. Recall Effectiveness Research: A Review and Summary of the Literature on Consumer Motivation and Behavior, Prepared for the U.S. Consumer Product Safety Commission.

4

III.  **SUMMARY OF OPINIONS**

  A.  **VALUATION METHODOLOGY**

22.  I performed the following general procedures to make my valuation estimate of the Class Member benefits associated with the Electrolux proposed Settlement:

  a. Reviewed data provided by Defendant regarding Electrolux dryers (excluding laundry centers) manufactured between January 1, 2002 and December 31, 2011;

  b. Utilized the Electrolux Warranty Claims database, referred to as Service Bench, to estimate the number of class members eligible for Dryer Cleaning and Fire Damage benefits;

  c. Estimated the value of each benefit based on Electrolux input, the Electrolux Claims database (which included various information regarding Electrolux dryer sales and related costs), and fire damage costs compiled by FEMA; and

  d. Estimated class member participation in the claims submission process.

23.  ***Eligible class members are entitled to Dryer Cleaning benefits.*** Eligible class members will receive the benefit of a free cleaning provided by Electrolux authorized service personnel.  Eligible class members are those who experienced a performance problem within the first 5 years after the date of purchase. A performance problem is defined as one of the following:

  a. the dryer overheated;

  b. the laundry was burned or scorched (that is, by lint that caught fire inside the dryer),  the class member noticed burned or scorched lint inside the dryer (even if laundry was not damaged);

  c. abnormal lint built up in the dryer (such as in the dryer base, the air duct and adjacent blower housing, or inside or behind the dryer's drum);

5

1           d. the dryer had excessively long cycle times or longer than normal dry

2              times, the dryer's heating element sparked (for electric models with a

3              heating element behind drum);

4           e. the class member observed smoke, flame or burning odors emitting

5              from the dryer, or the class member called for repair service due to any

6              of the above.

7       24.   The Dryer Cleaning benefits were valued using a three step process,

8   described as follows:

9         • Step 1: Estimate the number of eligible class members;

10        • Step 2: Estimate the value of a one-time free cleaning; and

11        • Step 3: Estimate the range of eligible class members who will

12          participate or sign up for the benefit.

13      25.   **Step 1**: To estimate the number of eligible class members, the

14  Electrolux Warranty Claims database was queried (or searched) by Dr. van

15  Schoor, Plaintiff's liability expert, to determine an experience rate of service calls

16  within one year from the date of purchase that met one or more of the

17  aforementioned performance problems.  After reviewing the results, Dr. van

18  Schoor extrapolated the findings to estimate the number of claims within five

19  years from the date of purchase.  His finding provided an estimate of the total

20  number of potential class members who would be eligible for a free one-time

21  cleaning.

22      26.   **Step 2**:  To estimate the value of a one-time cleaning, I reviewed the

23  average labor charges associated with service calls from the Electrolux Warranty

24  database, of $60, and then multiplied that amount by 1.5, based on the scope of the

25  cleaning compared to a normal service call.  I compared this amount to

26  information orally provided by Electrolux to Plaintiffs' Counsel regarding the

27  average value of a cleaning.  Based on this analysis, I estimated the average value

28  of a free one-time dryer cleaning.  By multiplying the results from Step 1 by Step

6

1    2, I derived a Maximum Utilization Value – that is the value of the benefits made

2    available to the Class.

3        27.   **Step 3**: To estimate the number of eligible class members who would

4    participate or sign up for the Dryer Cleaning benefits, I reviewed actual experience

5    regarding the percentage of consumers who participate in recalls from information

6    published by the U.S. Consumer Protection Safety Commission, the FDA, the

7    National Transportation and Safety Association as well as other sources. I focused

8    my attention on those matters whose product characteristics were similar to the

9    subject matter, including: **(1)** product price; **(2)** age of product; **(3)** involved a

10   safety issue; **(4)** scope or pervasiveness of the issue; and **(5)** ease of claim forms

11   and efficiency of claims management, as well as other factors. From this analysis,

12   I estimated the level of participation (in a reasonable range) from eligible class

13   members for this benefit, which then allowed me to derive a Projected Utilization

14   Value.

15      28.   ***Eligible class members are entitled to a Fire Compensation benefit***.

