STEVE A. MILLER (CA Bar No. 171815)
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925
Email: sampc01@gmail.com
*Additional counsel below.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| SHAWN ROBERTS, et al., | Master File No. SACV12-1644-CAS (VBKx) |
| Plaintiffs, | **KRISTINA K. NEWMAN & JOYCE MILLER'S OBJECTIONS TO CLASS ACTION SETTLEMENT AND ATTORNEYS' FEES, AND NOTICE OF INTENTION TO APPEAR AT FAIRNESS HEARING** |
| vs. | |
| ELECTORLUX HOME PRODUCTS, INC., | |
| Defendants. | |
| | Date: August 18, 2014 |
| THIS DOCUMENT RELATES TO: | Time: 9:00 a.m. |
| | Place: Courtroom 5 |
| ALL ACTIONS | Judge: Hon. Christina A. Snyder |

COMES NOW, Objectors Kristina K. Newman, and Joyce Miller, owners of Frigidaire Dryers during the class period, with an address in Denver, Colorado and an address in Fort Collins, Colorado who have standing to bring this Objection having received their notice of the settlement of this class action[1] (attached hereto, and incorporated by reference herein) and also provide their attached signatures attesting to their ownership and purchase of such products and set forth the following:

---

1   Objectors redact their street addresses pursuant to redaction rules and that their addresses are bar coded.

**Introduction:**

Quite simply, this is a classic example of "bait and switch", where Class Counsel offers relief to the class whereupon closer examination it is revealed that no relief exists for the class members, who are relieved of their claims against Defendant in exchange for a multi-tiered marketing ploy designed to generate additional sales for the Defendant, leaving class members with clothes dryers that have either caught fire in the past, and/or will catch fire in the future.

Instead of removing the hazardous product from the class members households, the parties instead want this court to approve a sales gimmick designed to stimulate Defendant's earnings at the expense of class members, while Class Counsel gets a whopping 8 Million Dollars for telling everyone that their dryer is likely to catch fire. Meanwhile, the only class members who have received a legitimate benefit, or relief are the Named Plaintiffs in this suit who Class Counsel negotiated a nice settlement for each of them in varying amounts up to $25,000 while the class members received nothing. Not only did Class Counsel fail to disclose such conflict of interest, this Court is obligated to remove class counsel from this case and remove the Named Plaintiffs who have a conflict with the remaining class members numbering approximately 750,000.

**I.      The Settlement is unfair and should be denied by this Court as no relief is provided to the class and the parties instead promote the use and operation of a known hazardous product among over 791,413 class members.**

**A) Class Counsels' offer to clean the dryers of class members is nothing more than the offer of a coupon for Class Members to promote additional services from Defendant and expenditures for parts and repairs for the hazardous dryer.**

One of the expert witnesses in this case opined that there are 791,413 class members who own the hazardous product that is at issue in this litigation, and each and every one would benefit from having the dryer cleaned to reduce its likelihood of combustion, or catching fire. ( Doc 153-2, #3196, p. 3 of 17, Application for Attorney's Fees, Declaration of Edward A. Wallace). Despite the admission that only approximately 10-20% of the class members might avail themselves of such "remedy", the

expert opined that such portion of the settlement- offering a one time opportunity to have your dryer cleaned- was worth up to $15,828,259. (Doc 153-2, #3196, p. 3).  It appears that common sense and logic of such a scheme were not measured, or evaluated.  It makes absolutely no sense to have a dangerous product cleaned when the facts produced indicate that the product is inherently dangerous  to the consumer due to the continued risk of combustion.  (Notice: "Important Customer Safety Advisory- Lint Buildup in Clothes Dryers Can Cause Fires").  Class Counsels' allegations underlying this litigation was that the dryers were subject to "uniform design defects that could cause lint to accumulate behind the drum in direct proximity to the heat source and that lint could ignite and travel into the drum." (Doc 153, p. 3131).

What does a consumer do if they own an appliance that has an inherent defect causing it to catch fire?  Clean it?  No, the consumer gets rid of the hazardous product.  Because people with common sense and those who value their homes and families reduce fire hazards by eliminating dangerous products- not cleaning the product.  As acknowledged by Class Counsel, simply cleaning the dryer one time does not eliminate or abate the hazardous condition causing conflagration within a class member's laundry room. The cleaning must occur every 18 months by a trained professional paid for by the class member.  The first cleaning is paid by the Defendant. (FAQ's, # 9). In the Notice that Class Counsel disseminated, they make it clear that this dryer cleaning is not a one time only occasion- and does not eliminate the hazard or risk of combustion:

> "At lease every 18 months have an authorized service technician clean inside the dryer cabinet, especially between the drum and cabinet, the lint screen housing, and exhaust duct, where lint can build up. An excessive amount of lint buildup in these areas could result in inefficient drying and possible fire."

(Notice: "Important Customer Safety Advisory- Lint Buildup in Clothes Dryers Can Cause Fires").

Therefore, under the very terms of the agreement reached by the parties, the "cleaning" is just that- it merely ameliorates the hazardous condition- it is not eliminated, and unless cleaned time and time

again, will result in fire.  In fact, the parties appear to agree that all such dryers will catch fire, and it is only a matter of time as to when such tragedy occurs.

Keeping such facts in mind, *The Pocket Guide For Judges*, promulgated for the purpose of aiding the judiciary with its decision making in approving- and improving- class action settlements, contains this warning concerning non-monetary benefits as described above:

Likewise, in cases in which the benefit to the class is nonmonetary (coupons, discounts, warrants, injunctions, and the like), determining the actual value to the class requires looking beyond the face value of nonmonetary or contingent benefits. Redemption data or other evidence of class use is essential.  . . In other cases, perhaps a majority, the only reliable test of the benefit to the class will be evidence of class members' use or redemption of the coupons, warrants, or other nonmonetary scrip.

