# Exhibit A

*Roberts, et al. v. Electrolux Home Products, Inc.*

No. SACV12-1644-CAS(VBKx)

PLAINTIFFS' AND CLASS COUNSEL'S RESPONSE TO PATRICK
SWEENEY'S OBJECTIONS TO THE CLASS ACTION
SETTLEMENT AND ATTORNEYS' FEES, AND NOTICE OF
INTENTION TO APPEAR AT THE FAIRNESS HEARING AND
MOTION FOR SANCTIONS

```
 1                    UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON AT SEATTLE
      _____
 3
      MARK A. ARTHUR, CIRILO      )
 4    MARTINEZ, PARI NAJAFI and   )
      HEATHER MCCUE on behalf of  )
 5    themselves and all others   )    NO. C10-198JLR
      similarly situated,         )
 6                                )    SEATTLE, WASHINGTON
             Plaintiffs,          )    SEPTEMBER 14, 2012
 7                                )
      v.                          )
 8                                )
      SALLIE MAE, INC.,           )    MOTION HEARING
 9                                )
             Defendant.           )
10    _____

11                VERBATIM REPORT OF PROCEEDINGS
             BEFORE THE HONORABLE JAMES L. ROBART
12               UNITED STATES DISTRICT JUDGE
      _____
13    APPEARANCES:

14     For Plaintiffs:      MR. JONATHAN D. SELBIN
                            MS. BETH E. TERRELL
15                          MS. ALISON STOCKING
                            MR. MATTHEW R. WILSON
16

17     For Defendant:      MS. JULIA B. STRICKLAND
                            MS. LISA M. SIMONETTI
18                          MR. ERIC D. REICIN

19     For Intervenor      MR. DARRELL PALMER
       Judith Harper and   MR. BRIAN J. TRENZ
20     Objectors Sweeney
       and McBean:
21

22
       Reported by:        Kari McGrath, CCR, RMR, CRR
23                         Federal Court Reporter
                           206.370.8509
24                         kari_mcgrath@wawd.uscourts.gov

25
```

1          PROCEEDINGS

2    _____

3          THE COURT:  Please be seated.  The clerk will call

4    this matter.

5          THE CLERK:  Case C10-198, Mark Arthur versus Sallie

6    Mae.

7       Counsel, please make your appearances.

8          MR. SELBIN:  Good afternoon, Your Honor.  Jonathan

9    Selbin from Lieff Cabraser Heimann & Bernstein on behalf of

10   plaintiffs and the proposed class.

11         THE COURT:  Thank you.

12         MS. TERRELL:  Good afternoon.  Beth Terrell from

13   Marshall Daudt & Willie on behalf of plaintiffs and the

14   proposed class.

15         MS. STOCKING:  Good afternoon.  Alison Stockins,

16   Lieff Cabraser Heimann & Bernstein on behalf of the

17   plaintiffs and proposed class.

18         MR. WILSON:  Good afternoon, Your Honor.  Matt Wilson

19   from Meyer Wilson on behalf of plaintiffs and the proposed

20   class.

21         MS. STRICKLAND:  Good afternoon, Your Honor.  Julia

22   Strickland from Stroock & Stroock & Lavan on behalf of

23   defendant Sallie Mae.

24         THE COURT:  Thank you.

25         MS. SIMONETTI:  Good afternoon, Your Honor.  Lisa

1    Simonetti, Stroock & Stroock & Lavan, on behalf of defendant

2    Sallie Mae.

3            MR. REICIN:  Good afternoon.  Eric Reicin, deputy

4    general counsel for Sallie Mae.

5            MR. PALMER:  Good afternoon, Your Honor.  Darrell

6    Palmer on behalf intervenor Judith Harper and objectors

7    Sweeney and McBean.

8            MR. TRENZ:  Good morning, Your Honor.  Brian Trenz on

9    behalf of intervenor Judith Harper.

10           THE COURT:  Counsel, there are four matters before me

11   today, and I'm going to take them in the order that makes

12   sense to me, which will be, first, to take up Docket 251,

13   which is the motion for revocation of court's order granting

14   admission pro hac vice to Darrell Palmer.  That will be

15   followed by Docket 232, motion for attorneys' fees filed by

16   intervenor Judith Harper.  Third will be Docket 219, motion

17   for final approval of amended class action settlement.  And

18   then last will be the motion for attorneys' fees and costs

19   and service awards in connection with the amended class

20   action settlement.

21       I will tell you that I will definitively rule on the

22   motion for revocation.  I will definitively rule on

23   Ms. Harper's motion for attorneys' fees.  I will give you my

24   oral indication of granting or denying the motion for final

25   approval of class action settlement, and the motion for

1   attorneys' fees and costs.  Those will be confirmed by a

2   written order which will have further detail to it.  So that

3   will be our schedule for the day.