16   Eligible class members will receive compensation for out-of-pocket expenses due

17   to a fire in the base of the drum or base of their dryer. Eligible class members are

18   those who experienced such an event within the first 10 years after the date of

19   purchase. Out-of-pocket expenses that will be covered include the following:

20          a. Purchase of a replacement dryer;

21          b. repair costs to their existing dryer;

22          c. repair or replace other property that was damaged as a result of the

23             fire; and/or

24          d. incurred an insurance deductible cost associated with filing a claim to

25             their insurers.

26      29.   The Fire Compensation benefit will cover actual documented costs up

27   to a maximum of $1300. Class members who provided insufficient

28   documentation, yet meet the eligibility requirements, will be compensated a

7

1  minimum of $300. Fire Compensation received does not preclude claims by
2  individual class members outside of the scope and description indicated above,
3  including significant damage to home and other property and death that may have
4  resulted from an Electrolux dryer fire.

5       30.    The Fire Compensation benefits were valued using a three step
6  process, described as follows:

7         • Step 1: Estimate the number of eligible class members, past and
8           future;

9         • Step 2: Estimate the average compensation to cover damages
10          sustained;

11        • Step 3: Adjust the number of future fire incidents based on the free
12          cleaning benefit; and

13        • Step 4: Estimate the number of eligible class members who will
14          participate or sign up for the benefit.

15      31.    ***Step 1***: To estimate the number of eligible class members, the
16 Electrolux Warranty Claims database was queried (or searched) by Dr. van Schoor
17 to determine a fire experience rate of Electrolux dryers from 2002 to the present
18 caused by lint build-up and subsequent ignition of a fire related thereto. After
19 reviewing the results, Dr. van Schoor estimated the incidents of fire that would
20 likely occur for 10 years following the date of purchase in the period from 2002
21 through 2013. Further, Dr. van Schoor extrapolated the findings to further
22 estimate the number of fire incidents that will likely occur from 2014 through
23 2022. His findings provided an estimate of the total number of potential class
24 members who would be eligible for Fire Compensation benefits.

25      32.    ***Step 2***: To estimate the average amount of compensation, I reviewed
26 the Warranty Claims database as well as outside information from FEMA to
27 understand the type and amount of damages that might relate to a fire incident, as
28 described above. After review of the aforementioned information, I determined

8

1  that a reasonable estimate of Fire Compensation for the eligible class members in
2  the period 2002 – 20013 should be based on the average retail cost paid by the
3  consumer for his dryer unit. I developed this amount through the use of the
4  Electrolux sales database of all relevant dryers in the subject period, which
5  included the actual Electrolux wholesale price of the unit. I then reviewed actual
6  retail mark-up data from seven large retail merchants including: Brandsmart,
7  Sears, Conns, REX, HH Gregg, and Lowes to determine a reasonable retail mark-
8  up from the Electrolux wholesale price. The average Fire Compensation was then
9  calculated as follows:

*Average Electrolux Sales Price (actual units with defective design), 2002-2012*

**Multiplied By**

*Average Retail Mark-Up, 2002-2013*

13      33.    Further, I estimated the retail cost for the future period, 2014 – 2022,
14  based on the average cost in the aforementioned historical period.

15      34.    **Step 3**: To adjust the number of future fire incidents based on the free
16  cleaning benefit, **First**, I utilized data prepared by Dr. van Schoor to calculate the
17  remaining life of dryers as of the end of 2013. I also estimated the benefits of a
18  cleaning (i.e., how long the cleaning would benefit the dryer). **Next**, I calculated
19  the percentage benefit from the cleaning *(percentage 1)* by dividing the estimated
20  cleaning benefit in months by the remaining useful life of the dryer (expressed in
21  months). **Following**, I calculated a percentage of dryers *(percentage 2)* that would
22  be cleaned divided by the population of dryers that are estimated to be in service at
23  the end of 2013. I obtained the number of dryers to be cleaned by multiplying Dr.
24  Van Schoor's estimated number of cleanings times the class participation
25  percentage discussed previously. I obtained the number of dryers in service at the
26  end of 2013 from Dr. Van Schoor's spreadsheet analysis of dryer cleaning class
27  members. **Finally**, I calculated the future fire incidents adjustment percentage
28  *(percentage 3)* by multiplying (percentage 1) times (percentage 2). The resultant