(*Managing Class Action Litigation: A Pocket Guide for Judges, p. 34. Rothstein, Barbara J. & Willging, Thomas E., (Federal Judicial Center, 2010).*  Here, Class Counsel should at the very minimum, be required to demonstrate that class members are utilizing the cleaning service, including data concerning the number of persons availing themselves of this "benefit".  This non-monetary benefit, on its very face is problematic because it seeks to only clean the hazardous item- not remove it from the household.  And the one time cleaning does not ameliorate the problem, since the parties agree that only with repeated cleanings can the likelihood of fire be reduced.

Which brings us back to the key problem for this Court: how can you permit the parties to work around the hazardous item that was the subject matter of the litigation, without removing the threat of harm to the class members?  At minimum, Class Counsel are shirking their duties to the class, which is discussed below in detail.

Also, it is unsurprising that the parties did not release claims for personal injury- because if you keep one of these products in your home, you are inviting disaster, and personal injury is likely to occur (FAQ's # 21). This should be looked upon as suspect.  Stated differently, if the parties agreed to remove the offending products from the class members households, it would remove the spectre or reduce the likelihood of raising up such horrors as personal injuries associated with dryer fires, as the parties

would have agreed to recall them, thereby eliminating the future threat of such preventable injury.

Besides, the cleaning of the dryer requires the class member to come out of pocket for a technician to make any repairs or replacement of parts.  Furthermore, any cleaning that exceeds one (1) hour in time is the responsibility of the class member (FAQ's #10).  But the class members have to prove that not only they continued to use a dryer with admitted dangerous propensities, but that they experienced a fire or problem consisting of overheating, burning or scorching of laundry loads during the first five (5) years of ownership (Doc 153, #3139, p. 16 of 32).

This "cleaning service" is nothing more than a coupon offered as a discount for service from a "trained technician" who will then invoice the class member for the balance of the cleaning time, repairs made, and parts replaced.[2]

Ordinarily, a coupon settlement is viewed as a rarity, and considered unique when discovered or presented to a court by the parties. _Managing Class Action Litigation: A Pocket Guide for Judges_, _Barbara J. Rothstein & Thomas Willging, 3rd ed., 2010, p. 18 (referred to herein as "Pocket Guide")_("Coupon settlements were rare even before the passage of CAFA."). Courts typically seek information from the parties as to whether the coupons are transferrable, can be discounted or converted to cash, "compare favorably with bargains generally available to a frugal shopper" and whether the coupons are likely to be redeemed by class members. _Id._

A "coupon settlement" is rejected where "in kind compensation" is proposed as the relief provided to class members. _Synfuel Technologies v. Dhl Express (USA)_, 463 F.3d 646, 654 (7th Cir., 2006)._  In _Synfuel_, the court of appeals rejected a settlement where the class members were to receive

---

[2] Class Counsel has already agreed that it is not seeking to recover attorney's fees based upon the marketing scheme employed by the Defendant concerning offering new dryers to class members at a reduced rate or additional appliances for their household at a discount as offered in the FAQ's.  Therefore, Objectors will not analyze such aspect of the settlement involving additional coupons offered to the class members since the class counsel appears to have agreed that it has no value (Doc 153, #3143, p. 18).  However, in the event Class Counsel attempts to place a dollar value upon the discounts and rebates offered by Defendant to the Class Members, the foregoing analysis and discussion is applicable reaching the same conclusion that such offers involving future purchases by the class are not of value for purposes of calculation of an attorney's fee.

pre-paid Letter Express envelopes instead of cash, with the court determining that the proposed settlement only benefited those class members who would continue to utilize Defendant's services and that the fairness of the settlement "must be evaluated primarily based on how it compensates class members for these past injuries." *Id.* *("Our confidence in the fairness of the settlement is further undermined by the agreement's bias toward compensating class members with pre-paid Letter Express envelopes instead of cash.").*

Compensation in kind "is worth less than cash of the same nominal value since, as is typical with coupons, some percentage of the pre-paid envelopes claimed by class members will never be used and, as a result with not constitute a cost to Airborne [Defendant]. *Synfuel Technologies, 463 F.3d at 654, citing In re Mexico Money Transfer Litig., 267 F.3d 743, 748 (7th Cir. 2001).*

The modern view is for courts to view coupon based settlements with skepticism, as the reality is that most consumers will not redeem the coupons that are issued, making the relief obtained worthless to the consumer.  S*ee Christopher R. Leslie, "The Need to Study Coupon Settlements in Class Action Litigation", 18 GEO. J. Legal Ethics 1395, 1396-97 (2005)* (Identifying three problems with coupon settlements: 1) it is doubtful that they "provide meaningful compensation to most class members"; 2) they often "fail to disgorge ill-gotten gains from the defendant; and 3) they may force class members "to do future business with the defendant.") *accord, Synfuel Technologies, 463 F.3d at 653.*

This is not compensation, but cleverly disguised loss prevention- Defendant's losses- from future claims for burned out dryers and personal injury claims.  It is a means of perpetuating the defective product's lifespan with the consumer while insulating the Defendant from liability.  And since the program does not cover replacement of parts or labor beyond 1 hour of cleaning, it is purely a device to put more money in Defendant's pockets due to repairs and replacement dryers and parts.

Indeed, forcing Class Members to do future business with Electrolux is a problem that this

6

Court should look into further.  *Syfuel Technologies, supra.*  Without offering the Class Members in question the option of receiving cash refunds, it instead forces these particular Class Members to "do future business with Electrolux." *Geoffrey P. Miller & Lori Singer, "Nonpecuniary Class Action Settlements," 60 Law & Contemp. Probs, 97, 108 (1997)* (noting that for many consumers "the right to receive a discount [or a coupon] will be worthless.") *accord, Synfuel Technologies, 463 F.3d at 653.* Building such cleaning program into extended discounts and rebates for new dryers and other irrelevant appliances seeks to enhance the attractiveness of the cleaning service.  A coupon settlement may benefit certain groups of the class more than others. *In re General Motors Corp. Pick-Up Truck Fuel Tank, 55 F.3d 768 (3rd Cir. 1995).* Here, the only class members that will benefit are those class members who have abandoned common sense and reason by electing to keep dryers that have caught fire in the past and/or smoked or smouldered, or ignore such likely propensities playing a dangerous game of laundry roulette, agreeing to a free cleaning, and ignoring the likelihood that continued use of such products will make the likelihood of fire all more impending.