4      Mr. Palmer, why don't you go to the podium, since I would

5   like to hear from you.  Mr. Palmer, you filed in connection

6   with this matter a declaration of Darrell Palmer in support

7   of Ms. Harper's motion for award of attorneys' fees and

8   costs, and it's in the form of a declaration of some six

9   pages, signed under penalty of perjury.

10      Is there anything in that declaration that you want to

11   change before I rule on the motion?

12        MR. PALMER:  This is the declaration in connection

13   with the application for attorneys' fees, Your Honor?

14        THE COURT:  Yes.

15        MR. PALMER:  I don't have that in front of me.  I

16   couldn't answer that question at this time.

17        THE COURT:  Well, you signed it under penalty of

18   perjury.

19        MR. PALMER:  Yes.

20        THE COURT:  And you reviewed it before you signed it?

21        MR. PALMER:  Yes.

22        THE COURT:  You believed everything in it was true at

23   that time?

24        MR. PALMER:  I believe so.

25        THE COURT:  All right.  Well, this is my issue then:

1    Paragraph 5, quote, "I notified the court of the foregoing
2    deficiencies during the December 17, 2010, conference call
3    between the court and all counsel.  As a result, the court
4    ordered that class and defense counsel look into the
5    'missing' class members and report back to the court
6    immediately.  The district court also extended all deadlines
7    for the settlement."
8        Do you have any reason to believe that that isn't your
9    account of what happened?
10            MR. PALMER:  This was for December of 2010?
11            THE COURT:  December 17, 2010.
12            MR. PALMER:  I don't think I was -- I don't think I
13    participated in that call, Your Honor.
14            THE COURT:  I don't think you did either.  First off,
15    there was no call.
16            MR. PALMER:  Right.
17            THE COURT:  It was a court hearing.
18            MR. PALMER:  Right.
19            THE COURT:  You didn't show up.  You didn't speak.
20            MR. PALMER:  Correct.
21            THE COURT:  How can you tell me, "I notified the
22    court of the foregoing deficiencies during the December 17,
23    2010, conference call"?
24            MR. PALMER:  Well, I think it's either an error in
25    the date, or it's referring to the objections that we filed.

1       THE COURT:  "I notified the court of the foregoing

2   deficiencies during the December 17, 2010, conference call."

3   That is a flat-out statement, sir.

4       MR. PALMER:  Yes.

5       THE COURT:  Is it true?

6       MR. PALMER:  There was no call, that I recall.

7       THE COURT:  In your declaration, you state, "I am the

8   lead partner at the Law Offices of Darrell Palmer."  That

9   could be good, since it's named after you.  And apparently

10  you have a Kira Rubel, senior associate, who is mentioned on

11  page 4 --

12      MR. PALMER:  Correct.

13      THE COURT:  -- as having worked 272 hours in this

14  matter.

15      MR. PALMER:  That's right.

16      THE COURT:  And in pleadings which she has filed with

17  this court, it lists her as having applied for and been

18  granted pro hac vice status.

19      MR. PALMER:  That would be incorrect.  She has not

20  yet applied for pro hac vice status in this court.

21      THE COURT:  Then why is she signing pleadings

22  submitted to this court?

23      MR. PALMER:  I think the one pleading that she

24  signed, as I recall, was done at a time when I was

25  unavailable to sign it.

1    THE COURT:  Is it a regular practice in your law firm

2    to have someone engage in unauthorized practice of law by

3    signing pleadings in courts where they are not admitted?

4    MR. PALMER:  No, sir.

5    THE COURT:  All right.  You may be seated.  Thank

6    you.

7    The ruling of this court will be as follows:  Plaintiffs

8    move the court to revoke Darrell Palmer's pro hac vice

9    admission on the grounds that he made a false statement in

10   his pro hac vice application.

11   My colleague, Judge Coughenour, on August 17, 2012, denied

12   Mr. Palmer's pro hac vice application for the reason of

13   containing the same false statement and, secondly, because,

14   in part, Mr. Palmer blamed his assistant for the error.

15   Those of us who know Judge Coughenour well know that that

16   would never be a good idea.

17   Mr. Palmer represents that it was an innocent mistake on

18   his part in connection with his application in this matter,

19   and has submitted an amended application that corrects the

20   false statement.  He also takes full responsibility for the

21   error, while stating, quote, "Mr. Palmer's office made an

22   inadvertent error."

23   It is undisputed that Mr. Palmer made a false statement in

24   his pro hac vice application.  He declared under penalty of

25   perjury that he had, quote, "not been disbarred or formally

1    censured by a court of record or by a state bar association;

2    and there are no disciplinary proceedings against me," in the

3    record at Docket 97.

4         In fact, Mr. Palmer was temporarily suspended from the

5    Colorado Bar Association, the State Bar of Arizona, and the

6    State Bar of California as a result of a Colorado felony

7    conviction in the 1990s.