9

percentage is used to reduce the future number of incidents estimated by Dr. Van Schoor as a result of cleaning benefits received by the class. By multiplying the results from Step 1 by Step 2, as adjusted by Step 3, I derived a Maximum Utilization Value – that is the value of the benefits made available to the Class

35.  ***Step 4***:  To estimate the number of eligible class members who would participate or sign up for the Fire Compensation benefits, I reviewed actual experience regarding the percentage of consumers who participate in recalls from information published by the U.S. Consumer Protection Safety Commission, the FDA, the National Transportation and Safety Association as well as other sources. I focused my attention on those matters whose product characteristics were similar to the subject matter, including: **(1)** product price; **(2)** age of product; **(3)** involved a safety issue; **(4)** scope or pervasiveness of the issue; and **(5)** ease of claim forms and efficiency of claims management, as well as other factors.  From this analysis, I estimated a reasonable range of the level of participation (in a reasonable range) from eligible class members for this benefit for the two aforementioned periods (2002-2013; 2014-2022), which then allowed me to derive a Projected Utilization Value for each period, which is the average of the range of the projected value of the benefits which will be received by the Class.

36.  ***Class members will receive the Safety Notice benefit***.  Class members will receive a safety notice outlining the importance of cleaning their dryer unit.  The notice will include information concerning the proper procedure for such a cleaning.  This Safety Notice, in addition to the free cleaning, will have a significant impact on the number of future fire incidents that will occur related to the subject Electrolux dryers.  The benefit is a future benefit estimated over the remaining life of the subject units, from 2014 through 2022.

37.  The Safety Notice benefits were valued using a three step process, described as follows:

- Step 1: Estimate the number of future fire incidents;

10

1    • Step 2: Estimate the average damage caused by such a fire;

2    • Step 3: Estimate the benefit of providing a safety notice to Class

3       members regarding dryer cleaning; and

4    • Step 4:  Estimate the number of eligible class members who will

5       follow the safety notice cleaning recommendation.

6    38.    ***Step 1***: The estimate of future fire incidents was based on procedures

7    performed by Dr. van Schoor in Step 1 of the Fire Compensation benefit valuation

8    methodology described above. His finding provided an estimate of the total

9    number of future fire incidents in the period 2014 -2022.  I adjusted (reduced) the

10    number of future fire incidents based on the benefits associated with a free

11    cleaning.

12    39.    ***Step 2***:  To estimate the average damage resulting from dryer fire, I

13    utilized a recent Federal Emergency Management Association (FEMA) report on

14    damages resulting from clothes dryer fires in residential building in the period

15    2008 through 2010.  FEMA's report was based on data collected by the U.S. Fire

16    Administration's (USFA's) National Fire Incident Reporting System (NFIRS).

17    FEMA's results are based on 2010 costs.  To estimate costs in this matter, I

18    adjusted FEMA's 2010 amount to its equivalent in 2018, the mid-point of the

19    future damage period, utilizing annual cost inflation statistics based on actual long-

20    term cost increases in the U.S. economy.

21    40.    ***Step 3***: To estimate the benefit of a strong safety notice campaign on

22    the behavior of consumers regarding dryer cleaning habits, **First**, I considered the

23    facts of the instant matter including the importance of cleaning, the extent of

24    appliance, personal and property damage that may ensue without a proper

25    cleaning, the extent to which damages had occurred and other factors.  Based on

26    these factors, I estimated the potential number of class members that would be

27    influenced to perform one cleaning as a result of the notice.  **Next**, I estimated the

28    benefit of a cleaning based on industry information.  In my understanding, a

11