        In addition, CAFA requires this Court to scrutinize the proposed coupon settlement "and restricts the use of unredeemed coupons in calculating fees for class counsel. *Pocket Guide, p. 18 ("It is important to discern whether attorney fees are being calculated using the face value of the coupons instead of the value of coupons actually redeemed.").*  The Pocket Guide strongly suggests that trial courts ". . . hold back the portion of any attorney fee awards that is linked with coupons, discounts, or other nonmonetary benefits until after the redemption period has ended and the value of the benefits can be established by calculating class members' actual use." (*Pocket Guide, p. 34, A. Evaluating monetary and nonmonetary results achieved*).  See also *In re HP Inkjet Printer Litigation,* 716 F.3d 1173, 1175-76 (9th Cir. 2013) ("When a settlement provides for coupon relief, either in whole or in part, any attorney's fee 'that is attributable to the award of coupons' must be calculated using the redemption value of the coupons.  § 1712(a).  Since the district court awarded fees that were 'attributable to' the

coupon relief, but failed to first calculate the redemption value of those coupons, we reverse the orders of the district court…").

Here, if this Court allows the settlement to go forward, it is necessary for this Court to refrain from establishing a value for the cleaning service until after such time the Court determines how many class members actually use the service. After such point in time, then this Court should ascertain the value of the cleaning service, and its corresponding value to Class Counsel in an award of attorneys' fees. This approach is consistent with the Pocket Guide, "Determining the precise value to the class of the rare beneficial coupon settlement, though, calls for hard data on class members' redemption of the coupons" (*Pocket Guide, p. 18, Hot Button Indicators- 1.Coupons*) and the law of this Circuit, *In re HP Inkjet Printer Litigation*, supra.

The 9th Circuit holds that a settlement that provides class members with the option of a cash recovery or "cash equivalent forgiveness of indebtedness already incurred" is not a coupon settlement, and does not trigger the Class Action Fairness Act's limitations on contingent fees awarded in connection with such settlements. *CLRB Hansons Indus. LLC v. Weiss & Assoc. PC, (unpublished) (January 5, 2012) (9th Cir., 2012); 28 U.S.C. Sec. 1712(a).* Again, Class Counsel could avoid this requirement and establish a fund under which class members could receive checks for $100.00.

But that's the problem. The only amount certain in this case is the payment of attorney's fees, and the payments to the named plaintiffs for their damages over and above what the class is to receive. Under the current standards utilized to evaluate coupon settlements and in kind compensation, this Settlement cannot be approved until either the parties agree to forego placing a benefit on the cleaning service program until all claims are made, or the parties agree to pay out the value of the cleaning service to the class members as an alternative to such cleaning.

This Court should not place any value on the cleaning services offered by Class Counsel to the class members as they are doing nothing more than perpetuating a hazardous product's existence

8

instead of removing it from the marketplace and class members' households.  More importantly, this Court should not approve such settlement because it allows the threat that was the basis of this lawsuit to continue into perpetuity, with only the offer of cleaning the hazardous object once while saddling the class members with a ticking time bomb of lint designed to burst into flame at some time in the future. If this Court should choose to allow the settlement to proceed and allow class members to clean their fire bomb/dryer, it should also require that the parties simply pay out the class members who elect to proceed in a safe manner, or who have already disposed of the deadly dryers.

**B)  Class Counsels' offer to pay compensation to class members who have experienced a dryer fire fails to provide meaningful relief to class members for their losses and involves a complicated claims procedure designed to hinder the class from making claims.**

The experts in this case estimated the number of past and "future fires" to be 25,655, and claim that the "full utilization value" for this aspect of the case between 2002 and 2013 consisting of those class members who have had flames shooting out of their dryer to be $9,322,952 (Doc 153-2, #3196, p. 3).  Class Counsel claims this as another basis upon which the Court should value the relief to the class for this action or offer at 9.3 Million Dollars as the "full utilization value" (Doc 153, #3138, p. 15). Whether the class participates or not changes little for the class members participating in terms of actual recovery.  Here, the Defendant only pays the class member if she/he establishes that insurance or a third party did not pay the full amount of any claim (FAQ's #13). And the amount paid must be supported with documentation establishing the class member's claim, up to $1,300.00.  No documentation means that the maximum amount that a class member will receive is $300.00.

In any event, proving entitlement to the funds is not easy matter, as the claim form requires the class member to:

> provide both the model number and serial number of your clothes dryer; the manufacturing date stamp of the dryer; or a photograph of the inside of your dryer drum sufficient to identify the dryer. You will have the opportunity later in the claim filing process to upload a photo.

(Claim Form Website, page 1).  What are the chances that a class member who suffered through a burning dryer kept the product after they put out the fire?  Better yet, what are the chances they documented the model number and the serial number of the dryer? (assuming you could still read the serial number after a fire).  The requirements for the class members to file a claim are too onerous and draconian to permit ease of access to the alleged "relief" offered to the class.  No one keeps a burnt item indefinitely, particularly one as large as a clothes dryer.  No provisions are made by class counsel to take into account the absence, or obliteration of the serial number due to fire.

According to the Pocket Guide, "First, consider whether a claims process is necessary at all. The defendant may already have the data it needs to automatically pay the claims of at least a portion of class members who do not opt out." (*Pocket Guide*, p. 30, G. Claims Processes and Response Handling).  Here, Defendant has all the information about who purchased these defective dryers, and is in a position to ascertain who suffered a loss.  Class Counsels' own experts seem to agree on this subject, as detailed in their respective declarations. Simply send a check for  $1,300 to 25,655 class members who have experienced a past conflagration or are destined to experience one in the future. This reduces the ridiculous claims process seeking information only found in burned out dryers.