8         Pursuant to Western District of Washington Local

9    Rule 2(f)(3), an attorney may be subject to disciplinary

10   action for violation of the Standards of Professional

11   Conduct, including the Federal Rules of Civil Procedure.

12        Under Federal Rule of Civil Procedure 11, an attorney's

13   signature on a court filing certifies that to the best of the

14   person's knowledge, the facts presented in the documents have

15   evidentiary support, Federal Rule of Civil Procedure

16   11(b)(3).

17        Here, Mr. Palmer improperly certified and declared under

18   penalty of perjury that he did not have a disciplinary

19   history.  As such, he violated the Standards of Professional

20   Conduct set forth in the local rules and is subject to

21   disciplinary action.

22        Mr. Palmer attempts to mitigate his error by

23   distinguishing the cases cited by plaintiff, explaining that

24   he was temporarily disbarred for conduct unrelated to the

25   practice of law, asserting that he meets the standards for

1    pro hac vice application in this district, taking

2    responsibility for his error, contending that his work

3    substantially benefitted the class, and maintaining that

4    plaintiffs have bad motives for bringing this action.

5        I have not conducted an independent investigation into the

6    Colorado Bar Association action, or Colorado conviction, and

7    I don't know if it was a disbarment or a suspension.  But

8    everyone seems to describe it as either one or the other of

9    those.

10           MR. PALMER:  So the record is clear, it was a

11   suspension, Your Honor.

12           THE COURT:  Please don't interrupt me, sir.  You are

13   in enough trouble already.

14       This misses the point that it is a civil rule violation

15   under Rule 11, not Mr. Palmer's suspension, that is at issue

16   in this matter.  I really don't want to know about the facts

17   of the underlying proceeding.  We will assume, since

18   Mr. Palmer is an officer of the court, that it was an

19   inadvertent problem.

20       However, in this matter, the conduct is unacceptable.

21   Mr. Palmer was alerted to the problem when his pro hac vice

22   application in Judge Coughenour's case was challenged.  That

23   was on October 10, 2012 (sic).  Mr. Palmer did not

24   immediately raise and seek to correct the same mistake in

25   this case.  In fact, plaintiffs waited ten days before filing

1    their motion to give Mr. Palmer time to raise and correct the

2    issue.

3        Mr. Palmer did not file an amended pro hac vice

4    application until August 27, 2012, a full 17 days after being

5    notified of the problem.  This does not demonstrate candor

6    with the court or that he took seriously the fact that he

7    made a false statement under oath.

8        Additionally, Mr. Palmer has apparently submitted false

9    pro hac vice applications in at least three other cases.  As

10   a final note, the false statement in the pro hac vice

11   application is not the only misrepresentation Mr. Palmer has

12   made to this court.  It is impossible to reconcile a

13   declaration submitted to this court under penalty of perjury,

14   dated May 17, 2012, with the court record.  And Mr. Palmer

15   has now acknowledged that it is incorrect.  That serves as

16   the basis for his fee application in this matter.

17       As will be further discussed today, Mr. Palmer made

18   several other misrepresentations in his motions for

19   attorneys' fees.  These misrepresentations confirm my

20   conclusion that the court sanction Mr. Palmer by revoking his

21   admission in this case.  Therefore, Docket 251 is granted,

22   and Mr. Palmer's pro hac vice is revoked.

23       Let me then take up next the question of the motion for

24   attorneys' fees by Judith Harper.

25       I'm not having argument, counsel.  I'm ruling from the

1   bench.

2           MR. TRENZ:  I apologize.

3           THE COURT:  Are you admitted?

4           MR. TRENZ:  Yes, Your Honor, I am.

5           THE COURT:  Good.  I'm glad to hear we got one right.

6       Under certain circumstances, attorneys for objectors may

7   be entitled to attorneys' fees from the common fund.

8   Objectors may claim the entitlement to fees on the same

9   equitable principle as class counsel when their objections

10  result in an increase to the common fund or otherwise

11  substantially benefit the class.

12      Where objectors do not add any new legal argument or

13  expertise and they do not participate constructively in the

14  litigation or confer a benefit on the class, they are not

15  entitled to an award premised on equitable principles, the

16  *Rodriguez versus Disner* case, 688 F.3d 645-658, Ninth

17  Circuit, 2012.

18      Ms. Harper seeks an award of $1,116,250 in attorneys'

19  fees, $7,805.04 in costs, and a $3,000 service award.

20  Ms. Harper arrives at the approximately $1.1 million fee

21  award by taking 25 percent of $4.65 million, representing the

22  increase in the value of the fund after the additional class

23  members were discovered.  Under the lodestar cross-check, she

24  requests a multiplier of 4.51.  She maintains that the

25  requested fees are warranted because her actions directly

1    resulted in this benefit to the class.