But then this would require the establishment of a bonafide settlement fund, and provide actual relief to the class members instead of a statistical analysis designed to hoodwink this Court into believing that this a legitimate settlement that actually aids the class when it is nothing more than a slickly designed payment device to distribute 8 Million Dollars to Class Counsel for abandoning this litigation, leaving the class with nothing more than slick sales pitches and discounts on future products offered by Defendant.

**C) The injunctive relief and Safety Notice offered to Class Members merely restates the legal obligation of the Defendant to warn the consumer about a deadly product, and serves only the interests of the Defendant in reducing future claims for damages by class members for dryer fires.**

10

The parties have disseminated a Safety Notice that is apparently disclosing the hazardous defect of the dryers in question, and providing Class Members with additional tips and suggestions to minimize the risk of their dryer becoming engulfed in flames (Doc 153, #3140-3141, p. 17-18). Incredibly, Class Counsel represents this "warning" as providing a value of 15.7 Million Dollars to the class. First of all, warning the class members merely restates the legal obligation of the Defendant. Second, no value is added to the settlement. There is no meaningful way to quantify this value.  Unless the Defendant is offering to replace the hazardous dryers (which they won't do, as that would cost money).  Instead, now the class members know the fires and problems with their dryers were the fault of the Defendant, and that they can call a "technician" to pay to clean their dryer.

But this does not provide a "value" to the class.  It's another stunt designed to push profits and money into the hands of the Defendant by having class members purchase new dryers that allegedly do not have such defect, and pay to have the old ones cleaned. Class Counsels' assignment of these varying numbers attributing the value of the settlement should be disregarded by this Court. These "non-monetary" recoveries cannot be the basis for establishment of attorneys' fees for $8 Million Dollars, unless this Court receives data showing the actual participation of the class members who have the cleaning performed on their hazardous dryer and for the small portion of class members eligible for reimbursement for a burnt dryer.  This settlement is nothing more than the offer of a paperless coupon to the Class Members, gussied up with discounts and rebates designed to distract the class members from the reality that no real recovery was achieved, and the hazardous appliances are not removed from the marketplace or their households.

## II.    The Attorneys' Fees sought by Class Counsel should not be approved, as such amounts cannot be linked to any recovery or relief received by the Class Members they purport to represent.

The Pocket Guide makes clear that "in such cases, it is especially importing to link the amount of any attorney fees with the actual benefit to the class." *(Pocket Guide, p. 34)*.  As discussed above,

11

Class Counsel has failed to provide any meaningful relief to the class members, nor has any fund of money been created through which a claim would lie for a portion of the common fund as payment of their fees.  The Common Fund exception "entitles a plaintiff to a fee award only if he has created, discovered, increased or preserved a fund to which others also have a claim." *B.P. North America Trading, Inc. v. Vessell Panamax Nova*, 784 F.2d 975, 977 (9th Cir., 1986).  As established above, Class Counsel has failed to establish any fund through which the class members may claim.  Instead, a host of sales pitches with discounts for new dryers and appliances, along with a cleaning service coupon are offered to the class members.  A few class members- approximately 25,000 of the 750,000 or so class members will have the opportunity to wrangle through Defendant's claim process to receive a paltry amount for any unreimbursed expenses their insurance or extended warranty did not pay after providing data and information that was destroyed in the fire.

But the cleaning program and Safety Notice does not provide any fund of monies for which the class members are entitled, or "to which others have a claim." *B.P. North America, supra.* Arguably, at best the only way to value the services offered is based on the utilization by the class members- which for most class members, is unlikely to occur, since common sense dictates you dispose of a dryer after it catches fire.  As discussed above, this Court should refrain from including the cleaning service, safety notice and fire reimbursement program in calculating any award of attorneys' fees.  Furthermore, the attorneys' fees sought in this case are not part of any fund of money-they are paid separately by the Defendant, and are not subject to such analysis under the common fund doctrine.  It is a fundamental concept in class action jurisprudence that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Wininger v. Si Management L.P.*, 301 F.3d 115, 1120 (9th Cir., 2002). Since Class Counsel established zero funds, they get just that- zero.

If this Court is still willing to entertain making an award of attorneys' fees, the *Pocket Guide*

provides for Court scrutiny of such ambiguous relief as set forth by the parties:

> A direct way to ensure that you have sufficient information to determine attorney fees in cases with nonmonetary benefits is simply to hold back the portion of any attorney fee awards that is linked with coupons, discounts, or other nonmonetary benefits until after the redemption period has ended and the value of the benefits can be established by calculating class members' actual use.

*(Pocket Guide, p. 34)*. Class Counsels' "dryer cleaning service" is highly suspect, and should be carefully scrutinized.  As stated before, why on earth would someone decide to clean an appliance that has caught fire in the past or smoked/smouldered ruining laundry (or worse)? Such premise assumes the class members lack common sense to dispose of a hazardous product.  No one wants it cleaned- they want it out of their household. Such program has zero value for calculating attorney's fees.

Class Counsel's "Safety Notice"  (Doc 153, #3140, p. 17) where they magnanimously claim to have provided a benefit to the class that should allow them to derive an attorney's fee, is nothing more than a self-serving warning issued by the Defendant to warn class members that their dryer is likely to burst into flame at some point in the future, for the purpose of reducing personal injury claims.  This is another "nonmonetary benefit" that provides zero value to the class, and translates into zero attorneys' fees.   Class Counsel has the temerity to claim that such notification designed to insulate and protect the Defendant has provided a benefit to the class worth $15.7 Million Dollars (Doc 153, #3141, p. 18).  Since when has a defendant warning a plaintiff of it's tortious conduct in the very litigation they are involved in given way to a value for settlement purposes?