2        Ms. Harper's counsel asserts that their actions resulted

3    in the following benefits to the class:  Number one, during a

4    December 17, 2010, conference call, they notified the court

5    of their fear that the parties had effectively left out a

6    portion of eligible class members from the original notice.

7    That is found in the Harper fee motion at page 2.

8        Mr. Palmer specifically states in his declaration, "I

9    notified the court of the foregoing deficiencies during the

10   December 17, 2010, conference call between the court and all

11   counsel.  As a result, the court ordered that class and

12   defense counsel look into the 'missing' class members and

13   report back to the court immediately."  Palmer declaration,

14   which is found in the docket at 232-1, paragraph 5.

15       Ms. Harper's counsel does assert that their observation

16   directly resulted in over 3 million additional class members

17   being discovered.  We now know, as has been admitted by

18   counsel today, that those statements are false.

19       Second, they identify the fact that the original

20   settlement agreement did not provide monetary benefit to

21   class members who were 180 days or more delinquent but who

22   had since paid off their debt, in the Palmer declaration at

23   paragraph 4.  They identified the fact that "charged-off"

24   class members were not provided monetary relief, Palmer

25   declaration at paragraph 4.

1    They identified the issue in the original settlement that,

2    although the lawsuit complained only of the statutory

3    violations committed by Sallie Mae, the settlement included

4    all released parties, Palmer declaration at paragraph 4.

5    The settlement agreement addressed the following

6    deficiencies identified by Ms. Harper's counsel:  Clearly

7    identifying the fact that the settling defendants included

8    all released parties; permitting monetary recovery to those

9    who were over 180 days late in making payments but who have

10   since paid off their debt; three, ensuring that all class

11   members received adequate notice of the settlement; and,

12   four, increasing the common fund to reflect the increase in

13   class membership.

14   Finally, they claim the court instructed the parties to

15   revise the revocation form in accordance with Ms. Harper's

16   counsels' suggestion prior to making it available to the

17   class.

18   Despite Ms. Harper's counsels' contention, they did not

19   directly add to the discovery of additional class members.

20   Sallie Mae's Rule 30(b)(6) deponent, Michael Walter,

21   testified that Sallie Mae realized its error after internal

22   counsel asked Mr. Walter to research a Sallie Mae borrower's

23   account and see if they were on the original notice list and

24   found that they were not on that list.

25   Mr. Walter further testified that Sallie Mae discovered

1 additional class members who were omitted from the original
2 notice when internal counsel asked Mr. Walter to research a
3 borrower that had a potential lawsuit with Sallie Mae.
4 Plaintiffs have submitted persuasive evidence that neither
5 Ms. Harper nor her counsel had anything to do with the
6 discovery of the additional class members.
7        As we have already discussed, Mr. Palmer makes the bald
8 assertion, in fact, a statement, in his declaration that he
9 notified the court of the deficiencies during a nonexistent
10 December conference call.  As a result, the court was
11 supposed to have ordered the class and defense counsel look
12 into class members.
13        The transcript of the December 17, 2010, in-court hearing
14 indicates that Mr. Palmer did not speak at all during the
15 hearing, and the court did not order the parties to
16 investigate any, quote, "missing," unquote class members.
17        Instead, it shows Mr. Dashiak, not Mr. Palmer, on behalf
18 of objectors McSweeney, Heath, and McBean, asserted that no
19 notice had been sent to class members in relationship with
20 affiliates or subsidiaries of Student Loan Marketing,
21 including Arrow Financial.
22        Counsel for Sallie Mae responded that notice had been sent
23 to these class members.  Counsel did not at that time know of
24 the additional class members.  In short, Ms. Harper's counsel
25 did nothing that resulted in the discovery of the additional

1   class members.  Furthermore, class counsel, not Ms. Harper's

2   counsel, negotiated the additional $4.65 million in the fund,

3   and are therefore responsible for that added benefit.

4       Ms. Harper's counsels' contention that they added a

5   substantial benefit to the class by identifying the fact that

6   "charged-off" members are not provided monetary relief and

7   identifying the issue that the settlement included all

8   released parties is unavailing.  The court rejected

9   Ms. Harper's objection regarding the "charged-off" class

10  members, and there is no indication that any change between

11  the original settlement and the amended settlement relating

12  to the released parties added any benefit to the class.

13      Further, Ms. Harper's counsel makes yet another

14  misrepresentation when they asserted that the court

15  instructed the parties to revise the revocation request form

16  in accordance with counsel's suggestion.  The court did no

17  such thing.  See the court's order of January 10, 2012, at

18  page 20.

19      The only benefit that Ms. Harper's counsel provided to the

20  class was pointing out that the original settlement did not

21  provide a monetary benefit to class members who were 180 days

22  or more delinquent but who had since paid off their debt.