The "Safety Notice" does not change the hazardous nature of the product.  Nor does the content of the notice change anything appreciably to benefit the class.   Class Counsel makes it clear that cleaning the dryer will "substantially reduce the risk of fire" in the dryer (Doc 153, #3141, p. 18).  However, they fail to remind the Court that the dryer needs to be cleaned on a repeated basis for such benefit to be long lasting, nor do they mention that most class members will have already disposed of a

dryer that has burnt up on a previous occasion.  Failing to take the next necessary step and recall the

dryers makes such Notice valueless to the class because it does nothing to change the status quo.

**III.     The attorneys' fees sought should be denied by this Court in light of the parties negotiated
clear sailing provision, and the fact that such fees are paid separate and apart from any class
recovery, while the Class Members receive no funds.**

Here, a clear sailing provision is evident in the parties agreement to pay attorneys' fees

of 8 Million Dollars in fees and costs to Class Counsel:

> These fees, expense reimbursements, and service awards will be paid
> separately by Electrolux, who has no objection to them, and will have no
> impact on or otherwise diminish the benefits paid to the Settlement Class.

(Doc 153, #3131, p. 8).  This indicates that the Settlement reached was the product of collusion

between the parties, and include "(1) when counsel receives a disproportionate distribution of the

settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;

(2) when the parties negotiate a clear sailing arrangement providing for the payment of attorneys' fees

separate and apart from class funds; . . . and (3) when the parties arrange for fees not awarded to revert

to defendants rather than be added to the class fund." _In re Bluetooth, 654 F.3d 935, 947 (9th Cir._

_2011)._  A clear sailing agreement exists where the party paying the fee agrees not to contest the amount

to be awarded as long as it falls beneath a negotiated ceiling. _True v. Am. Honda Motor Co., 749 F._

_Supp. 2d 1052, 1077, 1077 n.29 (C.D. Cal. 2010)._  The presence of a clear sailing provision heightens

the district court's duty to closely scrutinize the relationship between attorneys' fees and benefit to the

class, being careful to not award unreasonably high fees. _See In re Bluetooth, 654 F.3d at 948 (citation_

_omitted)._  Clear sailing provisions are disfavored, although not entirely prohibited. See _id. at 949;_

_Hartless v. Clorox Corp., 273 F.R.D. 630, 645 n.6 (S.D. Cal. 2011)._

Here, there is a clear sailing arrangement within the Settlement, and this Court should closely

scrutinize the award of attorneys' fees against the actual benefit received by the class.  These funds are

14

"separate and apart" from the class members purported recovery ("If approved, Electrolux will separately pay these fees, costs, expenses, and awards; they will not reduce the amount of benefits available to Class Members.")(FAQ's #23 "How will these Lawyers be paid?"). Here, the attorneys' fees sought, are preordained and approved by the Defendant who will not object to such amount. Here also, Class Counsel is the only entity that is receiving a defined amount of money-8 Million Dollars, while the class members are not scheduled to receive any defined dollar amount, resulting in a disproportionate amount of funds delivered into the hands of Class Counsel.

No reversion exists, because the Defendant is not obligated to pay one dime.  As discussed above, instead a lengthy claims process filters out class members who have experienced a burning dryer, and Defendant is offering coupon based relief toward future purchases of products and a one time cleaning service.  No relief, no remedy and payment of 8 Million Dollars to Class Counsel. This Court should not permit such activity.

**IV.    Class Counsel and the Named Plaintiffs have a conflict of interest with the unnamed class members they purport to represent stemming from additional negotiated settlement payments to the Named Plaintiffs from Defendant for property damage caused by dryer fires, and therefore such counsel and named plaintiffs must be removed from this litigation.**

Section VII of the Settlement Agreement sets forth the compensation to be paid to the class representatives.  That section explicitly reveals compensation to certain of the named Plaintiffs that is so excessive when compared to any compensation paid to the absent class members that it places Class Counsel and the named Plaintiffs in conflict with the interests of the absent class members (Doc 147, #3043-3044, p. 41-41).  The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Ninth Circuit has indicated that "the proper resolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re*

_Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 462 (9th Cir. 2000)._  In this case, by the very terms of Section VII of the Settlement Agreement, the conflict of interest of Plaintiffs and their counsel is so apparent that the Court cannot find that the representative parties can fairly and adequately protect the interests of the class.

Pursuant to Section VII(A) of the Settlement Agreement, each Plaintiff is entitled to participate in the coupon portion of the settlement.  Section VII (B) provides that the named Plaintiffs who experienced a Past Dryer Fire are entitled to receive compensation up to the purchase price of their dryer.  Just like all other class members, for any of the named Plaintiffs to participate under Sections VII(A) or (B), the Plaintiff must submit a claim form.  The troublesome portion of the Settlement is found in Section VII (C).  The parties identify this section as "Compensation for Individual (Non-Class) Property Damage Claims."  Under that subsection, three of the named Plaintiffs will receive additional amounts ranging from $1,239.65 to $25,000.00 for damage to property other than the dryer itself.  These Plaintiffs are not required to submit any claim forms to receive such compensation.  Rather, such amounts will be sent by wire transfer to Class Counsel within 15 days of the Effective Date.  These particular Plaintiffs are receiving compensation which is not available to any other member of the class.  The fact that the parties refer to such claims as "Non-Class" claims in no way renders such payments as proper.  Not only are these Plaintiffs receiving additional compensation not available to any other member of the class, they are receiving additional compensation in the form of Incentive Awards of $3,000 each.

An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class. _Hanlon v. Chrysler Corp.,_ 150 F.3d 1011, 1020 (9th Cir.1998).  The adequacy requirement is paramount, and applies to both the named plaintiff(s) and counsel. _Amchem Prods., Inc. v. Windsor,_ 521 U.S. 591, 626 (1997).  A primary purpose of the adequacy inquiry is to "uncover conflicts of interest

between named parties and the class they seek to represent." *Id. at 625-626.* The adequate

representation requirement "is typically construed to foreclose the class action where there is a conflict

of interest between the named plaintiff and the members of the putative class." *Gen. Tel. Co. of the*

*Northwest, Inc. v. EEOC, 446 U.S. 318, 331, 100 S.Ct. 1698, 1707 (1980); Prado-Steiman ex rel. v.*

*Bush, 221 F.3d 1266, 1279 (11th Cir. 2000)* (noting that the "incentives" of the class representative must

"align with those of absent class members so as to assure that the absentees' interests will be fairly

represented").