23  This was a suggestion adopted by the parties in the amended

24  settlement, and it has provided a benefit to those class

25  members who are now able to receive a cash award.

1    Nevertheless, there is insufficient evidence in the record

2    for the court to conclude that this suggestion resulted in a

3    substantial benefit to the class so as to warrant attorneys'

4    fees.  For example, there is no evidence regarding how many

5    class members will benefit from this change.  As such, it

6    does not warrant any award of attorneys' fees and costs.

7        There are additional factors, counsel, against awarding

8    attorneys' fees and costs to Ms. Harper's counsel.  First of

9    all, many of their motions since the motion to intervene have

10   been rejected by the court, suggesting that the actions were

11   to disrupt and delay, which is consistent with the fact that

12   Mr. Palmer is a, and I'll use the phrase "professional" not

13   in any favorable sense, objector.  I believe that he has

14   previously been labeled that by one of my colleagues.

15       Second, counsel has made at least three misrepresentations

16   to the court in their motions for attorneys' fees, in

17   addition to the false statement on the pro hac vice

18   application.

19       Finally, the motion for attorneys' fees, a very

20   significant document, is signed by Kira Rubel, who represents

21   to the court that she is admitted pro hac vice, in addition

22   to Mr. Palmer, who now says that he wasn't there.  Ms. Ruble

23   has not been admitted pro hac vice.  Therefore this is

24   another misrepresentation.

25       Finally, even if the court deems it appropriate to make

1    some award of attorneys' fees here, Ms. Harper's counsel

2    bears the burden of documenting the appropriate hours and

3    providing support for those hours and the hourly rate.  And

4    her support is far too bare-boned and inadequate to satisfy

5    this burden.

6        Finally, it is highly questionable whether Ms. Harper even

7    has standing in this action.  Although Ms. Harper has

8    testified and presented declarations that she received 40 to

9    50 calls from Arrow Financial on her cell phone in violation

10   of the TCPA, Sallie Mae has presented a declaration that

11   Arrow Financial only has records of calling Ms. Harper's home

12   and fax lines.

13       Consistent with the findings in other judicial districts,

14   based on the submissions of the parties, the court finds

15   Sallie Mae's declaration has more credibility than Ms. Harper

16   for the following reasons:

17       Ms. Harper has not produced phone bills establishing the

18   alleged calls, even though Sallie Mae has requested them and

19   that would definitively resolve the matter in her favor; two,

20   Ms. Harper has made a false statement in a declaration that

21   she received a voicemail on December 3, 2010, when in fact

22   she received that voicemail in December 2008, paren, she now

23   claims this was simply a mistake, but it was once again in a

24   declaration submitted to the court; and, finally, Arrow

25   Financial has records that indicate it made a call to

1    Ms. Harper's home number on December 3, 2008, at the precise

2    time of the voice message Ms. Harper contends was left on her

3    cell phone.

4         For these reasons, I would resolve any factual disputes

5    regarding Ms. Harper's standing in favor of Sallie Mae, and

6    do not believe that she has standing in this matter.

7         Because Ms. Harper's counsel has not established their

8    entitlement to an attorneys' fee award, there is no reason to

9    award Ms. Harper a service award of $3,000.

10        In sum, the court denies Ms. Harper's motion for

11   attorneys' fees, costs, and a service award.

12        We will now turn to the third motion, which is the motion

13   for final approval of the amended class action settlement.  I

14   will hear from the plaintiffs first.

15             MR. SELBIN:  Thank you, Your Honor.  May it please

16   the court.  Jonathan Selbin, Lieff Cabraser Heimann &

17   Bernstein, on behalf of plaintiffs in the proposed class.

18        I know the court knows the history of this case

19   intimately.  I'm not going to walk through that history or

20   all of the aspects of the settlement.  I'm going to very

21   briefly summarize a few points, and then I'm happy to answer

22   any questions the court may have, if that's acceptable.

23             THE COURT:  Do your summary.  I would like to hear

24   you address by category the objectors.

25             MR. SELBIN:  Okay.  I can do that, Your Honor.  Very

1    briefly, to focus on the summary for a moment, we think this

2    is an outstanding settlement.  We recognize it's been

3    somewhat of a long road to get from there to here.  But we're

4    here, and we think it's time to bring this case to an end.

5        We are proud to present this settlement to the court for

6    its final approval.  It provides core relief to all 8 million

7    class members, all of whom had the right -- many of whom

8    exercised the right to stop the phone calls that were at

9    issue here and to do so by the submission of a very simple

10   form.  Some 100,000 -- just shy of 100,000 individuals

11   elected that remedy.