Settlement of claims for the named class members gives such persons a perverse incentive to

end this litigation, so that they may receive their additional reimbursement- without regard to the

character or nature of the settlement proposed by the parties.  It also demonstrates that the named

plaintiffs are not above negotiating for their damages at the expense of the class members they purport

to represent, using the class action device as a tool to extract settlement from the Defendant.  The

named plaintiffs must adequately represent the interests of the class, acting as fiduciaries on behalf of

the class, without any conflicts with class interests. *Williams v. L.A. Fitness Int'l, LLC, B225622, Dist.*

*Div. 8, (Cal. App., 2011)*, citing *LaSala v. American Sav. & Loan Assn., 5 Cal. 3d 864 (1971).*  Here, the

class members interests are in receiving the maximum benefit that can be achieved through either

litigation or settlement.  Whereas, the Named Plaintiffs interests are clearly divergent, seeking to

recover the maximum amount from Defendant- without considering the class members recovery.

Adequate representation "as required by Federal Rules of Civil Procedure Rule 23(a)(4)

'depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of

interests between representatives and absentees, and the unlikelihood that the suit is collusive.' "*Linney*

*v. Cellular Alaska Partnership, 151 F.3d 1234,1239 (C.A.9 (Cal.), 1998)*, citing *Brown v. Ticor Title*

*Ins. Co., 982 F.2d 386, 390 (9th Cir. 1992).*  Adequacy is measured by both class counsels' conduct and

that of the class representatives. *Id.*   Any protestations that the settlements achieved for the Named

Plaintiffs do not interfere or conflict with Class Counsels' continued representation of the class is unavailing, as Class Counsel has demonstrated that they are willing to sell out the Class Members, who each are not scheduled to receive any funds, while the Named Plaintiffs are earmarked for distributions for up to $25,000.00 for their damage claims.

Class Counsel has negotiated a settlement which provides full and complete compensation to their clients while limiting the recovery of the absent class members- no common fund, and requirement of Defendant to pay money to anyone other than approximately 25,000 of the 750,000 members of the class.  While limiting the potential compensation to the absent class members to amounts much less than their own clients will receive, Class Counsel seeks $8 million in fees.  This is much more than an appearance of impropriety.  It is an actual conflict which cannot be remedied. Antagonism exists between the named class representatives who have received amounts over and above that allowed (or fought for) on behalf of the unnamed class members they claim to represent. Class Members do not share anything with the Named Plaintiffs in this case- the resolution of their claims, although identical have been worked out favorably, involving cash payments totaling thousands of dollars- to the disadvantage of the Class Members.   It is incumbent upon this Court to prohibit certification of a class at this time, and remove both the Named Plaintiffs and Class Counsel from this litigation.

This behavior of settling Named Plaintiffs' claims but not Class Members demonstrates the existence of divided loyalties.  Class Counsel is willing to go the extra mile for their named plaintiffs, but abandoning such vigorous pursuit of damages and funds for the class members they purport to represent. In California, Class Counsel has a duty of loyalty to all the clients in this litigation. _Rotenberg v. Brain Research Labs, LLC_ Super. Ct. No. 30-2010-00401652, 4th App. Dist. Div. 3 (Cal. App., 2011).  In the 9th Circuit, "The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of

counsel." *Rodriguez, 563 F.3d at 967; citing Kayes v. Pac. Lumber Co., 51 F.3d 1449, 1465 (9th Cir. 1995) (quoting Sullivan v. Chase Inv. Servs. Of Boston, Inc., 79 F.R.D. 246, 258 (N.D. Cal. 1978).*

This Settlement Agreement implicates California ethics rules that prohibit representation of clients with conflicting interests. *See Image Tech. Serv., Inc. v. Eastman Kodak Co., 136 F.3d 1354, 1358 (9th Cir.1998)* (noting that "[s]imultaneous representation of clients with conflicting interests (and without informed written consent) is an automatic ethics violation in California") and is grounds for disqualification. *Flatt v. Superior Court, 9 Cal.4th 275, 36 Cal.Rptr.2d 537, 885 P.2d 950, 955 (1994); accord Rodriguez v. West Publishing Corp., 563 F.3d 948, 967 (9th Cir., 2009).* An attorney "cannot recover fees for such conflicting representation." Id.

In the 9th Circuit, "Class Counsel's fiduciary duty is to the class as a whole and it includes reporting potential conflict issues." *Rodriguez, 563 F.3d at 967.* Here, Class Counsel has failed to disclose such conflict to the class members either through the Notice they disseminated, or through the FAQ's found on the website.  Nor did Class Counsel disclose such conflict to this Court in their Application for Attorney's Fees. Instead, such conflict was buried in the Settlement Agreement entered into by the parties- available to only those who would take the time to review such legal document. Class Counsel should not be allowed to profit from such circumstances that they created at the expense of the class they agreed to vigorously represent.

Class Counsel has placed their interests and the interests of the named Plaintiffs above those of the absent class members.  This Court must protect the due process rights of the absent class members and refuse to permit the conflicts of interest in this case to continue.

It is incumbent upon this Court to remove class counsel from representation of the unnamed class members, and remove the named plaintiffs as well.

**Conclusion:**

In the 9th Circuit, it is recognized that the benchmark award for attorneys' fees awarded is

approximately 25%, with such percentage adjusted downward when the case qualifies as a "megafund". *Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir., 2002)*. However, since the fees sought by Class Counsel in this immediate case of 8 Million Dollars cannot be attributed to any real benefit bestowed upon the class, such amount should be reduced to zero or a nominal number unless Class Counsel agrees base its fee upon the actual (and not imagined) participation of the class members in the cleaning program and dryer fire reimbursement program.  And only if this Court somehow views that failure to remove the hazardous appliances from the stream of commerce and class members' households can be ignored by the Court and the parties.