12       In a case about statutory damages, in other words, no

13   actual injury, no personal injury, no property damage, no

14   economic loss even, a case about statutory damages, Sallie

15   Mae is paying $24.15 million.

16       There is a declaration in front of Your Honor from the

17   claims administrator, Jennifer Keough, with all of the final

18   claims data in it.  And it provides that, based on the claims

19   that they've processed and all the information they have,

20   they estimate that the class members will receive somewhere

21   between $110 and $120 each.  The best bet is something like

22   $116 each.  I know that was an issue of concern for Your

23   Honor back in December of 2010, what those numbers would look

24   like.  We noticed the class at $20 to $40, to be on the

25   conservative side.  In fact, the payoff is going to be about

1    $116 each.

2        Direct notice -- individual direct notice was provided to

3    almost 95 percent of the class.  This isn't a case where we

4    have to worry that class members didn't get notice.  This

5    wasn't a publication notice case.  This was a case where we

6    knew the names and addresses and e-mail addresses of just shy

7    of 95 percent of the class.  Most of those people got notice

8    twice as a result of the original settlement and the amended

9    settlement.

10       The overwhelming class member response has been positive.

11   The numbers are in front of Your Honor.  But just to walk

12   briefly through them, we've had 163,250 individual, unique

13   claims filed.  We've had 99,860 revocation requests

14   submitted.  A total of 171,263 unique individuals have chosen

15   to participate in one form or the other.  So there's a lot of

16   overlap in those numbers.  But it's a total of 171,263

17   individuals.  We've had 35 objectors that were set out in 28

18   total objections.  But there were 35 individual class members

19   who objected.  We've had 395 opt-outs.

20       We've had no state Attorney General objections, as Your

21   Honor may be familiar with these days, under CAFA, because we

22   send out a notice to all the state AGs.  And I think that was

23   accomplished here on three occasions as a result of various

24   changes that took place.  And many of those state AGs are

25   typically very active these days.  They are heard from in

1   cases where they see a problem.  We have had no objections or

2   even calls or concerns from any state's Attorney General

3   about this settlement.

4       Most of the objections, Your Honor -- I can walk through

5   them more specifically, but the overwhelming majority of them

6   are of the "The settlement could have been more money"

7   nature.  We think the case law is pretty clear as to why

8   that's not a valid generic objection to make.

9       Your Honor asked us to brief, and we did brief, on

10  preliminary approval, after the initial denial of preliminary

11  approval, the comparison of the value of the settlement to

12  the potential damages.

13      And as we walk through there, Your Honor, it's hard to

14  come up with numbers here that's less than billions and

15  billions of dollars, if we were to win the case at the end of

16  the day and maintain it on appeal and go all the way up.

17      That's part of the problem with these cases, frankly, is

18  that they are statutory damages cases, where the numbers get

19  very large very quickly, to the point that they would be

20  annihilating damages for many of these defendants, which of

21  course would give the defendant every incentive to litigate

22  all the way up as far as they could for as many years as they

23  could.  And I think they would tell you it raises due process

24  issues for them.

25      So it's not a case where we can say the class has suffered

1    X million dollars in actual damages, and we recovered some

2    percentage of that.  To some degree, the dollars recovered

3    have to be looked at as whether it's a reasonable amount of

4    money to pay to this class based on how much each class

5    member is getting.

6        And as I indicated, for a case involving statutory damages

7    only, the $115, $116 class members will get, in conjunction

8    with the core prospective relief, we think is more than

9    adequate and reasonable.

10       A few of the specific objections, Your Honor, you've

11   addressed many of them in your preliminary approval order,

12   actually, it's Docket 206, in which you denied preliminary

13   approval, but you analyzed many of the objections and

14   overruled them at that time and ordered us to go back and fix

15   a couple of notice issues.

16       The issue of the allocation regarding "charged-off" class

17   members, the fact that no money is allocated to "charged-off"

18   class members, Your Honor addressed that at length in

19   Docket 206, at pages 21 through 23.

20       The short answer is, as the Ninth Circuit said in the *Mego*

21   litigation, it is appropriate to allocate no damages to class

22   members who have significantly weaker claims, so long as

23   there is a principled basis for doing so.  We explained those

24   principled bases, and the court has already adopted those in

25   its previous findings.

1    We've briefed the various issues relating to the

2    revocation form.  I'm not sure Your Honor needs to hear about

3    those again.  There is talk about the prospective relief and

4    whether it's meaningful.  Obviously, that's the central issue

5    in this entire case, is whether Sallie Mae is entitled to

6    make these phone calls or not.

7        To suggest that requiring people to go and check a form

8    and say, "Stop calling me," is somehow an illusionary relief

9    is just not accurate.  And the court made that finding

10   already as well.

11       So I don't know if Your Honor needs to hear about any

12   other specific objections.  I'm prepared to address them if

13   you need to.

14              THE COURT:  No, that's fine.  Thank you.

15              MR. SELBIN:  Thank you, Your Honor.

16              THE COURT:  Ms. Strickland, are you speaking on your

17   side?