Moreover, the conflict of interests that have been presented militate against an award of attorney's fees, and require that this Court remove class counsel from this case along with the named plaintiffs for the reasons set forth above. Objectors intend to appear at the Fairness Hearing through their Counsel of Record, and reserve the right to cross examine witnesses presented by the parties and introduce evidence based on the Objections lodged above.

WHEREFORE, Objectors pray that this Court enter its order with following:

1) Removing Class Counsel from this litigation due to the conflict of interest that exists between them and the unnamed class members they purport to represent;

2) Remove the Named Plaintiffs from this litigation due to the conflict of interest that exists between them and the unnamed class members they purport to represent;

3) Enter an Order denying Class Counsels' Application for Attorneys' fee based upon the conflict of interest in this litigation;

4) Enter an Order denying Class Counsels' Application for Attorneys' fees based upon the finding that the relief offered to the class has zero value;

5) In the alternative, enter an Order adjusting Class Counsels' fees to account for the value that this Court has found that one or more of the offered items of relief provide after determining the

20

amount of class participation in the dryer cleaning and dryer fire reimbursement program;

6) Enter an Order denying Class Counsels' Application for Attorneys' fees due to the existence of the clear sailing provision;

7) Enter an Order denying Class Counsels' Application for Attorneys' fees due to the failure to establish a common fund under which Class Counsel can establish such right to entitlement of fees;

8) Order the parties to negotiate a settlement that involves offering money to the class in lieu of a cleaning service;

9) Order the parties to negotiate a settlement that does not require that the class establish their right to a claim by identifying information that can only be reasonably identified on a burnt out dryer;

10) Order the parties to negotiate a settlement that requires the Defendant to offer to remove the dryers from the households of class members and compensate them for the value of the product, and

11) Any other relief that this Court finds necessary within the premises.

/s/ Steve A. Miller
STEVE A. MILLER (CA Bar No. 171815)
STEVE A. MILLER, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925
Email: sampc01@gmail.com

JOHN C. KRESS (53396MO)
The Kress Law Firm, LLC
P.O. Box 6525
St. Louis, MO 63125
Ph.#: (314) 631-3883
Fax: (314) 332-1534
Email: jckress@thekresslawfirm.com

21

JONATHAN E. FORTMAN (40319MO)
Law Office of Jonathan E. Fortman, LLC
10 Strecker Rd., Suite 1150
Ellisville, MO 63011
Ph# (314) 522-2312
Fax:  (314) 524-1519
Email:  jef@fortmanlaw.com


**CERTIFICATE OF SERVICE**

On this 28th day of JULY, 2014 this document and its exhibits were filed with the Clerk of Court and

were deposited in the United States Mail, postage prepaid addressed to:


Edward A Wallace
Amy E. Keller
Dawn M. Goulet
Wexler Wallace LLP
55 West Monroe St., Ste 3300
Chicago, Illinois 60603
*Class Counsel*

Michael T. Williams
Kenneth E. Stalzer
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 450
Denver, Colorado 80202
*Counsel for Electrolux*

s/Steve A. Miller

I authorize the attached Objection to be filed on my behalf.  I own a Frigidaire Dryer manufactured between January 1, 2002, and December 31, 2011.  The serial number is _XD9080 7240_ and the model number is _AEQ 8000 FSO_ I received the attached Notice in the mail at my current address.  I can be reached through my attorneys.

7/23/14

Kristina K. Newman

I authorize the attached Objection to be filed on my behalf. I own a Frigidaire Dryer
manufactured between January 1, 2002, and December 31, 2011. The serial number
is XD80500599 and the model number is AEQ6700FS0. I received the attached
Notice in the mail at my current address. I can be reached through my attorneys.

_____   7.24.14
Joyce Miller

EXR

*Electrolux Dryer Settlement Administrator*
P.O. Box 43267
Providence, RI 02940-3267

*Electrolux Dryer Settlement Administrator*
P.O. Box 43267
Providence, RI 02940-3267

PRESORTED
FIRST CLASS MAIL
U.S. POSTAGE
PAID
SANTA ANA, CA
PERMIT No. 626

Claim#: EXR-10439280001   389068

NEWMAN
DENVER, CO 80212-2910

T823

PRESORTED
FIRST CLASS MAIL
U.S. POSTAGE
PAID
SANTA ANA, CA
PERMIT No. 626

Claim#: EXR-10411406001   361196

JOYCE MILLER
FORT COLLINS, CO 80526-1995

T829

# If you purchased or currently own a clothes dryer manufactured by Electrolux (includes Frigidaire) between January 1, 2002, and December 31, 2011, you could get benefits from a class action settlement.

*Includes Frigidaire, White Westinghouse, Kelvinator, Gibson, Tappan, Crosley, and Kenmore Brands*

*Si usted desea obtener una copia de este documento en Español, visite el sitio www.DryerSettlement.com.*

A Settlement has been reached with *Electrolux Home Products, Inc.* ("Electrolux") about whether the company manufactured freestanding clothes dryers that contain a defect which may cause lint to build up and catch fire. Electrolux denies all of the claims in the lawsuit and maintains that its dryers are not defective. The Court has not decided who is right. Instead, both parties have agreed to settle the case. *This is only a summary of your legal rights. For more information, visit www.DryerSettlement.com.*

**What is the class action about?** The lawsuit claims that the Dryers contain defects that can cause them to catch on fire due to a buildup of lint inside them. The lawsuit further claims that Electrolux breached warranties, was negligent, violated various state consumer protection statutes and unlawfully profited from the sale of the Dryers. Electrolux denies that there is any defect in its Dryers or that the Dryers pose any unreasonable fire hazard to consumers. Electrolux also denies that it violated any law or engaged in any wrongdoing..