18              MS. STRICKLAND:  Your Honor, I am speaking on our

19   side.  But, candidly, I have very little to add, unless Your

20   Honor has specific questions.

21              THE COURT:  I don't.

22              MS. STRICKLAND:  Thank you.

23              THE COURT:  All right.  As I indicated, I am taking

24   that one under advisement.  Counsel, you should be aware

25   that, unless I see something in the final order that changes

1    my mind, I will be approving the settlement.

2        Let's go then to the motion for attorneys' fees, costs,

3    and service award.

4            MR. SELBIN:  Thank you, Your Honor.  Jonathan Selbin

5    again.  Very briefly here, Your Honor is aware that we are

6    seeking a fee out of the common fund here.  This is not a

7    lodestar multiplier fee situation.  Although, of course Your

8    Honor is required to engage in that as a cross-check on the

9    common fund.

10       I know Your Honor knows the benchmark of the Ninth Circuit

11   is 25 percent.  We are seeking below the benchmark in this

12   case.  By one measure, we're seeking 20 percent of the

13   24.15 million.  It actually is about 19 percent, because

14   we're not seeking the 20 percent plus costs; we're seeking

15   the 20 percent with the costs included.  So if you walk

16   through the math, it ends up being 19 percent, approximately,

17   of the total fund.

18       In terms of the lodestar cross-check, the multiplier,

19   we're seeking -- and this is on time just through April 30,

20   2012, which is the cutoff date we used.  There's obviously

21   been substantial additional time, and will be substantial

22   additional time as we oversee the mailing of the claims --

23   the claims processing and the mailing of the checks.

24           THE COURT:  What do you estimate that substantial

25   time will be?

1    MR. SELBIN:  Over time?  You know, Your Honor, it's

2    been --

3    THE COURT:  Since the application was filed.

4    MR. SELBIN:  Oh, since the application.  You know,

5    Your Honor, we could run those numbers for you, if you would

6    like them.  I don't even have a ballpark sense.  It's all

7    been surrounding the final approval papers and responding to

8    the various motions from the Harper counsel and those sort of

9    things.  I don't -- I can't represent to the court what that

10   number is.

11   THE COURT:  Would you say that it's under 400 hours?

12   MR. SELBIN:  Oh, I think it's probably under

13   400 hours.  I think that's probably right, Your Honor.  In

14   terms of how much more time we will have to devote, I do know

15   from experience that there will be many additional hours in

16   overseeing the work of the Garden City Group, who is

17   administering the claims program, assisting class members.

18   We get class member calls all the time, and we work very

19   closely with class members to help them through the process.

20       So there will be additional time.  Again, it's not

21   possible to really quantify that, other than to say that that

22   amount of time as well will further reduce the lodestar

23   multiplier.

24       But as of April 30, 2012, the multiplier was 2.59.  In

25   terms of a cross-check multiplier, that's a very reasonable

1   multiplier.  If we were seeking an award just on our lodestar

2   under that method, we think that would be a reasonable

3   multiplier.  But certainly as a cross-check, it's well within

4   the range of 1 to 4, which the Ninth Circuit has said is the

5   typical multiplier in these sorts of situations.  And we

6   think it's justified.

7       In terms of -- and I can walk through the additional

8   factors, but it's all in our briefs, so I --

9               THE COURT:  Well, let me ask you my question.

10              MR. SELBIN:  Sure.

11              THE COURT:  If I were to ask you to give yourself a

12  grade on your handling of this litigation, what grade would

13  you give?

14              MR. SELBIN:  That's a fair question, Your Honor.  And

15  I've actually thought quite a bit about that and gone back

16  and looked over the history of this case.  And as I look back

17  over the history of this case, we made one mistake very early

18  on, which was that we put the wrong date on the notice, the

19  date by which we were going to post our fee application on

20  the settlement website.  And that, Your Honor, found under

21  *Mercury Interactive*, required a re-noticing, for which we

22  took responsibility.

23      And so that mistake was an initial hiccup that was

24  resolved very quickly.  And so I think that, looking over the

25  whole case, I would give us probably an A minus.  I think our

1    one mistake was that initial mistake.  And other than that,

2    there have been hiccups in the litigation, but they haven't

3    been of our making.

4       So Sallie Mae found additional class members on two

5    different occasions, and that required us to go back and

6    negotiate a new settlement on two different occasions.

7              THE COURT:  Well, let me stop you, because I can't

8    accept the A minus.  Mr. Palmer was responsible for me having

9    to go read that December court transcript.  And I found you

10   standing at that very podium -- I think you were wearing a

11   different tie -- saying, "Judge, this is all just fine.

12   We're working through a couple loose details here, but sign

13   the settlement.  Give approval."  And what I hear, counsel,

14   is, "We've invested enough in this case.  Get us paid."  And

15   if I had done so at that time, we would have missed a

16   substantial portion of this class.