**Who is included in the Settlement?** Electrolux's records show that you may be a member of the Settlement Class. The "Settlement Class" or "Class Members" include all U.S. residents who, for personal or household use, purchased or currently own a Frigidaire, Kenmore, White Westinghouse, Kelvinator, Gibson, Crosley, or Tappan-brand "ball-hitch" freestanding clothes dryer manufactured by Electrolux in Webster City, Iowa, between January 1, 2002 and December 31, 2011 (these types of dryers have serial numbers beginning with "XD," and can be identified by the design of the Dryers' drum—go to www.DryerSettlement.com to see if you have one of these Dryers). The Settlement also includes two smaller Settlement Subclasses consisting of Class Members who (a) have experienced a Dryer fire, or (b) experience a Dryer fire in the future.

**What does the Settlement provide?** The Settlement provides a variety of benefits including free dryer cleaning services to remove lint build-up in the Dryers that may cause fires, up to $1,300 in cash reimbursements for past or future dryer fires, a rebate of up to $350 off the purchase of a new Frigidaire or Electrolux brand clothes dryer (which do not contain the alleged defects) or home appliance, and up to $350 off the purchase of new products from www.ElectroluxAppliances.com. Electrolux will not cap or limit the benefits available under this Settlement. The Settlement also requires Electrolux to publish a customer safety notice informing customers and Settlement Class Members that lint in dryers may build up and increase the risk of fires. *The Settlement does not require you to release any personal injury or property damage claims, other than damage to the Dryer itself, you have against Electrolux.*

**How do you ask for benefits?** You must complete and submit a Claim Form with any required documents by **December 15, 2014.** You can complete and submit your Claim Form online at www.DryerSettlement.com or print one from the website and mail it to the address on the form. Claim Forms are also available by calling 1-888-541-4923, sending an email to Administrator@DryerSettlement.com or writing to the Electrolux Dryer Settlement Administrator.

**Your other options in this Settlement.** If you do nothing, your rights will be affected and you will not get any settlement benefits beyond receiving Electrolux's customer safety notice. If you do not want to be legally bound by the Settlement, you must exclude yourself from it by sending a letter to the Electrolux Dryer Settlement Administrator by July 28, 2014. Unless you exclude yourself, you will not be able to sue or continue to sue Electrolux for any claim resolved by the Settlement or released by the Settlement Agreement. If you exclude yourself, you cannot get any benefits from the Settlement. If you stay in the Settlement (*i.e.,* don't exclude yourself), you may object to it by July 28, 2014 by filing a written objection with the Court, Class Counsel, and Defense Counsel.

**The Court's Fairness Hearing.** The U.S. District Court for the Central District of California, located at 312 North Spring Street, Los Angeles, California 90012, will hold a hearing in this case (*Roberts v. Electrolux Home Products, Inc.,* Case No. SACV12-1644-CAS(VBKx)) on August 18, 2014, at 10:00 a.m. PDT in Courtroom 5. At the fairness hearing the Court will decide whether to approve: (1) the Settlement; (2) Class Counsel's request for an award of attorneys' fees and reimbursement of costs—which will include at least $583,000 in costs incurred to-date and that continue to accrue, and the total amount of fees and costs requested will not exceed $8,000,000; and (3) incentive awards of $3,000 to each of the five Class Representatives. If approved, these fees, expenses and awards will be paid separately by Electrolux and will not reduce the benefits available to Class Members. You may appear at the hearing, but you do not have to. You may also hire your own attorney, at your own expense, to appear or speak for you at the hearing.

**More information.** For more information, including specific information on the proposed Settlement, filing a claim, excluding yourself, or filing objections, visit www.DryerSettlement.com, send an email to Administrator@DryerSettlement.com, or write to Electrolux Dryer Settlement Administrator, PO Box 43268, Providence, RI 02940-3268 or Class Counsel at 55 West Monroe Street, Suite 3300, Chicago, IL 60603 or call 1-888-541-4923.

**Do not contact the Court, Electrolux, or any appliance retailer or dealer for information about the Settlement.**

**FRIGIDAIRE**

## Important Customer Safety Advisory

# Lint Buildup in Clothes Dryers Can Cause Fires

Fires can occur when lint builds up in the dryer or in the exhaust duct. Excessive lint buildup can block the flow of air, cause overheating, and result in a fire in some dryers. To help prevent fires:

- **Clean the lint screen/filter before or after drying each load of laundry.** If you notice that your laundry is still damp at the end of drying cycles that ordinarily would dry your laundry, or if you experience longer than normal drying times on automatic moisture sensing cycles, this may be a sign that lint has built up, blocking air flow. Clean your lint filter and call an authorized servicer to inspect and clean your dryer and exhaust duct and diagnose the cause of the problem. Call 1-877-435-3287 to schedule service with an Electrolux-authorized servicer.

- **Regularly inspect and clean the outdoor exhaust opening.** A clothes dryer produces combustible lint. The dryer must exhaust to the outdoors. Regularly inspect the outdoor exhaust opening and remove any accumulated lint around the outdoor exhaust opening and in the surrounding areas.

- **At least every 18 months have an authorized service technician clean inside the dryer cabinet, especially between the drum and cabinet, the lint screen housing, and exhaust duct, where lint can build up.** An excessive amount of lint buildup in these areas could result in inefficient drying and possible fire.

- **Replace flexible plastic or foil, accordion-type ducting material with rigid or semi-rigid metal duct.** Rigid or semi-rigid metal ducting provides maximum airflow and reduces the likelihood of a crushed or blocked vent. The flexible plastic or foil type duct is known to collapse, be easily crushed, and trap lint. These conditions will obstruct clothes dryer airflow and increase the risk of a fire.

- **Don't dry items that have been previously cleaned in or soaked with gasoline, cleaning solvents, or other flammable substances.** They could give off vapors that could ignite or explode.



Use rigid or semi-rigid metal ducting

At least every 18 months have an authorized service technician clean the exhaust duct and inside the dryer cabinet (including behind the drum and the lint screen housing)

Regularly inspect and clean the outdoor exhaust opening

Clean the lint screen/filter before or after each cycle

EXRINS1