17      And, frankly, I don't think the lawyering has been very

18   good in this case.  So, I mean, help me understand why you

19   give yourself an A minus, when we have had what you describe

20   as hiccups, but what I would describe as falling off the

21   cliff.

22             MR. SELBIN:  Your Honor, if I may, I --

23             THE COURT:  I mean, you can't blame Sallie Mae for

24   knowing who is in your class.  That's not going to fly around

25   here.

1          MR. SELBIN:  The problem with that, Your Honor, is

2     that they are the ones who had the information.  It was

3     solely in their possession.  And they presented us the

4     information in interrogatory responses.  We did the work you

5     would expect lawyers to do to get that information.

6          So, in other words, we served interrogatories that asked

7     Sallie Mae to tell us how many people were in the class and

8     how many people fell into different categories, and they

9     answered those interrogatories.  And so based on that

10     information, we thought we had all the information.  And I'm

11     not sure what a reasonable lawyer would do in those

12     circumstances, beyond accepting the sworn discovery responses

13     of the defendant.

14          Now, as it turned out, they came to us and discovered that

15     they had missed some things.  We came forward immediately to

16     the court and said, Your Honor, we need time to figure out

17     what's going on here.  We took the deposition of Mr. Walter

18     on two occasions in order to ascertain what happened.  We

19     served additional interrogatories.  They answered additional

20     interrogatories.

21          So I really do believe, Your Honor, what I am fully

22     cognizant of and take responsibility for is our error on the

23     *Mercury Interactive* piece of this.  We actually, as you will

24     recall, did post our -- we did post our fee application on

25     the website.  We just put the wrong date in the notice as to

1  when we were going to do it.

2      Unquestionably, that was a mistake.  Was it a big mistake?

3  I don't think that was a big mistake.  It required us to then

4  put everything over.  And I don't recall, Your Honor, saying

5  everything is fine, just fine, we want you to go ahead and

6  approve the settlement.  You indicated pretty quickly at that

7  hearing that you were inclined to put things over, given all

8  of the loose ends that were out there.

9      But I believe, Your Honor, that we have done our job as

10  class counsel.  We've worked hard in this case.  We waived

11  any fees out of that additional money that was generated,

12  because we didn't feel like the Palmer folks could take

13  responsibility, equally.  Frankly, we felt like that was

14  something that came about not because of us but because of

15  Sallie Mae.

16      So I stand by -- I hear Your Honor, but I stand by my A

17  minus.  And I say that we made one mistake.  The finding of

18  the additional class members was not something any reasonable

19  lawyer working diligently could have uncovered.  It wasn't

20  information that we had access to.  It was information that

21  we sought discovery on, and they provided us responses.

22          THE COURT:  All right.  Thank you.

23          MR. SELBIN:  Very good, Your Honor.  Thank you.

24          THE COURT:  Ms. Strickland, Sallie Mae, do you wish

25  to be heard?

1          MS. STRICKLAND:  No, Your Honor.

2          THE COURT:  All right.  Counsel, as I indicated, in

3    regards to the prior motion for approval, I do intend to

4    award some attorneys' fees.  I wanted to have the advantage

5    of hearing what counsel had to say.

6       This case has not gone smoothly.  And I would have

7    expected more from the quality of counsel that we have in the

8    room.  I will grant you that the Ninth Circuit has some

9    unusual rules in regards to administration of class actions.

10   And the question in my mind at this time is, somewhere

11   between actual attorneys' fees and a lodestar factor,

12   particularly the lodestar factor recommended by the

13   plaintiffs in this matter, what is the appropriate amount?

14   So that is the question that I will answer, but know that you

15   will get paid.  The question is:  How much?

16      Counsel, anything further at this time?

17          MS. TERRELL:  No, Your Honor.

18          MR. SELBIN:  Nothing further here, Your Honor.

19          MS. STRICKLAND:  Nothing, Your Honor.

20          THE COURT:  All right.  Then we'll be in recess.

21   Thank you.

22          MR. SELBIN:  Thank you, Your Honor.

23          MR. PALMER:  Thank you, Your Honor.

24          (Proceedings adjourned.)

25

```
 1                    C E R T I F I C A T E

 2

 3

 4            I, Kari McGrath, CCR, CRR, RMR, Official Court

 5   Reporter for the United States District Court in the Western

 6   District of Washington at Seattle, do hereby certify that I

 7   was present in court during the foregoing matter and reported

 8   said proceedings stenographically.

 9            I further certify that thereafter, I have caused

10   said stenographic notes to be transcribed under my direction

11   and that the foregoing pages are a true and accurate

12   transcription to the best of my ability.

13

14

15                         /S/  KARI McGRATH

16                         Kari McGrath, CCR, CRR, RMR

17                         Official Court Reporter

18

19

20

21

22

23

24

25
```